No. 20-1373

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

LISA MILICE,
*Petitioner*

v.

CONSUMER PRODUCT SAFETY COMMISSION,
*Respondent.*

Petition for Review of a Direct Final Rule of
the Consumer Product Safety Commission

## PETITIONER'S APPENDIX VOLUME 2, pp. 8-106

PETER L. STRAUSS
Betts Professor Emeritus of Law
Columbia Law School
Jerome Green Hall, No. 910
435 W. 116th Street
New York, NY 10027

NEW CIVIL LIBERTIES ALLIANCE
MARK CHENOWETH
CALEB KRUCKENBERG
JARED MCCLAIN
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
Jared.McClain@NCLA.legal
*Counsel for Petitioner Lisa Milice*

# TABLE OF CONTENTS

1. Federal Register Notice titled "Safety Standard for Infant Bath Seats: Final Rule," 75 Fed. Reg. 31691 (June 4, 2010)………………….Page 8

2. Federal Register Notice titled "Revisions to Safety Standards for Durable Infant or Toddler Products: Infant Bath Seats and Full-Size Cribs," 77 Fed. Reg. 45242 (July 31, 2012)………………………….Page 17

3. Federal Register Notice titled "Revisions to Safety Standards for Infant Bath Seats, Toddler Beds, and Full-Size Baby Cribs," 78 Fed. Reg. 73692 (Dec. 9, 2013)………………………………………………………………Page 22

4. Letter via electronic mail from Katharine E. Morgan, President, ASTM International, to Alberta Mills, U.S. Consumer Product Safety Commission ("CPSC") Secretary (June 25, 2019)………………………………..Page 27

5. Letter from Oliver A. Potts, Director of the Federal Register, to David M. DiMatteo, Attorney, CPSC Staff (August 26, 2019)…………………….Page 48

6. CPSC Ballot Vote Sheet Transmitting Draft Federal Register Notice and CPSC Staff Memorandum Regarding ASTM's Revisions to Safety Standard for Infant Bath Seats (August 28, 2019)………………………………………..Page 72

7. Record of Commission Action of CPSC's Approval of Publication of Federal Register Notice Regarding ASTM's Revisions to Safety Standard for Infant Bath Seats (September 4, 2019)…………………………………..Page 90

8. Letter via Regulations.gov from New Civil Liberties Alliance to CPSC re: CPSC Docket No. CPSC-2009-0064, Revisions to Safety Standard for Infant Bath Seats (October 21, 2019)…………………………………………Page 91

9. Letter from CPSC to NCLA re: CPSC Docket No. CPSC-2009-0064, Revisions to Safety Standard for Infant Bath Seats (February 6, 2020)…………..Page 99

10. Affidavit of Lisa Milice (May 11, 2020)……………………………Page 102

11. Affidavit of Counsel Jared McClain (May 11, 2020)…………………..Page 104

any such product manufactured on or after December 1, 2010 tested by a third party conformity assessment body accredited to do so and must issue a certificate of compliance with 16 CFR part 1215 based on that testing.

To ease the transition to the new standard and avoid a "bottlenecking" of products at conformity assessment bodies at or near the effective date of 16 CFR 1215, the Commission will accept certifications based on testing that occurred prior to the effective date of the new standard in certain prescribed circumstances. However, any such testing must comport with all CPSC requirements, including:

• At the time of product testing, the product was tested by a third party conformity assessment body that was ISO/IEC 17025 accredited by an ILAC–MRA member, and had been accepted by the Commission, at the time of the test.

• The accreditation scope in effect for the third party conformity assessment body at the time of testing expressly included testing to the test method(s) included in 16 CFR part 1215; and

• The test results show compliance with the test methods in the new regulation (16 CFR part 1215).

Dated: May 25, 2010.

**Todd A. Stevenson,**

*Secretary, Consumer Product Safety Commission.*

[FR Doc. 2010–13080 Filed 6–3–10; 8:45 am]

**BILLING CODE 6355–01–P**

---

# CONSUMER PRODUCT SAFETY COMMISSION

## 16 CFR Part 1215

**[CPSC Docket No. CPSC–2009–0064]**

## Safety Standard for Infant Bath Seats: Final Rule

**AGENCY:** Consumer Product Safety Commission.

**ACTION:** Final rule.

**SUMMARY:** Section 104(b) of the Consumer Product Safety Improvement Act of 2008 ("CPSIA") requires the United States Consumer Product Safety Commission ("Commission," "CPSC," "we") to promulgate consumer product safety standards for durable infant or toddler products. These standards are to be "substantially the same as" applicable voluntary standards or more stringent than the voluntary standard if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product. We are issuing a safety standard for infant bath seats in

response to the direction under section 104(b) of the CPSIA.

**DATES:** The rule will become effective on December 6, 2010 and apply to products manufactured or imported on or after that date. The incorporation by reference of the publication listed in this rule is approved by the Director of the Federal Register as of December 6, 2010.

**FOR FURTHER INFORMATION CONTACT:** Carolyn Manley, Office of Compliance and Field Operations, Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814; telephone (301) 504–7607; *cmanley@cpsc.gov.*

**SUPPLEMENTARY INFORMATION:**

## A. Background and Statutory Authority

Section 104(b) of the Consumer Product Safety Improvement Act of 2008 ("CPSIA," Public Law 110–314) requires the Commission to promulgate consumer product safety standards for durable infant or toddler products. Section 104 includes infant bath seats among these products. *See* CPSIA, section 104(f). The standards developed under section 104 of the CPSIA are to be "substantially the same as" applicable voluntary standards or more stringent than the voluntary standard if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product. Section 104(b)(2) of the CPSIA directs the Commission to begin rulemaking for two standards by August 14, 2009. Under this provision, the Commission published a notice of proposed rulemaking ("NPR") in the **Federal Register** of September 3, 2009 (74 FR 45719) proposing a safety standard for bath seats. The proposed standard was substantially the same as a voluntary standard developed by ASTM International (formerly known as the American Society for Testing and Materials), ASTM F 1967–08a, "Standard Consumer Safety Specification for Infant Bath Seats," with some modifications to strengthen the standard in order to reduce the risk of injury associated with bath seats. The Commission is now issuing a final standard for infant bath seats that is almost the same as the proposed standard it published in September 2009.

## B. The Product

Infant bath seats are used in a tub or sink to support a seated infant while he or she is being bathed. They are marketed for use with infants between the age of approximately 5 months (the time at which infants can sit up

unassisted) to the age of approximately 10 months (the time at which infants begin pulling themselves up to a standing position). Currently, there are two manufacturers and one importer of bath seats active in the United States (one fewer than at the time the Commission published its proposed rule). All are members of the Juvenile Products Manufacturers Association ("JPMA"), which is the major United States trade association representing juvenile product manufacturers and importers. All produce a variety of children's products in addition to bath seats.

The exact number of bath seats currently sold or in use is not known. Data from a 2005 survey by the American Baby Group (*2006 Baby Products Tracking Study*), in conjunction with Centers for Disease Control ("CDC") birth data, indicated annual sales of bath seats of about 1.5 million and about 1.8 million bath seats in use. In 2000, JPMA estimated annual sales of bath seats at about one million and estimated up to 2 million bath seats in use for infants under one year of age.

## C. ASTM Voluntary Standard

ASTM F 1967, "*Standard Consumer Safety Specification for Infant Bath Seats*," was first published in 1999. Between 2003 and 2007, the ASTM standard was subsequently revised several times to exclude tub-like products and to include requirements that the Commission had proposed in a notice of proposed rulemaking it issued in 2003, 68 FR 74878 (December 29, 2003).

In response to changes in the ASTM standard, the design of bath seats changed significantly. The new designs use an arm that clamps onto the side of the bath tub rather than relying on suction cups for stability. In its proposed rule, the Commission referenced ASTM F 1967–08a, which was published in December 2008, and contains the same labeling, stability and leg opening requirements as the 2007 version. In April 2010, ASTM published a new version of ASTM F 1967. The differences between the 2008 and 2010 standards are insubstantial (one word in section 8.1.1). The 2010 version adopted none of the changes the Commission proposed. Thus, the final standard continues to reference ASTM F 1967–08a.

JPMA provides certification programs for juvenile products, including bath seats. Manufacturers submit their products to an independent testing laboratory to test the product for conformance to the ASTM standard.

8

Currently only one bath seat model is certified to ASTM F 1967–08a.

The ASTM standard includes general requirements common to many ASTM standards for children's products; performance requirements specific to bath seats to address the hazards of the bath seat tipping over or the child becoming entrapped and/or submerged in the leg openings; and labeling requirements to address the child coming out of the bath seat.

*General requirements in the ASTM standard, none of which the Commission is modifying, include:*

• Requiring compliance with CPSC's standards concerning sharp points and edges, small parts, and lead paint (16 CFR parts 1303, 1500.48, 1500.49, 1500.50, 1500.51, and 1501);

• Requirements for latching and locking mechanisms;

• Requirements to prevent scissoring, shearing and pinching;

• Entrapment testing for accessible holes and openings;

• Torque/tension test for graspable components; and

• A requirement that warning labels be permanent.

The ASTM standard's requirements specifically related to hazards posed by bath seats (as discussed in part F of this preamble, the Commission's rule modifies aspects of some of these requirements) include:

• A test for stability performed on a test platform containing both a slip resistant surface and a smooth surface to test whether the bath seat may tip over during use;

• Requirements for restraint systems requiring passive crotch restraint to prevent a child from sliding through front or sides of the seat;

• Static load test to test whether the bath seat may break or become damaged during use;

• A requirement that suction cups (if used) adhere to the bath seat and the surface;

• A leg opening requirement to prevent children from sliding through these openings;

• A leg opening requirement restricting the expansiveness of the seating area to prevent the child from slumping and becoming entrapped in a reclined position; and

• Requirements for warning labels and instruction manual.

**D. Incident Data**

Since publication of the NPR in the **Federal Register** of September 3, 2009, the CPSC staff identified five new fatalities and five new non-fatal incidents, all of which occurred in 2009. Three deaths and three additional non-

fatal incidents involved bath seat products (not combination infant bath tub-bath seat products) meeting the stability requirements of either F 1967–04 or F 1967–07. One death involved an earlier pre-2004 bath seat product and the remaining death involved a combination infant bath tub-bath seat product that was certified to the 2004 edition of the bath seat and bath ring standard (F 1967–04) but is no longer being produced. (Combination bath tub-bath seat products are no longer covered by F 1967 and will be covered by a new separate infant bath tub-specific standard.) This fatality is not included in the frequency statistics. The data update for the final rule also located additional information enabling CPSC staff to identify two 2005 fatality case reports, previously considered to be independent, as being a single case.

Taking into account these changes in the data, from 1983 through November 30, 2009, there have been 174 reported fatalities involving bath seats, although more fatalities may have occurred because fatality reporting is not considered to be complete for 2006, 2007, 2008, and 2009. All of these fatalities were submersions.

There were 300 non-fatal bath seat incidents reported to CPSC staff in this 1983 through November 30, 2009 time frame. A submersion hazard was identified in 154 of these non-fatal incidents of which 117 were actual submersion incidents. (Submersion is defined as the act of placing, or the condition of being, under water. A submersion hazard indicates that submersion is possible, as a direct result of the incident. An actual submersion is when the victim actually became submerged as a result of the incident.) The remaining 146 reports were non-submersion hazards such as lacerations and limb entrapments.

None of the identifiable products involved in the fatal bath seat incidents were certified to meet ASTM F 1967–08a or its predecessor, ASTM F 1967–07. Four of the non-fatal incidents involved products certified to ASTM F 1967–07, neither of which were submersion hazards, and thus were not life threatening.

Of the 174 fatal incidents, 23 involved products that were identified as being certified to the 2004 version of the ASTM standard. Three of these were due to the arm of the bath seat disengaging from the bath tub. Fifty-four of the non-fatal incidents involved bath seats certified to the 2004 version of the ASTM voluntary standard.

**E. Response to Comments on the NPR of September 3, 2009**

The Commission received seven comments on the NPR of September 3, 2009. Four comments from individual consumers supported a mandatory safety standard for infant bath seats. In addition, the Commission received three specific comments on various aspects of the NPR. These three comments were from IISG (an international testing laboratory); the Juvenile Products Manufacturers Association (JPMA); and one comment from various consumer groups (Consumers Union, Kids in Danger, and Consumer Federation of America). These comments and the Commission's responses to them are discussed below.

*1. Leg Opening Requirement*

a. *Comment:* One commenter asked that the rule be clarified to indicate that the torso probe shall be inserted in a straight direction and it is not allowed to be inserted partially and then rotated along some minor axis to make it pass through the hole.

*Response:* In the NPR, the Commission proposed a change to the voluntary standard that called for the torso probe to be inserted in all orientations of the leg openings to determine if any position can create a slip through and/or entrapment hazard. This change was proposed because the language in the ASTM standard, which stated that the probe should be inserted in the most adverse orientation, was open to interpretation by the person performing the test. The language the commenter suggests would actually make the requirement less restrictive than what is already in the voluntary standard. For this reason, the Commission disagrees with the recommendation.

b. *Comment:* One commenter argued that the proposed change to the leg opening torso probe would not have prevented the two incidents discussed in the NPR when children fit both their legs and hips through a single leg hole of the bath seat. The commenter asserted that reducing the leg opening might exacerbate entrapment and ingress and egress conditions. The commenter believes that the ASTM standard has optimized this probe size, is consistent with other standards that provide similar submarining protection, and should not be changed.

*Response:* Although in these two incidents children did become entrapped in the leg holes, of more concern is the fact the victims' pelvis and torso were able to penetrate the leg openings. Once the pelvis goes through

the leg hole, the victim is in serious danger of submersion because the waist and upper torso are more malleable and therefore more capable of squeezing through the leg holes. Therefore, contrary to the commenter's characterization of the incidents, the leg holes failed to prevent a potential submersion condition. The infants were not endangered by the entrapment as much as they were endangered by their position during their entrapment. These incidents show a failure in the design of the torso probe and the leg opening test which was developed to prevent the manufacture of leg holes that allow a pelvis to fit through them. As a photograph taken of the actual victim from one of the incidents clearly shows, in that incident the pelvis had fit through the leg opening. The current bath seat torso probe used to test the leg openings was based on probes from other juvenile products that do not normally entail use with wet, naked babies. The data associated with these two incidents suggest that the unique use of a bath seat in a watery, soapy environment requires a smaller probe. Reducing the size of leg openings by making the torso probe more rounded at the corners and slightly smaller will prevent future submersion incidents.

The issue of entrapment during ingress and egress is irrelevant to the leg hole opening test method. The Commission is aware that consumers have encountered difficulties with getting infants in and out of some models of bath seats currently sold in the United States. However, the size and shape of the leg hole opening is only one factor in the overall design of a bath seat's occupant retention space. Such features as the shape of the seat, the slope of the supports, and the thickness and the type of materials used to make the bath seat are not determined by the performance requirements of the standard. The leg hole opening test does not dictate any other dimensional or design requirements for bath seats, leaving the designer ample freedom to design a bath seat that allows easy entry and exit.

c. *Comment:* One commenter approved of the proposed change to the torso probe and conducting testing in all orientations, but stated that incident data indicate that leg openings on models currently meeting the ASTM standard may still pose this hazard.

*Response:* The Commission concurs. The Commission's changes to the torso probe are intended to address such incidents.

*2. Stability Issues*

a. *Comment:* One commenter states that the pass/fail criteria in the ASTM standard were specifically created to require that both the attachment disengage from the test platform and that the product fail to return to the manufacturer's intended use position after being tested. The commenter asserts that both conditions must be present in order to constitute a failure. The commenter argues that the proposal to consider a tilt angle of 12-degrees or more from the bath seat's initial starting position to be a failure is not indicative of an unsafe condition and "is a departure from the primary intent of the requirement which is to determine if the bath seat tips."

*Response:* The two parts of the criteria were added to the ASTM standard at different times, and there is no language to suggest that both conditions must be met in order to constitute a failure. If that were the intent, then there would be no need to add the second pass/fail criteria because if the bath seat disengaged from the test platform (condition #1), then obviously it would not return to the manufacturer's intended use position (condition #2). This second condition was added in the 2007 standard to address those situations where a bath seat started tipping, to a degree that could be hazardous, but did not fully disengage from the tub. The Commission's modification to the ASTM standard clarifies the intent, as well as ensuring that a bath seat which significantly tips during the stability test, but returns to a fully upright condition, is not in compliance with the requirement.

b. *Comment:* The same commenter argues that the 12 degree tilt test "is unrelated to submersion risk and would not reduce the risk of injury and submersion incidences identified in the incident data. The risk of submersion presents itself when the position of the product indicates that the child's head area would be in a compromising position."

*Response:* CPSC agrees with the last statement presented above which is why the Commission is modifying the ASTM standard to provide a clearer definition of the pass/fail criteria. If the bath seat is tilted, children can slump over, lean over, and expose their faces to the water more easily than if the bath seat is not tilted.

c. *Comment:* The same commenter states that the 17-pound force used in the stability testing in the ASTM standard was based on the assumption that the older user of a bath seat would apply his/her total weight in the head

location when in a seated position. However, the commenter states, it is more likely that the child would exert only a percentage of his/her total body weight.

*Response:* According to the rationale in the ASTM standard (Appendix, part X1.17), the original basis for the 17-pound force is that it represents 60 percent of the 95th percentile (27.8 pound) body weight for oldest users (which was for 12 to 15 month old children at the time the requirement was developed), not the child's total body weight. A review of the incident data shows that fatal incidents that occurred in the newer style bath seats (which are designed for children who cannot yet pull themselves to a standing position) involved babies whose weights ranged from 15 to 30 pounds, with at least two of the victims (ages 8 and 9 months) being 30 pounds at the time of their deaths. Thus, it is foreseeable that a child of this size may use the product and, as the commenter recognizes, exert a percentage of his/her body weight. Thus, the 17-pound force is still valid.

d. *Comment:* The same commenter argues that the Commission's change to the failure definition (adding the 12 degree tilt angle test) would prohibit even "infinitesimal movements" of the bath seat with little affect on safety.

*Response:* The Commission disagrees that this additional requirement would prohibit infinitesimal movement. The ASTM standard could be interpreted very strictly to not allow any movement or tilt of the bath seat from the original position. By adding the 12 degree tilt limit, the stability test allows bath seats some controlled flexibility.

e. *Comment:* The same commenter asserts that the 12 degree tilt angle is random and lacks any rationale as to how exceeding this angle could result in a compromising unsafe condition.

*Response:* In developing this requirement, CPSC staff conducted an analysis looking at various water levels and possible head positions of occupants vs. angles of bath seats to determine what level of tilt was potentially hazardous. In addition, CPSC staff looked at other ASTM standards, such as those for infant bouncer seats and toys which use a 10 degree table or tilt when testing for stability. Lastly, staff acknowledged that the requirement must allow for the ductility of the aluminum rod test fixture combined with some expected ductility or flexing of the bath seat itself. Therefore, the staff conducted testing to determine the maximum level of tilt that might be expected solely due to the flexibility of the bath seat and the test rig. As a result of this work, staff

selected a tilt angle of 12 degrees as the pass/fail criteria to insure passing products will remain in the manufacturer's intended use position.

Thus, the 12 degree angle will allow for some inherent flexibility in the system (the product and the test rig) as a whole, but would fail a bath seat that: (1) Stayed firmly clamped to the bath tub but the bath seat itself experienced significant ductility (*i.e.*, its ability to be fashioned into a new form or drawn out without breaking) or flexibility (12 degrees or more) during the testing; or (2) had a clamping mechanism that lost firm contact with the bath tub and allowed the bath seat to tilt 12 degrees or more during the test.

f. *Comment:* The same commenter argues that, so long as the product remains attached, the angle at which it may tilt during testing does not affect the safety of the bath seat. The commenter asks, if the product were to reach a 15 degree angle, how would this angle result in an unsafe condition if the product remains attached?

*Response:* CPSC disagrees with the commenter's assertion that the condition of the product during the test has no bearing on safety. In the test, a 17-pound load is applied and then released. In real life, if a child leans over a bath seat railing, he/she may not be able to sit back upright. Young infants do not have a good sense of balance, and the more the bath seat allows them to tilt forward, the less likely they will be able to return to an upright position. If a child's body remains tilted forward, this could result in his/her face becoming submerged in the water. Once an infant's face is submerged, the infant may not pull his/her face out of the water. Infants may be physically capable of lifting their heads, but they may not do so because they do not recognize the need to do so or because they breathe in a lungful of water before trying to lift their head. Bath seats should never allow an infant's face to be submerged under water. In addition, another argument against allowing any significant tilt during the test is that the more the seat tilts forward, the higher the likelihood for a child to crawl out of the seat. When the seat is far enough forward, even if it has not tipped over, the child can stand (hunched over) on his/her feet with legs still through the leg holes, and this would also make a tilted seat hazardous.

g. *Comment:* One commenter agreed that the pass/fail criteria in the ASTM stability requirements need clarification, but recommended that the Commission consider any movement from the bath seat's originally fixed position to be a failure.

*Response:* There are three ways that a bath seat can fail the stability requirement as proposed in the NPR (and finalized in the rule): (1) If the bath seat tips over (and remains tipped over after the test); (2) if any attachment point disengages from (is no longer in contact with) the test platform (bath tub) and the bath seat fails to return to the manufacturer's recommended use position after the test; and (3) if the measured tilt angle during the test ever exceeds 12 degrees.

The first two pass/fail criteria above were already required under the voluntary standard, and the third one was proposed by CPSC as a new additional requirement in the NPR, and is also in the final rule. With regard to the third criteria, there are two different ways in which a bath seat can tilt during stability testing. The first is the tilt that might occur when the bath seat attachment slips or moves from its original fixed position. The second is the tilt that can occur due to the flexibility between all the parts of the bath seat and the bath seat test fixture (the aluminum rod and clamping devices). Depending on the product, it is possible to have both factors contribute to the tilt, or just have the second factor contribute to the tilt.

There is no way to eliminate the flexibility of the system (the bath seat and the test fixture) entirely. The flexibility of the aluminum rod itself can result in a two degree tilt. When the clamping fixtures and then the expected flexibility of the plastic used in the product are added, there is inherent flexibility in the system that cannot be totally eliminated. A tilt test must allow for this flexibility among all the components of the system. Twelve degrees allows for some practical amount of flexibility that is inherent in a bath seat and the test rig, but is still not a significant tilt angle that might compromise the safety of the occupant.

### 3. Changes to Test Platform Preparation

*Comment:* One commenter stated that, while it agrees with the application of the soap solution inside and outside of the tub, it believes that the soap solution should be applied once the product has been installed, if manufacturers present this as a prerequisite to use in instructional literature because clamping mechanisms rely on a clean tub side surface for effectiveness.

*Response:* Regardless of instructional literature or warnings, it is foreseeable that caregivers will install the bath seat on a wet and soapy tub; therefore, bath seats should be tested under such conditions.

### 4. Weighing the Seat Down

*Comment:* One commenter recommended adding a statement requiring removal of the weight once the seat is flooded to eliminate the potential for a counterweight to be included during the test.

*Response:* The Commission agrees with this comment and has included such a statement in the final rule.

### 5. Maximum Water Level

*Comment:* One commenter recommended that all bath seats be labeled to indicate a maximum water level to be used. The comment stated that, because 96% of all deaths, injuries, and other incidents involve bath seats used in water depths greater than one or two inches, the fill line demarcation should be specified at depths of no greater than two inches.

*Response:* The Commission is concerned that a water line could imply a safe water level. However, children can drown in very little water. In addition, because of various bath seat designs, some of which may elevate the bath seat, two inches of water in the tub can correspond to a water level insufficient to cover the occupant's legs. Thus, the maximum water level recommended would change based on the design of the bath seat, and would not necessarily reflect a "safe level". The Commission believes that the ASTM wording required in the user instruction, "Babies can drown in as little as 1 inch of water. ALWAYS bathe your infant using as little water as necessary," describes the risk associated with any level of water in a more accurate manner. If there was a water line indicator that could visually express the increasing risk with increasing water depth without implying that a shallow level was "safe," then CPSC staff may agree with the suggestion. At this time, CPSC staff does not believe a maximum water level requirement should be added to the standard, but does believe it is something that manufacturers could consider for their products. CPSC staff will continue to monitor this issue and the Commission could add such a requirement in the future if it is feasible.

### 6. Incident Data

*Comment:* One comment notes that the numbers of fatalities stated in the NPR do not reflect the increased fatality rate of recent years. Although the 171 reported fatalities involving bath seats from 1983 through 2008 represents an average of 6.6 reported deaths per year over the 26 year period, an analysis of the most recent years for which there is

complete data (1998 through 2007) shows an average of 9.7 reported deaths per year—nearly 50 percent more than stated. The commenter notes that, in comparison, baby bath tubs (a popular alternative) showed an average fatality rate of only 1.7 deaths per year during this same time period.

*Response:* Some fatalities in recent years involved older products. Caution should be used in any analysis since this product, its standards, and markets have changed significantly over the years. Comparisons between bath seats and infant bath tubs are not straightforward due to differences in the product and target population. Also, incidents are voluntarily reported and represent a minimum count. An updated memorandum of incident data was provided as part of the briefing package for the final rule.

## 7. Risks Related to Bath Seats and Risks Related to Bath Tubs

*Comment:* The same commenter noted that comparing the risks related to bath seats and those related to bath tubs indicates that the ASTM F 1967 standard has not been effective in reducing infant deaths in bath seats and that bath seats are inherently more dangerous than infant bath tubs.

*Response:* Risk analysis is very difficult to perform with these products due to changes in the market, standards, and product. Without accurate usage data, it was not possible for CPSC staff to perform this analysis. Comparisons between bath seats and infant bath tubs are not straightforward due to differences in the product and target population. Based on the ownership data that is available for infant bath seats and infant bath tubs, it is clear that infant bath tubs are far more prevalent than infant bath seats. It is also clear that many of those surveyed own both products, possibly using them at different stages in their child's development. It is also apparent that ownership rates for bath seats increased substantially between 1993 and 2002, but have since dropped off. In 2004, the ASTM standard was significantly modified (with additional changes made in 2007 and 2008), which means that determining the effectiveness of the voluntary standard requires examining the incidents with pre-2004 infant bath seats and comparing them to incidents involving post-2004 bath seats—in particular those that comply with the voluntary standard. Therefore, looking at only the number of annual incidents is insufficient to evaluate the voluntary standard's effectiveness or to evaluate its likely effectiveness, were it mandatory.

## 8. Unattended Bath Seats

*Comment:* One commenter stated that the bath seat standard must address the primary hazard pattern with these products—leaving an infant unattended—and encouraged the CPSC to "explore technology to ensure that it would be difficult to use a bath seat unless a caregiver is in close proximity to the product."

*Response:* The Commission is open to suggestions to overcome the tendency of caregivers to feel confident leaving children unsupervised in bath seats. To date, no practical solutions to this serious problem have been developed, except for warning labels, which were last strengthened in the ASTM voluntary standard in 2007.

## 9. CPSIA Process

a. *Comment:* One commenter stated that the Commission "should not modify existing effective standards unless it can clearly substantiate on the record before it that such changes will provide a demonstrable reduction of injury." The commenter noted that the ASTM standard was originally published in 1999 and has undergone several revisions since then through the ASTM subcommittee and task group process and that CPSC has participated in this process. The commenter states that it sees "little value in revising the current requirements in this standard by using the NPR regulatory process" and is "concerned that the imposition of additional requirements without demonstrable evidence that they will both enhance bath safety and not create unintended entrapment related hazards, will restrict the availability of potentially lifesaving products."

*Response:* Section 104(b) of the CPSIA requires the Commission to use the notice and comment rulemaking process under the Administrative Procedure Act to promulgate consumer product safety standards for durable infant or toddler products. The CPSIA directs the Commission to issue a rule that is "substantially the same as" the applicable voluntary standard or "more stringent than" the voluntary standard if the more stringent standard "would further reduce the risk of injury associated with the product." *See* section 104(b)(1)(B) of the CPSIA. The statute does not require that the Commission, in the commenter's words, "clearly substantiate on the record before it that such change will provide a demonstrable reduction in injury." Section 104 of the CPSIA takes durable infant or toddler products out of the Commission's usual rulemaking procedure and all of the findings that

would be required under sections 7 and 9 of the Consumer Product Safety Act ("CPSA"). For these products, Congress wanted "the highest level of safety for such products that is feasible." See section 104(b)(2) of the CPSIA. The Commission recognizes that the ASTM standard has been in place for numerous years and has been refined through ASTM's standard-setting process. Nevertheless, incidents continue to occur. Under the mandate of section 104 of the CPSIA, the Commission is promulgating more stringent requirements where necessary to address certain design features that CPSC staff believes contribute to some of these continuing deaths and torso entrapments. The staff has conducted testing and performed analyses to support the requirements that are different from the ASTM requirements and that it believes will reduce the risk of injury from infant bath seats.

b. *Comment:* The same commenter states that it believes "the most streamlined approach to following the primary congressional mandate that standards required to be developed are to be 'substantially the same as' applicable voluntary standards, would be to adopt a regulation that wholly adopts the existing ASTM standard, with the ability to subject it to the ASTM update and review process. CPSC can assure itself veto authority as part of an implementing regulation, which provides it with the ability to restrict diminution of effective ASTM standard provisions, similar to the authority applicable under CPSIA Section 106, as a check to changes that reduce stringent protections." The commenter suggests that CPSC adopt ASTM F 1967–08a as a consumer product safety standard issued by the Commission under section 9 of the CPSA and that any additional changes to the pending ASTM standard be submitted to the ASTM standard setting process. The commenter states, "this process could also incorporate a provision by rule that a reservation of right to the CPSC to object to any subsequent revisions to the ASTM Standard, similar to that afforded under CPSIA Section 106(g)."

*Response:* The standard the Commission proposed for infant bath seats incorporates by reference most of ASTM F 1967–08a with a few modifications to strengthen the standard. Section 104(b) of the CPSIA sets forth the procedure for these standards for durable infant or toddler products, and it is different from what Congress provided in section 106 of the CPSIA. It is doubtful that the Commission, by rule, could change the procedure Congress provided for rules

under section 104 of the CPSIA to the one Congress provided for rules under section 106 of the CPSIA.

**F. Assessment of Voluntary Standard ASTM F 1967–08a and Description of the Final Rule**

*1. Section 104(b) of the CPSIA: Consultation and CPSC Staff Review*

Section 104(b) of the CPSIA requires the Commission to assess the effectiveness of the voluntary standard in consultation with representatives of consumer groups, juvenile product manufacturers and other experts. This consultation process began in October 2008 during the ASTM subcommittee meeting regarding the ASTM infant bath seat voluntary standard. The Commission has reviewed the incident data and the ASTM F 1967–08a standard and conducted testing on bath seats to assess the ASTM standard.

Consistent with section 104(b) of the CPSIA, this rule establishes a new 16 CFR part 1215, "Safety Standard for Bath Seats." The new part incorporates by reference the requirements for bath seats in ASTM F 1967–08a with certain changes to specific provisions to strengthen the ASTM standard as discussed below. These modifications are almost identical to the changes the Commission proposed in the NPR of September 3, 2009. Differences from the NPR are noted in the discussion below.

*2. Description of the Final Rule, Including Changes to the ASTM Standard's Requirements*

While most requirements of the ASTM standard are sufficient to reduce the risk of injury posed by bath seats, the Commission has determined to modify several provisions in the standard to make them more stringent and further reduce the risk of injury and to clarify the test procedures. The following discussion describes the final rule, including changes to the ASTM requirements, and notes any changes from the NPR. In addition, some editing and formatting changes have been made which make the final text different from the NPR. These changes were made at the request of the Office of the **Federal Register** and do not alter the substance of the rule.

a. Scope (§ 1215.1)

The final rule states that part 1215 establishes a consumer product safety standard for infant bath seats manufactured or imported on or after a date which would be six months after the date of publication of a final rule in the **Federal Register**.

The Commission received no comments on this provision in the NPR and is finalizing it without change.

b. Incorporation by Reference (§ 1215.2(a))

Section 1215.2(a) explains that, except as provided in § 1215.2(b), each infant bath seat must comply with all applicable provisions of ASTM F 1967–08a, "Standard Consumer Safety Specification for Infant Bath Seats," which is incorporated by reference. Section 1215.2(a) also provides information on how to obtain a copy of the ASTM standard or to inspect a copy of the standard at the CPSC.

The Commission received no comments on this provision in the NPR and is finalizing it without change.

c. Definition of Bath Seat (§ 1215.2(b)(1)(i))

In the NPR, the Commission proposed changing the definition of bath seat to the definition in a previous NPR the Commission had issued in 2003—"an article that is used in a bath tub, sink, or similar bathing enclosure and that provides support, at a minimum, to the front and back of a seated infant during bathing by a caregiver * * *."

The Commission received no comments on this provision and is finalizing it without change.

d. Stability Requirement

*Limiting the tilt of the bath seat (§ 1215.2(b)(2)(i), (b)(4)(i), and (b)(5)(i)).* As discussed in the preamble to the proposed rule (74 FR at 45720 through 45721), when testing bath seats, CPSC staff found that the clamping mechanism on the JPMA-certified bath seat lifted from the side of the tub and continued to tip when force was applied. The clamp did not disengage from the tub, but the arm rest contact points were no longer in contact with the tub surface. This situation allows for possible misinterpretation of the ASTM standard's pass/fail criteria because the bath seat tilted from its original position while the clamp remained attached to the side of the tub. Moreover, this scenario could present a hazard to an infant using a bath seat. As explained in greater detail in the response to comments in section E of this preamble above, with the bath seat in this position an infant could submerge his/her face in the water, and the tilt of the seat could increase the likelihood the infant will crawl out of the seat. Thus, the NPR proposed a requirement to limit the allowable tilt angle of the bath seat during the stability test. This modification is added in several places of the ASTM standard: To section 6.1,

between sections 7.4.2.2 and 7.4.2.3, and between sections 7.4.2.3 and 7.4.2.4. The Commission proposed that a bath seat capable of tilting 12 degrees or more during testing be considered a failure. This limit was determined after measuring, and allowing for the flexibility of, current products. CPSC staff also considered other ASTM standards such as those for infant bouncer seats and toys. These standards use a 10 degree table or tilt when testing stability, and so the Commission proposed a tilt angle just above that level.

The final rule retains the 12 degree tilt limit. (We discussed comments relating to stability at part E of this preamble.)

The final rule also clarifies the language in section 6.1 of the ASTM standard to make it consistent with the definition of bath seat. This is a change from the NPR. Thus, the final rule removes the beginning phrase in section 6.1: "for bath seats which provide support for an occupant's back and support for the sides or front of the occupant or both." Given the definition of bath seat in the final rule, this phrase is redundant, and the final rule, therefore, eliminates it.

*Clarifying the order of steps in the stability test (§ 1215.2(b)(3)).* The final rule retains other proposed changes clarifying the order of steps to be performed when conducting the stability test. The Commission proposed re-ordering the steps specified in the ASTM standard for preparing the test surface and installing the bath seat to clarify that the test platform should be flooded before installing the bath seat.

*Test solution application (§ 1215.2(b)(3)(i)(B)).* The Commission proposed that a test solution be applied to all areas where the product may make contact while in use. As explained in the NPR's preamble (74 FR at 45721), the ASTM standard requires that a soapy test solution "thoroughly saturate the coverage area" which is defined in the ASTM standard as any internal surface of the tub well or tub bottom that makes contact with the product. In its testing of bath seats, CPSC staff found that spraying the soap solution on the top and outer surface contact points as well as the interior surfaces affected the final position of the bath seat and therefore could affect the results of the test. The Commission recognizes that the outside of a tub may become wet, and this may affect the ability of a bath seat's attachment arm to remain stable. The final rule retains this requirement. (We discussed comments relating to test platform preparation at part E of this preamble.)

*Measuring water levels (§ 1215.2(b)(3)(i)(D)).* When testing the stability of bath seats, CPSC staff noted that it can be difficult to obtain accurate water level measurements because the unoccupied bath seat may float when the test platform is flooded. To address this, the Commission proposed to add a clarifying statement: "For the purpose of measuring the water level, the product's seating surface can be temporarily weighed down to prevent the seat from floating."

In response to a comment to the NPR (see part E of this preamble), the final rule retains this change, but also adds the following clarifying language: "The weight shall be removed following the measurement of the water level and prior to conducting the test."

### e. Leg Opening Requirement (§ 1215.2(b)(6)(i) Through (8))

According to recent incident reports, children have fit both legs and their hips through a single leg hole of a bath seat that complies with the ASTM standard. The torso probe specified in the ASTM standard used to test the size of the leg openings is not sufficiently analogous to the human infant in this wet environment. This has resulted in a child's torso fitting through a leg hole when the ASTM torso probe does not. The Commission proposed decreasing the length of the vertical and horizontal axes of the wood torso probe specified in the ASTM standard by approximately five percent and rounding the corners of the probe resulting in a 1.45″ radius rather than the current 1″ radius size of the probe. To accomplish this, the Commission proposed modifications to Figure 4 in the ASTM standard that shows the torso probe. As explained in the preamble to the NPR (see 74 FR at 45721) and in the response to comments in section E above, the Commission believes that changes to the test probe would not restrict the utility of the product, but would still allow many possible designs for bath seats, even ones which would accommodate large children.

The NPR also proposed changing (at § 1215.2(b)(6)(i) and (7)(i)) the ASTM standard's instruction in section 7.7.1 and 7.7.2 of the ASTM standard to insert the test probe "* * * in the most adverse orientation into each opening." The Commission proposed changing this language because the terms "the most" appearing with respect to adverse orientation is open to interpretation. The final rule retains the proposed wording that the probe needs to be inserted "in *all* orientations to determine if any position can create a slip through and/or entrapment hazard."

### f. Size of Warning Label Requirement (§ 1215.2(b)(9) and(10))

According to the incident data, one hazard associated with almost all of the deaths that are reported involving bath seats is caregivers leaving children unattended in the bath seat. For example, of the 23 deaths reported from 2004–2009, where the bath seat product was certified to meet the stability requirements of ASTM F 1967–04, 21, or more than 91%, occurred when caregivers reported leaving the child for as little as 1 minute. (This data, collected by CPSC staff only reflects full reporting of deaths through 2006.)

While ASTM 1967–07 updated the language of the warning label (see 1967–07 section 8.1), the size of the warning label has not changed in any of the prior four updates to this standard. (The previous standards required letters not less than 0.2 in. (5 mm) in height for the safety alert symbol, the signal word, and all other words that are all capital letters, with all remaining text not less than 0.1 in. (2.5 mm) in height.) The warning label explains, among other things, caregivers should "ALWAYS keep baby within adult's reach." The final rule doubles the size of this warning in order to raise the visibility of this vital information to caregivers.

### G. Effective Date

In the NPR, the Commission proposed that the standard would become effective six months after publication of a final rule. The Commission received no comments on the proposed effective date. The final rule provides that the rule will become effective six months after publication and thus will require that bath seats manufactured or imported on or after that date must meet this standard.

### H. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA") generally requires that agencies review final rules for their potential economic impact on small entities, including small businesses. 5 U.S.C. 604.

*Three firms currently market infant bath seats in the United States:* One large domestic manufacturer, one small foreign manufacturer and one small domestic importer. All of these companies' bath seats are expected to require modifications to meet the bath seat standard. This final regulatory flexibility analysis focuses on the small domestic importer.

As noted in the NPR preamble (see 74 FR at 45722), the effect of the regulation on importers of bath seats would be felt indirectly, requiring a shift in suppliers rather than the design and production of a different product. The impact on the small domestic importer is expected to be small. The small domestic importer would most likely respond by discontinuing the import of its non-complying bath seat, either replacing the bath seat with a complying product or another juvenile product (the firm currently imports approximately 165 juvenile products, of which three are substitutes for its imported bath seat).

Hence, even if the cost of developing a compliant product did prove to be a barrier for individual small firms, the loss of bath seats as a product category is expected to be minor and would likely be mitigated by increased sales of competing products, such as multi-stage infant bathtubs, or entirely different juvenile products.

### I. Environmental Considerations

The Commission's regulations provide a categorical exclusion for the Commission's safety standards from any requirement to prepare an environmental assessment or an environmental impact statement as they "have little or no potential for affecting the human environment." 16 CFR 1021.5(c)(1). This rule falls within the categorical exclusion.

### J. Paperwork Reduction Act

Sections 8 and 9 of ASTM F 1967–08 contain requirements for marking, labeling and instructional literature that are considered "information collection requirements" under the Paperwork Reduction Act, 44 U.S.C. 3501–3520. In a separate notice in this issue of the **Federal Register**, the Commission is publishing a notice requesting comments on this collection of information.

### K. Preemption

Section 26(a) of the CPSA, 15 U.S.C. 2075(a), provides that where a "consumer product safety standard under [the CPSA]" is in effect and applies to a product, no State or political subdivision of a State may either establish or continue in effect a requirement dealing with the same risk of injury unless the State requirement is identical to the Federal standard. (Section 26(c) of the CPSA also provides that States or political subdivisions of States may apply to the Commission for an exemption from this preemption under certain circumstances.) Section 104(b) of the CPSIA refers to the rules to be issued under that section as "consumer product safety rules," thus implying that the preemptive effect of section 26(a) of the CPSA would apply. Therefore, a rule issued under section

104 of the CPSIA will invoke the preemptive effect of section 26(a) of the CPSA when it becomes effective.

## L. Certification

Section 14(a) of the CPSA imposes the requirement that products subject to a consumer product safety rule under the CPSA, or to a similar rule, ban, standard, or regulation under any other act enforced by the Commission, must be certified as complying with all applicable CPSC-enforced requirements. 15 U.S.C. 2063(a). Such certification must be based on a test of each product or on a reasonable testing program or, for children's products, on tests on a sufficient number of samples by a third party conformity assessment body recognized by the Commission to test according to the applicable requirements. As discussed above in section K, section 104(b)(1)(B) of the CPSIA refers to standards issued under that section, such as the rule for infant bath seats established in this notice, as "consumer product safety standards." By the same reasoning, such standards would also be subject to section 14 of the CPSA. Therefore, any such standard would be considered to be a consumer product safety rule to which products subject to the rule must be certified.

Because infant bath seats are children's products, they must be tested by a third party conformity assessment body accredited by the Commission. The Commission is issuing a separate notice of requirements to explain how laboratories can become accredited as a third party conformity assessment bodies to test to this new infant bath seat safety standard. (Infant bath seats also must comply with all other applicable CPSC requirements, such as the lead content requirements of section 101 of the CPSIA and potentially the phthalate content requirements in section 108 of the CPSIA should the bath seat incorporate a toy component, the tracking label requirement in section 14(a)(5) of the CPSA, and the consumer registration form requirements in section 104 of the CPSIA.)

## List of Subjects in 16 CFR 1215

Consumer protection, Incorporation by reference, Imports, Infants and children, Labeling, Law enforcement, and Toys.

■ Therefore, the Commission amends Title 16 of the Code of Federal Regulations by adding part 1215 to read as follows:

## PART 1215—SAFETY STANDARD FOR INFANT BATH SEATS

Sec.
1215.1   Scope.

1215.2   Requirements for infant bath seats.

**Authority:** The Consumer Product Safety Improvement Act of 2008, Pub. Law 110–314, § 104, 122 Stat. 3016 (August 14, 2008).

## § 1215.1   Scope.

This part 1215 establishes a consumer product safety standard for infant bath seats manufactured or imported on or after December 6, 2010.

## § 1215.2   Requirements for infant bath seats.

(a) Except as provided in paragraph (b) of this section, each infant bath seat shall comply with all applicable provisions of ASTM F 1967–08a, Standard Consumer Safety Specification for Infant Bath Seats, approved November 1, 2008. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy from ASTM International, 100 Bar Harbor Drive, P.O. Box 0700, West Conshohocken, PA 19428; telephone 610–832–9585; *www.astm.org*. You may inspect a copy at the Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301–504–7923, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/ federal_register/ code_of_federal_regulations/ ibr_locations.html*.

(b) Comply with the ASTM F 1967–08a standard with the following additions or exclusions:

(1) Instead of complying with section 3.1.1 of ASTM F 1967–08a, comply with the following:

(i) 3.1.1 *Bath seat, n*—an article that is used in a bath tub, sink, or similar bathing enclosure and that provides support, at a minimum, to the front and back of a seated infant during bathing by a caregiver. This does not include products that are designed or intended to retain water for bathing.

(ii) [Reserved]

(2) In addition to section 6.1 of ASTM F 1967–08a, comply with the following:

(i) 6.1 *Stability*—* * * If any time during the application of force, the seat is no longer in the initial 'intended use position' and is tilted at an angle of 12 degrees or more from its initial starting position, it shall be considered a failure.

(ii) [Reserved]

(3) Instead of complying with section 7.4.1 of ASTM F 1967–08a, comply with the following:

(i) 7.4.1 *Surface Preparation and Product Installation:*

(A) 7.4.1.1 Prepare the test surface as follows:

(B) 7.4.1.2 For all surfaces on the test platform where the product makes contact, clean the coverage area (as defined in 7.4.3.3) with a commercial cleaner intended for bath tubs, then wipe the coverage area with alcohol and allow to dry.

(C) 7.4.1.3 Using a spray bottle containing a 1:25 mixture of test solution (*see* table 1) to distilled water, immediately before each test run, thoroughly saturate all test platform surfaces above the water line where the product makes contact and where contact might be expected.

(D) 7.4.1.4 Flood the test platform with clear water that is at an initial temperature of 100 to 105° F (37.8 to 10.6° C) and a depth of 2 in. (51 mm) above the highest point of the occupant seating surface. Install the product according to the manufacturer's instructions onto the test platform specified in 7.4.3. For the purpose of measuring the water level, the product's seating surface can be temporarily weighed down to prevent the seat from floating. The weight shall be removed following the measurement of the water level and prior to conducting the test.

(ii) [Reserved]

(4) After section 7.4.2.2 and before section 7.4.2.3 of ASTM F 1967–08a, comply with the following:

(i) Rigidly install an inclinometer to the test bar above the location where force is to be applied. The weight of the inclinometer and the fastening method shall be less than or equal to 2.2 pounds. The inclinometer shall have a measurement tolerance of less than or equal to 0.5 degrees. Measure and record the pre-test angle of the test bar.

(ii) [Reserved]

(5) Between section 7.4.2.3 (including Note 2) and section 7.4.2.4 of ASTM F 1967–08a, comply with the following:

(i) Measure and record the maximum angle of the test bar during the application of the 17.0 lbf load. Calculate the absolute value of the Change in Angle in degrees. Change in Angle = (Angle measured during test)— (Angle measured pre-test).

(ii) [Reserved]

(6) Instead of complying with the first sentence in section 7.7.1 of ASTM F 1967–08a, comply with the following:

(i) 7.7.1 With the bath seat in each of the manufacturer's recommended use position(s), insert the tapered end of the Bath Seat Torso Probe (*see* Fig. 4) in all orientations into each opening. * * *

(ii) [Reserved]

(7) Instead of complying with the first sentence in section 7.7.2 of ASTM F 1967–08a, comply with the following:

(i) 7.7.2 With the bath seat in each of the manufacturer's recommended use position(s), insert the tapered end of the

Bath Seat Shoulder Probe (*see* Fig. 6) in all orientations into each opening.
* * *

(ii) [Reserved]
(8) Instead of Figure 4 of ASTM F 1967–08a, use the following:



**Figure 4: Modified Bath Seat Torso Probe**

(9) Instead of complying with section 8.1.1 of ASTM F 1967–08a, comply with the following:

(i) 8.1.1 The safety alert symbol, the signal word, and all other words that are all capital letters shall be in sans serif type face with letters not less than 0.4 in. (10 mm) in height, with all remainder of the text not less than 0.2 in. (5 mm) in height. Specified warning(s) on both the product and the package shall be distinctively separated from any other wording or designs and shall appear in the English language at a minimum. They shall also be highly visible and in a contrasting color to the background on which they are located.

(ii) [Reserved]

(10) In addition to complying with section 8.2 of ASTM F 1967–08a, comply with the following:

(i) 8.2 * * * The specified warnings may not be placed in a location that allows the warning(s) to be obscured or rendered inconspicuous when in the manufacturer's recommended use position.

(ii) [Reserved]

Dated: May 25, 2010.
**Todd Stevenson,**
*Secretary, U.S. Consumer Product Safety Commission.*
[FR Doc. 2010–13073 Filed 6–3–10; 8:45 am]
**BILLING CODE 6355–01–P**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**25 CFR Part 900**

**DEPARTMENT OF THE INTERIOR**

**25 CFR Part 1000**

**Bureau of Indian Affairs**

**25 CFR Part 900**

**Indian Health Service**

**25 CFR Part 900**

**RIN 1076–AE86**

**Indian Self-Determination Act Contracts and Annual Funding Agreements—Appeal Procedures**

**AGENCIES:** Bureau of Indian Affairs, Interior; Indian Health Service, Health and Human Services.

**ACTION:** Final rule.

**SUMMARY:** The Bureau of Indian Affairs (BIA) in the Department of the Interior (DOI) and the Indian Health Service (IHS) in the Department of Health and

(77 FR 30439) Docket No. FAA–2012–0249. Interested parties were invited to participate in this rulemaking effort by submitting written comments on the proposal to the FAA. One comment was received in support of this action. Class E airspace designations are published in paragraph 6005 of FAA Order 7400.9V dated August 9, 2011, and effective September 15, 2011, which is incorporated by reference in 14 CFR 71.1. The Class E airspace designations listed in this document will be published subsequently in the Order.

## The Rule

This amendment to Title 14, Code of Federal Regulations (14 CFR) part 71 establishes Class E airspace extending upward from 700 feet above the surface at Apopka, FL, to provide the controlled airspace required to accommodate the new RNAV GPS Standard Instrument Approach Procedures developed for Orlando Apopka Airport. This action is necessary for the safety and management of IFR operations at the airport.

The FAA has determined that this regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current, is non-controversial and unlikely to result in adverse or negative comments. It, therefore, (1) is not a ''significant regulatory action'' under Executive Order 12866; (2) is not a ''significant rule'' under DOT Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a Regulatory Evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified that this rule, when promulgated, will not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the United States Code. Subtitle I, Section 106 describes the authority of the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority.

This rulemaking is promulgated under the authority described in Subtitle VII, Part A, Subpart I, Section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority as

it establishes controlled airspace at Orlando Apopka Airport, Apopka, FL.

## Environmental Review

The FAA has determined that this action qualifies for categorical exclusion under the National Environmental Policy Act in accordance with FAA Order 1050.1E, ''Environmental Impacts: Policies and Procedures,'' paragraph 311a. This airspace action is not expected to cause any potentially significant environmental impacts, and no extraordinary circumstances exist that warrant preparation of an environmental assessment.

## Lists of Subjects in 14 CFR Part 71

Airspace, Incorporation by reference, Navigation (air).

## Adoption of the Amendment

In consideration of the foregoing, the Federal Aviation Administration amends 14 CFR part 71 as follows:

## PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### §71.1 [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of Federal Aviation Administration Order 7400.9V, Airspace Designations and Reporting Points, dated August 9, 2011, effective September 15, 2011, is amended as follows:

*Paragraph 6005 Class E airspace areas extending upward from 700 feet or more above the surface of the earth.*

\* \* \* \* \*

### ASO FL E5 Apopka, FL [New]

Orlando Apopka Airport, FL
(Lat. 28°42′27″ N., long. 81°34′55″ W.)

That airspace extending upward from 700 feet above the surface within a 6.8-mile radius of Orlando Apopka Airport.

Issued in College Park, Georgia, on July 20, 2012.

**Barry A. Knight,**
*Manager, Operations Support Group, Eastern Service Center, Air Traffic Organization.*

[FR Doc. 2012–18540 Filed 7–30–12; 8:45 am]

**BILLING CODE 4910–13–P**

## CONSUMER PRODUCT SAFETY COMMISSION

**16 CFR Parts 1215 and 1219**

## Revisions to Safety Standards for Durable Infant or Toddler Products: Infant Bath Seats and Full-Size Cribs

**AGENCY:** Consumer Product Safety Commission.

**ACTION:** Direct final rule.

**SUMMARY:** In accordance with section 104(b) of the Consumer Product Safety Improvement Act of 2008 (CPSIA), also known as the Danny Keysar Child Product Safety Notification Act, the U.S. Consumer Product Safety Commission (Commission, CPSC, or we) has published consumer product safety standards for numerous durable infant or toddler products, including infant bath seats and full-size cribs. These standards incorporated by reference the ASTM voluntary standards associated with those products, with some modifications. In August 2011, Congress enacted Public Law 112–28, which sets forth a process for updating standards that the Commission has issued under the authority of section 104(b) of the CPSIA. In accordance with that process, we are publishing this direct final rule, revising the CPSC's standards for infant bath seats and full-size cribs to incorporate by reference more recent versions of the applicable ASTM standards. Because the changes to the ASTM standards make them essentially identical to the standards that the CPSC has issued previously, no changes to the products are required. We also received notification from ASTM of an updated ASTM standard for toddler beds. However, the Commission is not accepting the revised ASTM standard for toddler beds, and therefore, the CPSC standard for toddler beds will remain as it currently is stated at 16 CFR part 1217.

**DATES:** The rule is effective on November 12, 2012, unless we receive significant adverse comment by August 30, 2012. If we receive timely significant adverse comments, we will publish notification in the **Federal Register**, withdrawing this direct final rule before its effective date. The incorporation by reference of the publications listed in this rule is approved by the Director of the Federal Register as of November 12, 2012. The compliance dates for the full-size crib standard remain as stated in 16 CFR 1219.1(b).

**ADDRESSES:** You may submit comments, identified by Docket No. CPSC–2012–0039, by any of the following methods:

*Submit electronic comments in the following way:*

Federal eRulemaking Portal: *http:// www.regulations.gov.* Follow the instructions for submitting comments. To ensure timely processing of comments, the Commission is no longer accepting comments submitted by electronic mail (email), except through *www.regulations.gov.*

*Submit written submissions in the following way:*

Mail/Hand delivery/Courier (for paper, disk, or CD–ROM submissions), preferably in five copies, to: Office of the Secretary, Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814; telephone (301) 504–7923.

*Instructions:* All submissions received must include the agency name and docket number for this notice. All comments received may be posted without change, including any personal identifiers, contact information, or other personal information provided, to *http://www.regulations.gov.* Do not submit confidential business information, trade secret information, or other sensitive or protected information electronically. Such information should be submitted in writing.

**FOR FURTHER INFORMATION CONTACT:** For information related to the full-size crib standard, contact Troy Whitfield, Office of Compliance and Field Operations, Consumer Product Safety Commission, Bethesda, MD 20814–4408; telephone (301) 504–7548; *twhitfield@cpsc.gov.* For information related to the infant bath seat standard, contact Carolyn Manley, Office of Compliance and Field Operations, Consumer Product Safety Commission, Bethesda, MD 20814– 4408; telephone (301) 504–7607; *cmanley@cpsc.gov.*

**SUPPLEMENTARY INFORMATION:**

**A. Background**

*The Danny Keysar Child Product Safety Notification Act.* The Consumer Product Safety Improvement Act of 2008 (CPSIA, Pub. L. 110–314) was enacted on August 14, 2008. Section 104(b) of the CPSIA, also known as the Danny Keysar Child Product Safety Notification Act, requires the Commission to promulgate consumer product safety standards for durable infant or toddler products. The law requires that these standards are to be "substantially the same as" applicable voluntary standards or more stringent than the voluntary standards if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product. Under the statute, the term

"durable infant or toddler product" explicitly includes infant bath seats, full-size cribs, and toddler beds. In accordance with section 104(b), the Commission has published safety standards for these products that incorporate by reference the relevant ASTM standards with certain modifications that make the voluntary standard more stringent.

*Public Law 112–28.* On August 12, 2011, Congress enacted Public Law 112– 28, amending and revising several provisions of the CPSIA, including the Danny Keysar Child Product Safety Notification Act. The revised provision sets forth a process for updating CPSC's durable and infant or toddler standards when the voluntary standard upon which the CPSC standard was based is changed. This provision states that if an organization revises a standard that has been adopted, in whole or in part, as a consumer product safety standard under this subsection, it shall notify the Commission. The revised voluntary standard shall be considered to be a consumer product safety standard issued by the Commission under section 9 of the Consumer Product Safety Act (15 U.S.C. 2058), effective 180 days after the date on which the organization notifies the Commission (or such later date specified by the Commission in the **Federal Register**) unless, within 90 days after receiving that notice, the Commission notifies the organization that it has determined that the proposed revision does not improve the safety of the consumer product covered by the standard and that the Commission is retaining the existing consumer product safety standard. See Public Law 112–28, section 3.

*Notification and Review of Revisions.* On May 16, 2012, ASTM notified us of ASTM's approval and publication of revisions to ASTM F1169, Standard Consumer Safety Specification for Full- Size Baby Cribs; ASTM F1967, Standard Consumer Safety Specification for Infant Bath Seats; and ASTM F1821, Standard Consumer Safety Specification for Toddler Beds. In its notification, ASTM stated that revisions to these standards have occurred since the enactment of Public Law 112–28.

The Commission has reviewed the revisions. ASTM's revision to its toddler bed standard, ASTM F1821–11b, does not include several of the modifications that the Commission made in its mandatory standard at 16 CFR part 1217. Therefore, we have determined that ASTM F1821–11b does not improve the safety of toddler beds, and we are notifying ASTM that the Commission will retain the CPSC toddler bed standard at 16 CFR part 1217 as it is.

As explained below, ASTM's revisions to its standards for infant bath seats and full-size cribs make these revised ASTM standards essentially identical to the CPSC mandated standards for these products. In accordance with Public Law 112–28, unless the Commission determines that these revisions do not improve the safety of these consumer products, the revised ASTM standards for infant bath seats and full-size cribs will become the new CPSC mandatory standard for those products. We are publishing this direct final rule revising the incorporation by reference that is stated in each of these rules so that they will accurately reflect the revised version of the relevant ASTM standards.

**B. Revisions to the Particular ASTM Standards**

*1. Infant Bath Seats*

On June 4, 2010, the Commission published a final rule issuing a safety standard for infant bath seats that incorporated by reference ASTM F1967–08a, Standard Consumer Specification for Infant Bath Seats, with certain modifications to make the standard more stringent. 75 FR 31691.

ASTM notified us that the current version of the ASTM standard for infant bath seats is ASTM F1967–11a, which was approved and published in September 2011. Two previous revisions, ASTM F1967–10 and ASTM F1967–11, made minor changes to the ASTM standard. ASTM F1967–11a includes all the modifications that CPSC made when it issued its mandatory standard. Thus, the revised ASTM standard, ASTM F1967–11a, is essentially identical to CPSC's mandatory standard for infant bath seats at 16 CFR part 1215. Because the revised ASTM standard is essentially identical to the current mandatory standard, the Commission will not make the determination that "the proposed revision does not improve the safety" of infant bath seats, under Public Law 112–28. Therefore, in accordance with Public Law 112–28, the revised ASTM standard for infant bath seats becomes the new CPSC standard 180 days from the date we received notification of the revision from ASTM. This rule revises the incorporation by reference at 16 CFR part 1215, to reference the revised ASTM standard.

*2. Full-Size Cribs*

On December 28, 2010, the Commission published a final rule issuing a standard for full-size cribs that incorporated by reference ASTM F1969–10, with two modifications to

make the standard more stringent. 75 FR 81766.

ASTM notified us that the current version of the ASTM standard for full-size cribs is ASTM F1169–11, which was approved and published in September 2011. A previous revision, ASTM F1169–10a, made one change that clarified testing of cribs with folding or moveable sides. This change was identical to one of the modifications that the Commission made in its mandatory standard. ASTM F1169–11 has two additional revisions. One is editorial and corrects a typographical error. The other change tracks a modification that the Commission made in its mandatory standard: it removes a provision that required retightening of hardware between tests. With these changes, ASTM F 1169–11 is now essentially identical to the full-size crib standard that the Commission mandated at 16 CFR part 1219. Because the revised ASTM standard is essentially identical to the current mandatory standard, the Commission will not make the determination that "the proposed revision does not improve the safety" of full-size cribs. Therefore, in accordance with Public Law 112–28, the revised ASTM standard for full-size cribs becomes the new CPSC standard 180 days from the date we received notification of the revision from ASTM. This rule revises the incorporation by reference at 16 CFR part 1219 to reference the revised ASTM standard.

The 2010 crib rule fulfilled the direction in the Danny Keysar Child Product Safety Notification Act to issue standards for durable infant or toddler products, and it also implemented direction specific to cribs in section 104(c) of the CPSIA. In accordance with section 104(c) of the CPSIA, the CPSC's crib standards (covering both full-size and non-full-size cribs) apply to persons and entities not required to comply with other CPSC standards, such as child care facilities, family child care homes, and places of public accommodation. 75 FR 81786–87. The crib rule became effective on June 28, 2011. It provided for two compliance dates. The first date, June 28, 2011, applies to all entities subject to the crib rule, except for child care facilities, family child care homes, and places of public accommodation. The second date, December 28, 2012, applies to child care facilities, family child care homes, and places of public accommodation. 75 FR at 81781. In June 2011, the Commission gave additional time to companies that provide short-term crib rentals; accordingly, they have until December 28, 2012, to meet the crib standards.

Public Law 112–28 contains a provision limiting the application of revisions when ASTM revises its crib standards. That language states that such revisions shall apply only to a person that manufactures or imports cribs, unless the Commission determines that application to any person described in paragraph (2) [of section 104(c) of the CPSIA] is necessary to protect against an unreasonable risk to health or safety. If the Commission determines that application to a person described in paragraph (2) [of section 104(c) of the CPSIA] is necessary, it shall provide not less than 12 months for such person to come into compliance. See Public Law 112–28, section 3(b). According to this provision, changes to CPSC's crib standards would apply only to crib manufacturers and importers, not to the other entities mentioned in section 104(c)(2) who are not usually subject to CPSC's standards, such as child care facilities, family child care homes, and places of public accommodation.

ASTM's revision to its full-size crib standard included the modifications that the Commission made when it issued the CPSC's mandatory standard for full-size cribs. Thus, there is no substantive difference between ASTM's revised standard, ASTM F1169–11, and the currently mandated standard that the Commission published in December 2010. Therefore, the CPSC's action in this direct final rule, which revises the incorporation by reference in 16 CFR part 1219, does not require any change by the persons and entities subject to the CPSC's full-size crib standard. Those who manufacture, import, or sell full-size cribs continue to be required to meet the same full-size crib requirements as they have been required to meet since June 28, 2011. Child care facilities, family child care homes, places of public accommodation, and businesses that rent cribs for short terms will be required to meet the same requirements for full-size cribs beginning on December 28, 2012. Because the revision contemplated by this direct final rule does not require any change by the persons subject to the mandatory standard published in 2010, the provision set forth in Public Law 112–28 limiting the application of revisions is without effect in this instance.

## C. Direct Final Rule Process

The Commission is issuing this rule as a direct final rule. Although the Administrative Procedure Act (APA) generally requires notice and comment rulemaking, section 553 of the APA provides an exception when the agency,

for good cause, finds that notice and public procedure are "impracticable, unnecessary, or contrary to the public interest." We believe that in the circumstances of these revisions to ASTM standards upon which CPSC's durable infant or toddler product standards are based, notice and comment is not necessary. Public Law 112–128 provides for nearly automatic updating of durable infant or toddler product standards that the Commission issues under the Danny Keysar Child Product Safety Notification Act, if ASTM revises the underlying voluntary standard and the Commission does not determine that the revision "does not improve the safety of the consumer product covered by the standard." Nevertheless, without Commission action to update the incorporation by reference in its mandated standards, the standard published in the Code of Federal Regulations will not reflect the revised ASTM standard. Thus, the Commission believes that it is appropriate to issue a rule revising the incorporation by reference in these circumstances. However, little would be gained by allowing for public comment because Public Law 112–28 requires that the CPSC's mandatory standard must change to the revised voluntary standard (unless the Commission has made the requisite finding concerning safety). The revisions to the infant bath seat standard and full-size crib standard merely reflect the modifications that the Commission made previously when it mandated these standards. It is possible, that in the future, revisions to other voluntary standards that were the basis for Commission standards under section 104(b) of the CPSIA could include substantive changes that do more than reflect the Commission's changes. Therefore, we believe that it is appropriate to set in place a procedure that allows the Commission to receive significant adverse comments but at the same time accommodates the nearly automatic update procedure set forth in the statute.

In its Recommendation 95–4, the Administrative Conference of the United States (ACUS) endorsed direct final rulemaking as an appropriate procedure to expedite promulgation of rules that are noncontroversial and that are not expected to generate significant adverse comment. See 60 FR 43108 (August 18, 1995). ACUS recommends using direct final rulemaking when an agency employs the "unnecessary" prong of the good cause exemption to notice and comment rulemaking.

Thus, the Commission is publishing this rule as a direct final rule because we do not expect any significant adverse

comments. Unless we receive a significant adverse comment within 30 days, the rule will become effective November 12, 2012. In accordance with ACUS's recommendation, we consider a significant adverse comment to be one where the commenter explains why the rule would be inappropriate, including an assertion challenging the rule's underlying premise or approach, or a claim that the rule would be ineffective or unacceptable without change. Should the Commission receive a significant adverse comment, it would withdraw this rule. The Commission may then incorporate the adverse comment into a subsequent direct final rule or publish a notice of proposed rulemaking providing an opportunity for public comment.

### D. Effective Date

Under the procedure set forth in Public Law 112–28, when a voluntary standard organization revises a standard upon which a consumer product safety standard issued under the Danny Keysar Child Product Safety Notification Act was based, the revision becomes the CPSC standard within 180 days of notification to the Commission, unless the Commission determines that the revision does not improve the safety of the product, or the Commission sets a later date in the **Federal Register**. In accordance with this provision, this rule establishes an effective date that is 180 days after we received notification from ASTM of revisions to these standards. As discussed in the preceding section, this is a direct final rule. Unless we receive a significant adverse comment within 30 days, the rule will become effective November 12, 2012.

### E. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) generally requires that agencies review proposed and final rules for their potential economic impact on small entities, including small businesses, and prepare regulatory flexibility analyses. 5 U.S.C. 603 and 604. The changes to the incorporation by reference in the infant bath seat and full-size crib standards will not result in any substantive changes to the standards. Therefore, this rule will not have any economic impact on small entities.

### F. Environmental Considerations

The Commission's regulations provide a categorical exclusion for the Commission's rules from any requirement to prepare an environmental assessment or an environmental impact statement because they "have little or no potential for affecting the human environment."

16 CFR 1021.5(c)(2). This rule falls within the categorical exclusion, so no environmental assessment or environmental impact statement is required.

### G. Paperwork Reduction Act

Both the infant bath seat standard and the full-size crib standard contain information collection requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520). No changes have been made to those sections of the standards. Thus, these revisions will not have any effect on the information collection requirements related to those standards.

### H. Preemption

Section 26(a) of the CPSA, 15 U.S.C. 2075(a), provides that where a "consumer product safety standard under [the Consumer Product Safety Act (CPSA)]" is in effect and applies to a product, no state or political subdivision of a state may either establish or continue in effect a requirement dealing with the same risk of injury unless the State requirement is identical to the federal standard. (Section 26(c) of the CPSA also provides that states or political subdivisions of states may apply to the Commission for an exemption from this preemption under certain circumstances.) The Danny Keysar Child Product Safety Notification Act (at section 104(b)(1)(B) of the CPSIA) refers to the rules to be issued under that section as "consumer product safety standards," thus, implying that the preemptive effect of section 26(a) of the CPSA would apply. Therefore, a rule issued under section 104 of the CPSIA will invoke the preemptive effect of section 26(a) of the CPSA when it becomes effective.

### I. Certification

Section 14(a) of the CPSA imposes the requirement that products subject to a consumer product safety rule under the CPSA, or to a similar rule, ban, standard, or regulation under any other act enforced by the Commission, be certified as complying with all applicable CPSC requirements. 15 U.S.C. 2063(a). Such certification must be based on a test of each product, or on a reasonable testing program or, for children's products, on tests on a sufficient number of samples by a third party conformity assessment body accredited by the Commission to test according to the applicable requirements. As noted in the preceding discussion, standards issued under section 104(b)(1)(B) of the CPSIA are "consumer product safety standards." Thus, they are subject to the testing and

certification requirements of section 14 of the CPSA.

Because infant bath seats and full-size cribs are children's products, they must be tested by a third party conformity assessment body whose accreditation has been accepted by the Commission. (They also must comply with all other applicable CPSC requirements, such as the lead content requirements of section 101 of the CPSIA, the phthalate content requirements in section 108 of the CPSIA, the tracking label requirement in section 14(a)(5) of the CPSA, and the consumer registration form requirements in the Danny Keysar Child Product Safety Notification Act.)

### J. Notice of Requirements

In accordance with section 14(a)(3)(B)(iv) of the CPSIA, the Commission has previously published notices of requirements for accreditation of third party conformity assessment bodies for testing infant bath seats (75 FR 31688 (June 4, 2010)) and full-size cribs (75 FR 81789 (December 28, 2010)). The notices of requirements provided the criteria and process for our acceptance of accreditation of third party conformity assessment bodies for testing infant bath seats to 16 CFR part 1215 (which incorporated ASTM F1967–08a with modifications) and for testing full-size cribs to 16 CFR part 1219 (which incorporated ASTM F1969–10 with modifications). This rule revises the references to the standards that are incorporated by reference in the CPSC's infant bath seat and full-size crib standards. As discussed previously, the revised ASTM standards for these products make them substantively identical to the infant bath seat and full-size crib standards that the Commission mandated. Thus, revising the references will not necessitate any change in the way that third party conformity assessment bodies are testing these products for compliance to CPSC standards. Therefore, the Commission considers the existing accreditations that the Commission has accepted for testing to these standards also to cover testing to the revised standards.

### List of Subjects in 16 CFR Parts 1215 and 1219

Consumer protection, Incorporation by reference, Imports, Infants and children, Law enforcement, Safety, Toys.

For the reasons stated above, the Commission amends 16 CFR chapter II as follows:

## PART 1215—SAFETY STANDARD FOR INFANT BATH SEATS

■ 1. The authority citation for part 1215 is revised to read as follows:

**Authority:** Sections 3 and 104 of Pub. L. 110–314, 122 Stat. 3016 (August 14, 2008); section 3 of Pub. L. 112–28, 125 Stat. 273 (August 12, 2011).

■ 2. Revise § 1215.2 to read as follows:

### § 1215.2   Requirements for infant bath seats.

Each infant bath seat shall comply with all applicable provisions of ASTM F1967–11a, Standard Consumer Safety Specification for Infant Bath Seats, approved September 1, 2011. The Director of the Federal Register approves the incorporation by reference listed in this section in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy of these ASTM standards from ASTM International, 100 Barr Harbor Drive, P.O. Box C700, West Conshohocken, PA 19428–2959 USA, phone: 610–832–9585; *http:// www.astm.org/*. You may inspect copies at the Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301– 504–7923, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741– 6030, or go to: *http://www.archives.gov/ federal_register/code_of_federal regulations/ibr_locations.html.*

## PART 1219—SAFETY STANDARD FOR FULL-SIZE BABY CRIBS

■ 3. The authority citation for part 1219 is revised to read as follows:

**Authority:** The Consumer Product Safety Improvement Act of 2008, Pub. L. 110–314, Sec. 104, 122 Stat. 3016 (August 14, 2008); section 3 of Pub. L. 112–28, 125 Stat. 273 (August 12, 2011).

■ 4. Revise § 1219.2 to read as follows:

### § 1219.2   Requirements for full-size baby cribs.

Each full-size baby crib shall comply with all applicable provisions of ASTM

F1169–11, Standard Consumer Safety Specification for Full-Size Baby Cribs, approved August 15, 2011. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy from ASTM International, 100 Barr Harbor Drive, P.O. Box 0700, West Conshohocken, PA 19428; telephone 610–832–9585; *www.astm.org.* You may inspect a copy at the Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301–504–7923, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/ federal_register/ code_of_federal_regulations/ ibr_locations.html.*

Dated: July 25, 2012.

**Todd A. Stevenson,**

*Secretary, U.S. Consumer Product Safety Commission.*

[FR Doc. 2012–18483 Filed 7–30–12; 8:45 am]

**BILLING CODE 6355–01–P**

## POSTAL SERVICE

### 39 CFR Part 111

### Domestic Mail Manual; Incorporation by Reference

**AGENCY:** Postal Service™.

**ACTION:** Final rule.

**SUMMARY:** The Postal Service announces the issuance of the *Mailing Standards of the United States Postal Service,* Domestic Mail Manual (DMM®) dated June 24, 2012, and its incorporation by reference in the *Code of Federal Regulations.*

**DATES:** This final rule is effective on July 31, 2012. The incorporation by reference of the DMM dated June 24, 2012 is approved by the Director of the Federal Register as of July 31, 2012.

**FOR FURTHER INFORMATION CONTACT:** Lizbeth Dobbins (202) 268–3789.

**SUPPLEMENTARY INFORMATION:** The most recent issue of the *Domestic Mail Manual* (DMM) is dated June 24, 2012. This issue of the DMM contains all Postal Service domestic mailing standards, and continues to: (1) Increase the user's ability to find information; (2) increase confidence that users have found all the information they need; and (3) reduce the need to consult multiple chapters of the Manual to locate necessary information. The issue dated June 24, 2012, sets forth specific changes, including new standards throughout the DMM to support the standards and mail preparation changes implemented since the version issued on July 5, 2011.

Changes to mailing standards will continue to be published through **Federal Register** notices and the *Postal Bulletin,* and will appear in the next online version available via the Postal Explorer® Web site at: *http:// pe.usps.com.*

### List of Subjects in 39 CFR Part 111

Administrative practice and procedure, Incorporation by reference.

In view of the considerations discussed above, the Postal Service hereby amends 39 CFR Part 111 as follows:

## PART 111—GENERAL INFORMATION ON POSTAL SERVICE

■ 1. The authority citation for 39 CFR Part 111 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 13 U.S.C. 301– 307; 18 U.S.C. 1692–1737; 39 U.S.C. 101, 401, 403, 404, 414, 416, 3001–3011, 3201– 3219, 3403–3406, 3621, 3622, 3626, 3632, 3633, and 5001.

■ 2. Amend § 111.3 by adding a new entry to the table at the end of paragraph (f), as follows:

### § 111.3   Amendment to the Mailing Standards of the United States Postal Service, Domestic Mail Manual.

\*   \*   \*   \*   \*

(f) \* \* \*

| Transmittal letter for issue | Dated | **Federal Register** publication |
|---|---|---|
| * | * | * |
| DMM ........................................ | June 24, 2012 ........................................ | [Insert FR citation for this rule]. |

## CONSUMER PRODUCT SAFETY COMMISSION

**16 CFR Parts 1215, 1217 and 1219**

**Revisions to Safety Standards for Infant Bath Seats, Toddler Beds, and Full-Size Baby Cribs**

**AGENCY:** Consumer Product Safety Commission.

**ACTION:** Direct final rule.

**SUMMARY:** In accordance with section 104(b) of the Consumer Product Safety Improvement Act of 2008 (CPSIA), also known as the Danny Keysar Child Product Safety Notification Act, the U.S. Consumer Product Safety Commission (Commission or CPSC) has published consumer product safety standards for numerous durable infant or toddler products, including infant bath seats, toddler beds, and full-size baby cribs. These standards incorporated by reference the ASTM voluntary standards associated with the products, with some modifications. In August 2011, Congress enacted Public Law 112–28, which sets forth a process for updating standards that the Commission has issued under the authority of section 104(b) of the CPSIA. In accordance with that process, the CPSC is publishing this direct final rule, revising the CPSC's standards for infant bath seats, toddler beds, and full-size cribs, to incorporate by reference more recent versions of the applicable ASTM standards.

**DATES:** The rule is effective on March 24, 2014, unless we receive significant adverse comment by January 8, 2014. If we receive timely significant adverse comments, we will publish notification in the **Federal Register**, withdrawing this direct final rule before its effective date. The incorporation by reference of the publications listed in this rule is approved by the Director of the Federal Register as of March 24, 2014.

**ADDRESSES:** You may submit comments, identified by Docket No. CPSC–2013–0043, by any of the following methods:

*Submit electronic comments via: Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments. The Commission is no longer accepting comments submitted by electronic mail (email), except through *www.regulations.gov.*

*Submit written submissions by:* Mail/Hand delivery/Courier (for paper, disk, or CD–ROM submissions), preferably in five copies, to: Office of the Secretary, Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814; telephone (301) 504–7923.

*Instructions:* All submissions received must include the agency name and docket number for this notice. All comments received may be posted without change, including any personal identifiers, contact information, or other personal information provided, to *http://www.regulations.gov.* Do not submit confidential business information, trade secret information, or other sensitive or protected information electronically. Such information should be submitted in writing.

**FOR FURTHER INFORMATION CONTACT:** For information related to the infant bath seat standard, contact: Keysha Walker, Office of Compliance and Field Operations, Consumer Product Safety Commission, 4330 East-West Highway, Bethesda, MD 20814–4408; telephone: (301) 504–6820; email: *kwalker@cpsc.gov.* For information related to the toddler bed standard, contact Daniel Dunlap, Office of Compliance and Field Operations, Consumer Product Safety Commission, 4330 East-West Highway, Bethesda, MD 20814–4408; telephone: (301) 504–7733; email: *ddunlap@cpsc.gov.* For information related to the full-size crib standard, contact Justin Jirgl, Office of Compliance and Field Operations, Consumer Product Safety Commission, 4330 East-West Highway, Bethesda, MD 20814–4408; telephone: (301) 504–7814; email: *jjirgl@cpsc.gov.*

**SUPPLEMENTARY INFORMATION:**

### A. Background

*The Danny Keysar Child Product Safety Notification Act.* The Consumer Product Safety Improvement Act of 2008 (CPSIA, Pub. L. 110–314) was enacted on August 14, 2008. Section 104(b) of the CPSIA, also known as the Danny Keysar Child Product Safety Notification Act, requires the Commission to promulgate consumer product safety standards for durable infant or toddler products. The law requires that these standards are to be "substantially the same as" applicable voluntary standards or more stringent than the voluntary standards if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product. Under the statute, the term "durable infant or toddler product" explicitly includes infant bath seats, toddler beds, and full-size cribs. In accordance with section 104(b), the Commission has published safety standards for these products that incorporate by reference the relevant ASTM standards, with certain modifications that make the voluntary standard more stringent.

*Public Law 112–28.* On August 12, 2011, Congress enacted Public Law 112–28, amending and revising several provisions of the CPSIA, including the Danny Keysar Child Product Safety Notification Act. The revised provision sets forth a process for updating CPSC's durable infant or toddler standards when a voluntary standard group changes a voluntary standard upon which the CPSC standard was based. This provision states:

If an organization revises a standard that has been adopted, in whole or in part, as a consumer product safety standard under this subsection, it shall notify the Commission. The revised voluntary standard shall be considered to be a consumer product safety standard issued by the Commission under section 9 of the Consumer Product Safety Act (15 U.S.C. 2058), effective 180 days after the date on which the organization notifies the Commission (or such later date specified by the Commission in the **Federal Register**) unless, within 90 days after receiving that notice, the Commission notifies the organization that it has determined that the proposed revision does not improve the safety of the consumer product covered by the standard and that the Commission is retaining the existing consumer product safety standard.

Public Law 112–28, section 3.

*Notification and Review of ASTM Revisions.* On September 25, 2013, ASTM notified CPSC of ASTM's approval and publication of revisions to ASTM F1967, Standard Consumer Specification for Infant Bath Seats; ASTM F1821, Standard Consumer Safety Specification for Toddler Beds; and ASTM F1169, Standard Consumer Safety Specification for Full-Size Baby Cribs. In the notification, ASTM stated that ASTM has revised these standards since the Commission adopted the earlier versions of the standards as CPSC mandatory standards.

The Commission has reviewed the revisions. Under Public Law 112–28, the revised standards shall be considered consumer product safety rules, unless the Commission determines and notifies ASTM that these revisions do not improve the safety of these consumer products and that the Commission is retaining the existing standard. The Commission has declined to make such a determination and notification to ASTM with respect to these revisions. Accordingly, we are publishing this direct final rule, which revises the incorporation by reference included in each of these rules so that the Code of Federal Regulations will accurately reflect the revised version of the relevant ASTM standards.

**B. Revisions to the Particular ASTM Standards**

*1. Infant Bath Seats*

*Background.* On June 4, 2010, the Commission published a final rule for infant bath seats that incorporated by reference ASTM F1967–08a, Standard Consumer Specification for Infant Bath Seats, with certain modifications to make the standard more stringent. (75 FR 31691). On May 16, 2012, ASTM notified the CPSC that ASTM had approved and published a revised version of the bath seat standard, ASTM F1967–11a. In accordance with Public Law 112–28, the revised standard was considered a consumer product safety standard issued by the Commission in the absence of a notification to ASTM of a Commission determination that the proposed revision did not improve safety. The Commission published a final rule incorporating by reference the revised bath seat standard, ASTM F1967–11a, as the Commission's standard for infant bath seats. 77 FR 4542 (July 31, 2012).

Subsequently, ASTM notified us on September 25, 2013, that ASTM has revised ASTM's infant bath seat standard again; the current ASTM standard is ASTM F1967–13.

There are several differences between ASTM F1967–11a, the version that CPSC currently mandates as the safety standard for bath seats, and the revised voluntary standard, ASTM F1967–13. In this section of the preamble, we summarize those differences.

*Attachment Components.* The 2013 version of the ASTM standard contains a new definition and requirement for attachment components. The requirement specifies that all components needed to attach the bath seat to the bath tub (attachment components) must be permanently attached to the bath seat. Staff is aware of a bath seat design that provides some attachment components that are separate from the bath seat. With this design, consumers must install the attachment components, consisting of adhesive discs, on to the bath tub surface. If the consumer fails to install the adhesive discs or fails to install them properly, these bath seats pose a tip over hazard. We believe requiring all attachment components to be permanently attached to the bath seat will increase the safety of bath seats.

*Test Surface Preparation.* ASTM F1967–11a specifies that bath seats be tested for stability on two specific test surfaces and also provides specific directions for preparing the test surfaces. Staff is aware of third party testing laboratories that interpreted one step in the testing preparation directions differently than ASTM intended. Following this alternate interpretation, the testing laboratory provided passing test results for some bath seats that otherwise would not have passed the stability requirement. Therefore, ASTM changed this section of the standard to specify more clearly test surface preparation. We believe this change will improve the safety of bath seats because the revised provision would prevent bath seats that should, in ASTM's view, be deemed non-complying from passing the requirement in the future.

*Definition of a Bath Seat/Restraints Systems.* In 2011, ASTM changed the definition of a "bath seat" to specify better the type of support that a bath seat provides. Before the ASTM F1967–11a version, the definition of "bath seat" did not specify the type of support the product provided. The revised (and current) definition states that a bath seat provides, at a minimum, support to the front and back of a seated infant. Thus, a product with only back support is no longer considered a bath seat. ASTM F1967–13 removes a provision that applied to bath seats with only back support because the provision is no longer relevant, given the current definition of "bath seat" as a product with front and back support. This change thus removes an obsolete provision.

*Suction Cup Requirements.* ASTM clarified two requirements for testing bath seats that use suction cups. The standard provides two suction cup test requirements: One provision evaluates the attachment between the suction cups and the test surface; the other evaluates the attachment of the suction cups to the bath seat itself. The first difference between the two versions clarifies the test requirement to emphasize that the bath seat must actually attach to the test surfaces as part of the test. The second difference specifies that this particular test only needs to be performed on one of the two test surfaces. Both revisions are clarifications.

*Markings and Labeling.* ASTM made two minor changes to labeling requirements. One revision changed the test for label permanency to the relative humidity (RH) to be a range rather than a specific RH. Staff considers this a practical change that is needed because producing an exact RH for the test is difficult. The second change to the labeling requirements removes the word "adult" before the term "caregiver" in a provision that requires a warning to "be located on the product so that it is visible to the [adult] caregiver."

*Assessment.* Except for the revisions for attachment components and test surface preparation, the revisions discussed above do not make any substantial change to the standard. Staff's opinion is that the new requirement for attachment components and the change to the test surface preparation provision will improve the safety of the bath seats. As a result, the Commission did not determine or notify ASTM that the revised standard does not improve the safety of infant seats.

In accordance with Public Law 112–28, the revised ASTM standard for infant bath seats therefore becomes the new CPSC standard 180 days after the date the CPSC received notification of the revision from ASTM. This rule revises the incorporation by reference at 16 CFR part 1215, to reference the revised ASTM standard, ASTM F1967–13.

*2. Toddler Beds*

*Background.* On April 20, 2011, the Commission published a final rule for toddler beds that incorporated by reference ASTM F1821–09, Standard Consumer Safety Specification for Toddler Beds, with several modifications to make the standard more stringent. 76 FR 22019 (correction notice, 76 FR 27882 (May 13, 2011)). On May 16, 2012, ASTM notified the Commission that ASTM had revised ASTM's toddler bed standard and published ASTM F1821–11b. The CPSC reviewed the revised standard and concluded that the revision, ASTM F1821–11b, did not improve the safety of toddler beds. The revised standard contained several provisions for guardrail height and guardrail strength that were less stringent than the CPSC's existing standard in 16 CFR part 1217. The Commission retained ASTM F1821–09 as the standard incorporated by reference into the CPSC's mandatory standard at 16 CFR part 1217. The staff briefing package discussing staff's review of ASTM F1821–11b is posted on the Commission's Web site at: *http://www.cpsc.gov/Global/Newsroom/ FOIA/CommissionBriefingPackages/ 2012/ASTMRevisiointoSafety StandardsforDurableInfantToddler Products.pdf.*

*Revised Standard.* On September 25, 2013, ASTM notified the Commission that ASTM has revised ASTM F1821 again and has published a new version, ASTM F1821–13. This version contains 12 significant changes from ASTM F1821–09. These changes bring the ASTM standard into accord with the CPSC's mandatory standard for toddler beds at 16 CFR part 1217.

*Assessment.* Staff has concluded that the revised standard, ASTM F1821–13, is neutral with respect to safety as compared to the prior standard. Staff recommends that the Commission allow the ASTM revisions to the toddler bed standard to become the CPSC-mandated standards.

Nothing in Section 104 obligates the Commission to make a determination that safety is not improved or to notify the applicable standards organization accordingly. As a result, where a proposed revision to the voluntary standard does not impact safety, the Commission has the discretion to make no determination, which would result in the revised voluntary standard becoming the applicable consumer product safety standard. In the toddler bed situation, because the revised standard is neutral with respect to safety, a determination by the Commission under the statute is not warranted and the revised voluntary standard will therefore become effective as a consumer product safety standard pursuant to the statute. The revisions bring ASTM F1821 into accord with the CPSC's regulation in 16 CFR part 1217.

In accordance with Public Law 112–28, the revised ASTM standard for toddler beds becomes the new CPSC standard on March 24, 2014, which is 180 days after the date we received notification of the revision from ASTM. The rule the Commission issues today revises the incorporation by reference at 16 CFR part 1217 to reference the revised ASTM standard, ASTM F1821–13.

### 3. *Full-Size Cribs*

*Background.* On December 28, 2010, the Commission published a final rule for full-size cribs that incorporated by reference ASTM F1169–10, *Standard Consumer Safety Specification for Full-Size Baby Cribs,* along with two modifications. On May 16, 2012, ASTM notified the CPSC that ASTM had published a revised 2011 version of ASTM's standard, ASTM F1169–11. The CPSC reviewed the revised standard and determined that the revision, ASTM F1169–11, was essentially identical to the full-size crib standard that the Commission mandated at 16 CFR part 1219. Staff's briefing package is available at *http://www.cpsc.gov/ Global/Newsroom/FOIA/Commission BriefingPackages/2012/ASTMRevisioins toSafetyStandardsforDurableInfant ToddlerProducts.pdf.* In accordance with Pub. L. 112–28, the Commission published a final rule that incorporated by reference the revised full-size crib standard, ASTM F1169–11, as the Commission's standard for full-size

cribs. 77 FR 4542 (July 31, 2012). As noted above, ASTM notified us on September 25, 2013, that ASTM again has revised ASTM's full-size crib standard; the current ASTM standard is ASTM F1169–13.

*Revised Standard.* The revised standard, ASTM F1169–13, differs from ASTM F1169–11 (the current CPSC standard) in one aspect that is reflected in two sections of the revised standard. ASTM F1169–11 requires that before and after testing a crib, the crib must comply with all general requirements of the standard. These general requirements address the distance between slats. However, the specific testing procedure for slats allows for one slat to fail during testing if the load at failure is at least 60 pounds and an additional 25 percent of the slats are tested and meet the 80-pound force requirement. Thus, a tested crib potentially could comply with the specific testing procedures for slats even if a slat failed during testing, but not meet the general slat spacing requirements because of the failed slat. In that situation, the crib would not comply with the requirements in the current standard because the crib would not meet all of the general requirements after the crib had been tested.

The revised standard, ASTM F1169–13, provides an exception for this specific situation so that a crib's failure to meet the slat spacing requirement under the testing circumstances described above would not cause the crib to be considered noncompliant.

*Assessment.* The revision clarifies the intent of the ASTM standard and removes an unintended inconsistency. The revision does not change the substantive requirements of the standard.

As previously noted, the Commission is not obligated to make a determination that safety is not improved or to notify the applicable standards organization accordingly. As a result, where a proposed revision to the voluntary standard does not impact safety, the Commission has the discretion to make no determination, which would result in the revised voluntary standard becoming the applicable consumer product safety standard. In the crib situation, because the revised standard is neutral with respect to safety, a determination by the Commission under the statute is not warranted. The revised voluntary standard will therefore become effective as a consumer product safety standard pursuant to the statute.

In accordance with Public Law 112–28, the revised ASTM standard for full-size cribs becomes the new CPSC standard on March 24, 2014, which is

180 days after the date the CPSC received notification of the revision from ASTM. This rule revises the incorporation by reference at 16 CFR part 1219, to reference the revised ASTM standard, ASTM F1169–13.

### C. Direct Final Rule Process

The Commission is issuing this rule as a direct final rule. Although the Administrative Procedure Act (APA) generally requires notice and comment rulemaking, section 553 of the APA provides an exception when the agency, for good cause, finds that notice and public procedure are "impracticable, unnecessary, or contrary to the public interest." The Commission concludes that in the context of these revisions to ASTM standards upon which CPSC's durable infant or toddler product standards are based, which automatically become consumer product standards and which simply would be incorporated by reference into applicable regulatory provisions, notice and comment is not necessary.

Without Commission action to update the incorporation by reference in the CPSC's mandated standards, the standard published in the Code of Federal Regulations will not reflect the revised ASTM standard that will be in effect by operation of law under Public Law 112–28. For accuracy and to avoid misleading the public as to the applicable consumer product standard, the Commission believes that issuing a rule revising the incorporation by reference in these circumstances is appropriate. In Recommendation 95–4, the Administrative Conference of the United States (ACUS) endorsed direct final rulemaking as an appropriate procedure to expedite promulgation of rules that are noncontroversial and that are not expected to generate significant adverse comment. *See* 60 FR 43108 (August 18, 1995). Consistent with the ACUS recommendation, the Commission is publishing this rule as a direct final rule because we do not expect any significant adverse comments.

Revising the regulatory references to the ASTM standards will conform the regulation to the substantive change in the applicable consumer product standard that will occur by operation of law under Public Law 112–28. Public comment will not impact the substantive changes to the standards or the effect of the revised standards as consumer product safety standards under Public Law 112–28. Therefore, there is little for the public to comment upon.

Unless we receive a significant adverse comment within 30 days, the

rule will become effective on March 24, 2014. In accordance with ACUS's recommendation, the Commission considers a significant adverse comment to be one where the commenter explains why the rule would be inappropriate, including an assertion challenging the rule's underlying premise or approach, or a claim that the rule would be ineffective or unacceptable without change.

Should the Commission receive a significant adverse comment, the Commission would withdraw this direct final rule. Depending on the comments and other circumstances, the Commission may then incorporate the adverse comment into a subsequent direct final rule or publish a notice of proposed rulemaking, providing an opportunity for public comment.

### D. Effective Date

Under the procedure set forth in Public Law 112–28, when a voluntary standard organization revises a standard upon which a consumer product safety standard issued under the Danny Keysar Child Product Safety Notification Act was based, the revision becomes the CPSC standard within 180 days of notification to the Commission, unless the Commission determines that the revision does not improve the safety of the product, or the Commission sets a later date in the **Federal Register**. In accordance with this provision, this rule establishes an effective date that is 180 days after we received notification from ASTM of revisions to these standards. As discussed in the preceding section, this is a direct final rule. Unless the Commission receives a significant adverse comment within 30 days, the rule will become effective on March 24, 2014.

### E. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) generally requires that agencies review proposed and final rules for the rules' potential economic impact on small entities, including small businesses, and prepare regulatory flexibility analyses. 5 U.S.C. 603 and 604. The changes to the incorporation by reference in the infant bath seat, toddler bed, and full-size crib standards reflect changes made by operation of law under Public Law 112–28. Therefore, the rule will not have any economic impact on small entities.

### F. Environmental Considerations

The Commission's regulations provide a categorical exclusion for the Commission's rules from any requirement to prepare an environmental assessment or an environmental impact statement because they "have little or no potential for affecting the human environment." 16 CFR 1021.5(c)(2). This rule falls within the categorical exclusion, so no environmental assessment or environmental impact statement is required.

### G. Paperwork Reduction Act

The infant bath seat, toddler bed, and full-size crib standards contain information-collection requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520). No changes have been made to those sections of the standards. Thus, these revisions will not have any effect on the information-collection requirements related to those standards.

### H. Preemption

Section 26(a) of the CPSA, 15 U.S.C. 2075(a), provides that where a "consumer product safety standard under [the Consumer Product Safety Act (CPSA)]" is in effect and applies to a product, no state or political subdivision of a state may either establish or continue in effect a requirement dealing with the same risk of injury unless the state requirement is identical to the federal standard. Section 26(c) of the CPSA also provides that states or political subdivisions of states may apply to the Commission for an exemption from this preemption under certain circumstances.

The Danny Keysar Child Product Safety Notification Act (at section 104(b)(1)(B) of the CPSIA) refers to the rules to be issued under that section as "consumer product safety standards," thus, implying that the preemptive effect of section 26(a) of the CPSA would apply. Therefore, a rule issued under section 104 of the CPSIA will invoke the preemptive effect of section 26(a) of the CPSA when it becomes effective.

### I. Certification

Section 14(a) of the CPSA imposes the requirement that products subject to a consumer product safety rule under the CPSA, or to a similar rule, ban, standard, or regulation under any other act enforced by the Commission, be certified as complying with all applicable CPSC requirements. 15 U.S.C. 2063(a). Such certification must be based on a test of each product, or on a reasonable testing program or, for children's products, on tests on a sufficient number of samples by a third party conformity assessment body (test laboratory) accredited by the Commission to test according to the applicable requirements. As noted in the preceding discussion, standards issued under section 104(b)(1)(B) of the CPSIA are "consumer product safety standards." Thus, they are subject to the testing and certification requirements of section 14 of the CPSA.

Because infant bath seats, toddler beds, and full-size cribs are children's products, samples of these products must be tested by a third party conformity assessment body whose accreditation has been accepted by the Commission. These products also must comply with all other applicable CPSC requirements, such as the lead content requirements of section 101 of the CPSIA, the tracking label requirement in section 14(a)(5) of the CPSA, and the consumer registration form requirements in the Danny Keysar Child Product Safety Notification Act.

### J. Notice of Requirements

In accordance with section 14(a)(3)(B)(iv) of the CPSIA, the Commission has previously published NORs for accreditation of third party conformity assessment bodies for testing infant bath seats (75 FR 31688 (June 4, 2010)); toddler beds (76 FR 22030 (April 20, 2011)); and full-size cribs (75 FR 81789 (December 28, 2010)). The NORs provided the criteria and process for our acceptance of accreditation of third party conformity assessment bodies for testing infant bath seats to 16 CFR part 1215; for testing toddler beds to 16 CFR part 1217; and for testing full-size cribs to 16 CFR part 1219. These NORs are listed in the Commission's rule, "Requirements Pertaining to Third Party Conformity Assessment Bodies." 16 CFR part 1112.

The revisions discussed above do not add any new provisions that would require a third party conformity assessment body (testing laboratory) to conduct additional tests. As discussed above, the infant bath seat revision adds a requirement that attachment components must be permanently attached to the bath seat. Although this is a new requirement, the revision does not involve a new test, only a brief evaluation. The revisions to the toddler bed standard bring the ASTM standard into accord with the CPSC standard. Thus, the revised toddler bed standard will not change existing test methods. The revision to the full-size crib standard is a clarification and will not change the existing test methods in that standard.

Revising the references for the infant bath seat, toddler bed, and full-size crib standards will not necessitate any change in the way that third party conformity assessment bodies test these products for compliance to CPSC standards. Therefore, the Commission

considers the existing accreditations that the Commission has accepted for testing to these standards also to cover testing to the revised standards. The existing NORs for these standards remain in place, and CPSC-accepted third party conformity assessment bodies are expected to update the scope of the testing laboratories' accreditation to reflect the revised standards in the normal course of renewing their accreditation.

**List of Subjects in 16 CFR Parts 1215, 1217, and 1219**

Consumer protection, Incorporation by reference, Imports, Infants and children, Law enforcement, Safety, Toys.

For the reasons stated above, the Commission amends 16 CFR chapter II as follows:

## PART 1215—SAFETY STANDARD FOR INFANT BATH SEATS

■ 1. The authority citation for part 1215 is revised to read as follows:

**Authority:** Sec. 104, Pub. L. 110–314, 122 Stat. 3016 (August 14, 2008); Sec. 3, Pub. L. 112–28, 125 Stat. 273 (August 12, 2011).

■ 2. Revise § 1215.2 to read as follows:

**§ 1215.2    Requirements for infant bath seats.**

Each infant bath seat shall comply with all applicable provisions of ASTM F1967–13, Standard Consumer Safety Specification for Infant Bath Seats, approved on August 1, 2013. The Director of the Federal Register approves the incorporation by reference listed in this section in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy of these ASTM standards from ASTM International, 100 Barr Harbor Drive, P.O. Box C700, West Conshohocken, PA 19428–2959 USA, telephone: 610–832–9585; *http://www.astm.org/.* You may inspect copies at the Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301–504–7923, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/ federal_register/code_of_federal_ regulations/ibr_locations.html.*

## PART 1217—SAFETY STANDARD FOR TODDLER BEDS

■ 3. The authority citation for part 1217 is revised to read as follows:

**Authority:** Sec. 104, Pub. L. 110–314, 122 Stat. 3016 (August 14, 2008); Sec. 3, Pub. L. 112–28, 125 Stat. 273 (August 12, 2011).

■ 4. Revise § 1217.2 to read as follows:

**§ 1217.2    Requirements for toddler beds.**

Each toddler bed shall comply with all applicable provisions of ASTM F1821–13, Standard Consumer Safety Specification for Toddler Beds, approved on June 1, 2013. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy from ASTM International, 100 Barr Harbor Drive, P.O. Box 0700, West Conshohocken, PA 19428; telephone 610–832–9585; *www.astm.org.* You may inspect a copy at the Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301–504–7923, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/ federal_register/code_of_federal_ regulations/ibr_locations.html.*

## PART 1219—SAFETY STANDARD FOR FULL-SIZE BABY CRIBS

■ 5. The authority citation for part 1215 is revised to read as follows:

**Authority:** Sec. 104, Pub. L. 110–314, 122 Stat. 3016 (August 14, 2008); Sec. 3, Pub. L. 112–28, 125 Stat. 273 (August 12, 2011).

■ 6. Revise § 1219.2 to read as follows:

**§ 1219.2    Requirements for full-size baby cribs.**

Each full-size baby crib shall comply with all applicable provisions of ASTM F1169–13, Standard Consumer Safety Specification for Full-Size Baby Cribs, approved May 1, 2013. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy from ASTM International, 100 Barr Harbor Drive, P.O. Box 0700, West Conshohocken, PA 19428; telephone 610–832–9585; *www.astm.org.* You may inspect a copy at the Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301–504–7923, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/ federal_register/code_of_federal_ regulations/ibr_locations.html.*

Dated: December 3, 2013.

**Todd A. Stevenson,**

*Secretary, U.S. Consumer Product Safety Commission.*

[FR Doc. 2013–29226 Filed 12–6–13; 8:45 am]

**BILLING CODE 6355–01–P**

## SOCIAL SECURITY ADMINISTRATION

## 20 CFR Part 404

**[Docket No. SSA–2013–0040]**

**RIN 0960–AH62**

## Extension of Expiration Date for Mental Disorders Body System Listings; Correction

**AGENCY:** Social Security Administration.

**ACTION:** Final rule; correction.

**SUMMARY:** In the **Federal Register** of December 3, 2013, we published a final rule document extending the expiration date of the Mental Disorders body system in the Listing of Impairments (listings) in our regulations. We inadvertently stated the RIN incorrectly as 0960–AH49. This document corrects the RIN to 0960–AH62.

**DATES:** Effective on December 9, 2013.

**FOR FURTHER INFORMATION CONTACT:** William P. Gibson, Office of Regulations and Reports Clearance, Social Security Administration, 6401 Security Boulevard, Baltimore, MD 21235–6401, (410) 966–9039. For information on eligibility or filing for benefits, call our national toll-free number, 1–800–772–1213, or TTY 1–800–325–0778, or visit our Internet site, Social Security Online, at *http://www.socialsecurity.gov.*

**SUPPLEMENTARY INFORMATION:** We published a final rule document in the **Federal Register** of December 3, 2013, (78 FR 72571) extending the expiration date of the Mental Disorders body system in the Listing of Impairments (listings) in our regulations. In this final rule, we incorrectly stated the RIN as 0960–AH49. This correction changes the RIN to 0960–AH62.

In FR Doc. 2013–28836 appearing on page 72571 in the **Federal Register** of Tuesday, December 3, 2013, the following correction is made:

On page 72571, in the second column, the RIN is corrected to read "0960–AH62".

**Paul Kryglik,**

*Director, Office of Regulations and Reports Clearance.*

[FR Doc. 2013–29264 Filed 12–6–13; 8:45 am]

**BILLING CODE 4191–02–P**



**Katharine E. Morgan**
President

100 Barr Harbor Drive       kmorgan@astm.org
PO Box C700                 tel +1.610.832.9721
West Conshohocken, PA       fax +1.610.832.9599
19428-2959 USA              www.astm.org

June 25, 2019

**VIA ELECTRONIC MAIL**

Ms. Alberta Mills
Office of the Secretary
U.S. Consumer Product Safety Commission
4330 East-West Highway
Bethesda, MD  20814-4408

Re: Notice of revision to ASTM F1967 Standard Consumer Safety Specification for Infant Bath Seats

Dear Ms. Mills:

The Consumer Product Safety Improvement Act of 2008 (CPSIA), PL 110-314 Sec.104(b), (4)(B) as revised by PL 112-28 (H.R. 2715) Sec. 3 instructs ASTM International to notify the Consumer Product Safety Commission (CPSC) of revisions to voluntary standards that are a basis for a consumer product safety standard promulgated by the Commission.

*''(B) COMMISSION ACTION ON REVISED VOLUNTARY STANDARD.—If an organization revises a standard that has been adopted, in whole or in part, as a consumer product safety standard under this subsection, it shall notify the Commission. The revised voluntary standard shall be considered to be a consumer product safety standard issued by the Commission under section 9 of the Consumer Product Safety Act (15 U.S.C. 2058), effective 180 days after the date on which the organization notifies the Commission (or such later date specified by the Commission in the Federal Register) unless, within 90 days after receiving that notice, the Commission notifies the organization that it has determined that the proposed revision does not improve the safety of the consumer product covered by the standard and that the Commission is retaining the existing consumer product safety standard.''.*

We are writing to officially notify the CPSC that ASTM has published a revised 2019 version of F1967 *Standard Consumer Safety Specification for Infant Bath Seats*. ASTM previously published a 2018 version. The 2013 version of F1967 is currently adopted as a mandatory consumer product safety standard in 16 CFR 1215 Safety Standard for Bath Seats.  We are enclosing a redlined document highlighting the specific technical changes in the 2019 version and 2018 version to help facilitate review by the CPSC Staff.

If you or your staff have any questions about the specific revisions or would like to discuss any issues related to this request, you may contact me or Molly Lynyak (610-832-9743 or

mlynyak@astm.org) at any time.  ASTM International looks forward to continuing to work with the CPSC to help ensure the safety of consumer products.

Sincerely,

*Katharine E. Morgan*

Katharine E. Morgan
President, ASTM International


Attachment


cc:    Patricia Edwards – CPSC Voluntary Standards Coordinator
       Celestine Kish – CPSC Project Manager for Bath Seats Regulation
       Richard Rosati – Chairman, ASTM Committee F15 on Consumer Products
       Paul Ware – ASTM Bath Seats Subcommittee Chairman

This document is not an ASTM standard and is intended only to provide the user of an ASTM standard an indication of what changes have been made to the previous version. Because it may not be technically possible to adequately depict all changes accurately, ASTM recommends that users consult prior editions as appropriate. In all cases only the current version of the standard as published by ASTM is to be considered the official document.

Designation: ~~F1967 − 18~~ F1967 − 19

# Standard Consumer Safety Specification for Infant Bath Seats[1]

This standard is issued under the fixed designation F1967; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon ($\varepsilon$) indicates an editorial change since the last revision or reapproval.

## INTRODUCTION

This consumer safety specification is intended to address certain incidents associated with the use of bath seats, bath rings, and other similar devices.

The U.S. Consumer Product Safety Commission (CPSC) identified drowning incidents which generally involved infants either tipping over, climbing out of, or sliding through the product after being left unattended by their caregiver.

This specification does not address incidents in which bath seats are unreasonably misused, are used in a careless manner that disregards the warnings and instructions that are provided with each product, or those instances where the caregiver leaves the infant unattended in the product.

This consumer safety specification is written within the current state-of-the-art product technology. It is intended that this specification will be updated whenever substantive information becomes available and known to ASTM which necessitates additional requirements or justifies the revision of existing requirements.

## 1. Scope

1.1 This consumer safety specification establishes performance requirements, test methods, and labeling requirements to promote the safe use of infant bath seats. Products commonly referred to as bath rings also are included in the scope of this specification. Traditional infant bath tubs that are used to bathe an infant are not within the scope of this standard.

1.2 This consumer safety specification is intended to reduce the risk of death and minimize injury to infants resulting from use and reasonably foreseeable abuse of infant bath seats.

1.3 No infant bath seat produced after the approval date of this consumer safety specification shall, either by label or other means, indicate compliance with this specification unless it conforms to all requirements contained herein.

1.4 The values stated in inch-pound units are to be regarded as standard. The values given in parentheses are mathematical conversions to SI units that are provided for information only and are not considered standard.

1.5 The following precautionary caveat pertains only to the test methods portion, Section 7, of this specification: *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety, health, and environmental practices and determine the applicability of regulatory limitations prior to use.*

1.6 *This international standard was developed in accordance with internationally recognized principles on standardization established in the Decision on Principles for the Development of International Standards, Guides and Recommendations issued by the World Trade Organization Technical Barriers to Trade (TBT) Committee.*

## 2. Referenced Documents

2.1 *ASTM Standards:*[2]

D3359 Test Methods for Rating Adhesion by Tape Test

F404 Consumer Safety Specification for High Chairs

[1] This consumer safety specification is under the jurisdiction of ASTM Committee F15 on Consumer Products and is the direct responsibility of Subcommittee F15.20 on Bath Seats.

Current edition approved ~~Dec. 15, 2018~~. Published ~~December 2018~~XXX 2019. Originally approved in 1999. Last previous edition approved in ~~2013~~2018 as ~~F1967 − 13~~F1967 − 18. DOI: ~~10.1520/F1967-18~~10.1520/F1967-19.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959. United States

F1967 − 19

F963 Consumer Safety Specification for Toy Safety
F977 Consumer Safety Specification for Infant Walkers
2.2 *Federal Regulations:*[3]
16 CFR 1303 Ban of Lead-Containing Paint and Certain Consumer Products Bearing Lead Containing Paint
16 CFR 1500 Federal Hazardous Substances Act Regulations, including sections:
16 CFR 1500.48 Technical Requirements for Determining a Sharp Point in Toys and Other Articles Intended for Use by Children Under 8 Years of Age
16 CFR 1500.49 Technical Requirements for Determining a Sharp Metal or Glass Edge in Toys and Other Articles Intended for Use by Children Under 8 Years of Age
16 CFR 1501 Method for Identifying Toys and Other Articles Intended for Use by Children Under 3 Years of Age Which Present Choking, Aspiration, or Ingestion Hazards Because of Small Parts
Consumer Product Safety Improvement Act
2.3 *ANSI Standards:*[4]
ANSI Z535.1 Safety Colors
ANSI Z535.4 Product Safety Signs and Labels
ANSI Z535.6 Product Safety Information in Product Manuals, Instructions, and Other Collateral Materials

## 3. Terminology

3.1 *Definitions of Terms Specific to This Standard:*

3.1.1 *bath seat, n*—an article that is used in a bath tub, sink, or similar bathing enclosure and that provides support, at a minimum, to the front and back of a seated infant during bathing by a caregiver. This does not include products that are designed or intended to retain water for bathing.

3.1.2 *conspicuous, adj*—visible, when the product is in all manufacturer's recommended use positions and an occupant is sitting in the product, to an adult caregiver near the product at any one position around the product but not necessarily visible from all positions.

3.1.3 *double action release system, n*—a mechanism requiring either two consecutive actions, the first of which must be maintained while the second is carried out, or two separate and independent simultaneous actions to fully release.

3.1.4 *installation components, n*—components of the infant bath seat that provide the means of installation to the adult bath tub, including, but not limited to, clamps, arms, suction cups, and pads.

3.1.5 *locking and latching mechanism, n*—method of preventing a bath seat from folding or collapsing during use.

3.1.6 *manufacturer's recommended use position(s), n*—any position that is presented as a normal, allowable, or acceptable configuration for the use of the product by the manufacturer in any descriptive or instructional literature. This specifically excludes positions which the manufacturer shows in a like manner in its literature to be unacceptable, unsafe or not recommended.

3.1.7 *nonpaper label, n*—any label material, such as plastic or metal, that either will not tear without the aid of tools or tears leaving a sharply defined edge or labels made of fabric.

3.1.8 *occupant, n*—infant that is in an infant bath seat in any manufacturer's recommended use position(s).

3.1.9 *paper label, n*—any label material that tears without the aid of tools and leaves a fibrous edge.

3.1.10 *principal display panel, n*—that part of the product's package that is most likely to be displayed, presented, shown or examined under normal or customary conditions of display for retail sale.

3.1.11 *protective component, n*—any component used for protection from sharp edges, points, or entrapment of fingers or toes.

3.1.11.1 *Discussion*—

Examples of protective components include caps, sleeves, and plugs.

3.1.12 *stability, n*—ability of a bath seat to remain upright in all of the manufacturer's recommended use positions.

3.1.13 *static load, n*—vertically downward load applied by weights or other means.

## 4. Calibration and Standardization

4.1 Unless otherwise noted, the bath seat shall be completely assembled in accordance with the manufacturer's instructions.

4.2 The product to be tested shall be in a room with an ambient temperature of $73 \pm 9°F$ ($23 \pm 5°C$) for at least 1 h prior to testing. Testing then shall be conducted within this temperature range.

[3] Available from U.S. Government Printing Office Superintendent of Documents, 732 N. Capitol St., NW, Mail Stop: SDE, Washington, DC 20401.
[4] Available from American National Standards Institute (ANSI), 25 W. 43rd St., 4th Floor, New York, NY 10036, http://www.ansi.org.

F1967 − 19

4.3  All testing required by this specification shall be conducted on the same unit.

**5.  General Requirements**

5.1  *Hazardous Sharp Edges or Points*—There shall be no hazardous sharp points or edges as defined in 16 CFR 1500.48 and 16 CFR 1500.49 before or after the product has been tested to this consumer safety specification.

5.2  *Small Parts*—There shall be no small parts as defined in 16 CFR 1501 before testing or liberated as a result of testing to this consumer safety specification.

5.3  *Lead in Paints*—All paint and surface coatings on the product shall comply with the requirements of 16 CFR 1303.

5.4  *Latching and Locking Mechanisms:*

5.4.1  Products that fold shall have a latching and locking mechanism or other means to prevent collapse of the product when it is installed in any manufacturer's recommended use position(s).

5.4.2  During and upon completion of the test in accordance with 7.1.1, the product shall remain in the manufacturer's recommended use position, and the latching and locking mechanism shall remain engaged and operative.

5.4.3  Products designed with a latching and locking mechanism shall comply with either 5.4.3.1 or 5.4.3.2.

5.4.3.1  Product shall be designed with a single action release mechanism that shall not release when tested in accordance with 7.1.2.

5.4.3.2  Product shall be designed with a double action release system.

5.4.4  Latching and locking mechanisms shall also comply with all requirements in 5.4 after cycling has been conducted in accordance with 7.1.3.

5.5  *Scissoring, Shearing, and Pinching*—The product, when in the manufacturer's recommended use position(s), shall be designed and constructed to prevent injury to the occupant from any scissoring, shearing, or pinching when members or components rotate about a common axis or fastening point, slide, pivot, fold or otherwise move relative to one another. Scissoring, shearing, or pinching that may cause injury exists when the edges of the rigid parts admit a probe greater than 0.210 in. (5.33 mm) and less than 0.375 in. (9.53 mm) in diameter at any accessible point throughout the range of motion of such parts.

5.6  *Openings*—Holes or slots that extend entirely through a wall section of any rigid material less than 0.375-in. (9.53-mm) thick and admit a 0.210-in. (5.33-mm) diameter rod shall also admit a 0.375-in. (9.53-mm) diameter rod. Holes or slots that are between 0.210 in. (5.33 mm) and 0.375 in. (9.53 mm) and have a wall thickness less than 0.375 in. (9.53 mm) but are limited in depth to 0.375 in. (9.53 mm) maximum by another rigid surface shall be permissible (see Fig. 1 for examples). The product shall be evaluated in all manufacturer's recommended use positions.

5.7  *Protective Components*—If the child can grasp protective components between the thumb and forefinger, or teeth, or if there is at least a 0.04 in. (1.0 mm) gap between the component and its adjacent parent component, such component shall not be removed when tested in accordance with 7.2.

5.8  *Requirements for Toys*—Toy accessories attached to, removable from, or sold with infant bath seats, as well as their means of attachment, shall comply with the applicable requirements of Standard Consumer Safety Specification F963.

5.9  *Labeling:*

5.9.1  Warning labels, whether paper or nonpaper, shall be permanent when tested in accordance with 7.3.1 − 7.3.4.

5.9.2  Warning statements applied directly onto the surface of the product by hot stamping, heat transfer, printing, wood burning, etc. shall be permanent when tested in accordance with 7.3.1 and 7.3.5.

5.9.3  Nonpaper labels shall not liberate small parts when tested in accordance with 7.3.6.

5.10  Infant bath seats must comply with the applicable requirements of the Consumer Product Safety Improvement Act.

**6.  Performance Requirements**

6.1  *Stability:*

6.1.1  The stability test shall be conducted after the Mechanisms Durability test in 7.1.3.

6.1.2  During and after testing in accordance with 7.4, the product shall comply with the following:

6.1.2.1  No parts of the product shall become separated from it.

6.1.2.2  The product shall not sustain permanent damage.

6.1.2.3  The product shall not tip over. If the product would continue to tip over under the application of force, but it is prevented from doing so by the test platform interior side walls, it shall be considered a tip over.

6.1.2.4  No attachment point shall disengage from (is no longer in contact with) the test platform and then fail to return to its manufacturer's recommended use position.

6.1.2.5  At all time during the application of force, the seat shall remain in its initial position and shall not be tilted at an angle of 12° or more from its initial position.

6.2  *Restraint System:*

**F1967 − 19**



**FIG. 1 Opening Examples**

6.2.1  Bath seats, when in the manufacturer's recommended use position(s), must provide a passive crotch restraint and comply with 6.2.1.1. The bath seat shall not include any additional restraint system which requires action on the part of the caregiver to secure the restraint.

6.2.1.1  A passive crotch restraint shall be assembled as part of the bath seat before shipment from the manufacturer or shall be designed such that the bath seat cannot be used without the passive crotch restraint in place. The passive crotch restraint shall be permanently attached to the bath seat.

6.3  *Static Load*—The product shall not break, become permanently deformed or damaged, or fail to comply with any of the other requirements of this specification when tested in accordance with 7.5.

6.4  *Specific Requirements for Suction Cups*—Products that utilize suction cups as a method of attachment to the bathing surface shall comply with the following requirements:

6.4.1  Each suction cup shall remain attached to the product and shall not become damaged or broken after testing in accordance with 7.6.1.

6.4.2  The product shall attach and remain attached to each test surface and shall not become damaged or broken after testing in accordance with 7.6.2.

6.5  *Leg Openings:*

6.5.1  All openings on the sides of the product through which a seated occupant can slide or otherwise insert any extremity shall not permit the passage of the Bath Seat Torso Test Probe when tested in accordance with 7.7.1.

6.5.2  When these same openings are tested in accordance with 7.7.2, the 1.0 in. (25 mm) perimeter of the Bath Seat Shoulder Test Probe at the shoulder breadth end shall not be permitted to contact the seating surface of the product.

 **F1967 − 19**

6.6 *Installation Components*—Prior to shipment, all components required for the proper installation and use of the product according to the manufacturer's instructions in all manufacturer's recommended use positions shall be permanently attached to the product. Permanently attached shall mean that such components cannot be removed from the product without the use of a tool.

## 7. Test Methods

7.1 *Latching and Locking Mechanism Tests:*

7.1.1 *Resistance to Collapse:*

7.1.1.1 Install the product with the latching and locking mechanism(s) engaged in one of the manufacturer's recommended use positions on Test Surface #2 or Test Surface #3, or both, depending on the manufacturer's installation instructions (refer to Stability Test Method for test surface specification). Secure the product to the test surface(s) so that any collapsing motion is not impeded.

7.1.1.2 Gradually apply a 45 lbf (200 N) force to the product in the direction normally associated with collapsing the product.

7.1.1.3 Repeat this procedure four additional times within a 2-min period.

7.1.1.4 Submerge the product in enough clear water to fully cover the latching and locking mechanism. Water shall be at an initial temperature of 100 to 105°F (37.8 to 40.6°C).

7.1.1.5 Repeat 7.1.1.1 through 7.1.1.3 while maintaining the product in its submerged position.

7.1.1.6 Repeat the testing in both the dry and the submerged conditions for all other manufacturer's recommended use positions.

7.1.2 *Single Action Release Mechanism Test:*

7.1.2.1 Install the product in one of the manufacturer's recommended use positions on Test Surface #2 or Test Surface #3, or both (refer to Stability Test Method for test surface specification). Secure the product so that any collapsing motion is not impeded.

7.1.2.2 Gradually apply a 10 lbf (45 N) force to the locking and latching mechanism in the direction tending to release it.

7.1.2.3 Repeat 7.1.2.1 and 7.1.2.2 for all other manufacturer's recommended use positions.

7.1.3 *Latching and Locking Mechanism Durability Test*—All latching and locking mechanism(s) shall be cycled through their normal operation a total of 2000 cycles. Each cycle shall consist of opening and closing the mechanism(s) and erecting/folding the product. Cycling shall be conducted on a continuous basis.

7.2 *Removal of Protective Components Test:*

7.2.1 Prior to conducting the following tests, first completely submerge the testable components for 20 min in clear water that is at an initial temperature of 100 to 105°F (37.8 to 40.6°C). Conduct the following tests within 10 min after removal from the water.

7.2.2 Any protective component shall be tested in accordance with each of the following methods in the sequence listed.

7.2.3 Secure the product so that the product cannot move during the performance of the following tests:

7.2.4 *Torque Test*—Gradually apply a torque of 4 lbf-in. (0.4 N-m) over a period of 5 s in a clockwise direction until a rotation of 180° from the original position has been attained or 4 lbf-in. has been exceeded. The torque or maximum rotation shall be maintained for an additional 10 s. The torque shall then be removed and the test components permitted to return to a relaxed condition. This procedure shall then be repeated in the counter-clockwise direction.

7.2.5 *Tension Test:*

7.2.5.1 Attach a force gauge to the protective component by means of any suitable device. For components that cannot reasonably be expected to be grasped between thumb and forefinger, or teeth, on their outer diameter but have a gap of 0.04 in. (1.0 mm) or more between the rear surface of the component and the structural member of the product to which they are attached, a clamp such as shown in Fig. 2 may be a suitable device.

7.2.5.2 Be sure that the attachment device does not compress or expand the component hindering any possible removal.

7.2.5.3 Gradually apply a 15 lbf (67 N) force over a period of 5 s in the direction that would normally be associated with the removal of the protective component. Hold for an additional 10 s.

7.3 *Permanence of Labels and Warnings:*

7.3.1 To determine the permanence of a label or printing applied to the surface of the product, first completely submerge the label or printed area for 20 min in clear water that is at an initial temperature of 100 to 105°F (37.8 to 40.6°C). Drain off the excess water and let the label or printed area air dry for 24 h at 73 ± 9°F (23 ± 5°C), 20 to 70 % RH, prior to conducting any permanency tests.

7.3.2 A paper label (excluding labels attached by a seam) shall be considered permanent if, during an attempt to remove it without the aid of tools or solvents, it cannot be removed, it tears into pieces upon removal or such action damages the surface to which it is attached.

7.3.3 A nonpaper label (excluding labels attached by a seam) shall be considered permanent if, during an attempt to remove it without the aid of tools or solvents, it cannot be removed or such action damages the surface to which it is attached.

7.3.4 A warning label attached by a seam shall be considered permanent if it does not detach when subjected to a 15-lbf (67-N) pull force applied in any direction using a ¾-in. diameter clamp surface.

7.3.5 Adhesion test for warnings applied directly onto the surface of the product.

7.3.5.1 Apply the tape test defined in Test Method B, Cross-Cut Tape Test of Test Methods D3359, eliminating parallel cuts.

7.3.5.2 Perform this test once in each different location where warnings are applied.



**F1967 – 19**

15 lb Max TENSION



**FIG. 2 Tension Test Adapter/Clamp**

7.3.5.3 The warning statements will be considered permanent if the printing in the area tested is still legible and attached after being subjected to this test.

7.3.6 A nonpaper label, during an attempt to remove it without the aid of tools or solvents, shall not be removed or shall not fit entirely within the small parts cylinder defined in 16 CFR 1501 if it can be removed.

7.4 *Stability Test:*

7.4.1 *Test Equipment:*

7.4.1.1 *Test Platform*—Refer to Fig. 3, Fig. 4, and Fig. 5 for the specifications of an adult bath tub to be used as the test platform. All surfaces of this tub shall be smooth porcelain enamel. The side ledge of the tub shall be of uniform thickness of $4 \pm 0.5$ in. $(10.2 \pm 0.6$ cm) for at least 24 in. (60.0 cm) along the length of the tub.[5]

7.4.1.2 *Test Surface Usage*—The test surface(s) described below to be used for required tests shall be determined by considering all of the attachment configurations and contact locations a given product utilizes to provide support and stability for the product in or on an adult bath tub. The stability test shall be conducted using all relevant surfaces, and multiple surfaces may be used either separately or simultaneously for testing, depending upon the manufacturer's recommended installation instructions and use position(s).

*(1) Test Surface #1*—Any area on the bottom surface of the test platform where safety tread strips are applied as described below.

*(2) Test Surface #2*—Any area on the bottom surface of the test platform where safety tread strips are not applied.

*(3) Test Surface #3*—Any area on the side(s) of the test platform (for example, inside surface, outside surface, and top ledge), where safety tread strips are not applied.

NOTE 1—One test platform may be used for all test surfaces if sufficient space allows for the use of all coverage areas as specified below.

7.4.1.3 *Coverage Area*—Any area where the product can be installed per the manufacturer's instructions on Test Surfaces #1, #2 and #3, and that is at least 1 in. (25 mm) larger in all directions than the perimeter outlined by any part of the product that is designed to contact any of these surfaces.

NOTE 2—Each test surface requires an adequate coverage area.

7.4.1.4 *Safety Tread Strips*—Commercially available adhesive backed safety tread strips for bath tub use that are rectangular, approximately 0.75 in. (19 mm) wide by 7 in. (180 mm) or greater in length. The corners may be filleted with a radius that does not exceed ½ the width.

---

[5] At the time of original publication of this standard, the sole source of supply of the apparatus known to the committee was American Standard, 1 Centennial Plaza, Piscataway, NJ 08855-6820.

**F1967 − 19**



**FIG. 3 Test Platform Top View**

7.4.1.5 *Baby Wash Test Solution*—Any of the following products diluted in a 1 to 25 ratio of distilled water, and contained in a spray bottle:

    *(a)* Solution comprised of ingredients as shown in Table 1, or

    *(b)* Johnson's baby head-to-toe baby wash, or

    *(c)* Aveeno baby wash and shampoo.

7.4.1.6 Inclinometer with a measurement tolerance of less than or equal to 0.5°. The maximum weight of the inclinometer and the fastening method shall be ≤2.2 lb (1 kg).

7.4.1.7 *Test Bar*—A 1 in. by ¼ in. (25 mm by 6 mm) rigid aluminum flat bar. The length of the test bar shall be such that it extends beyond the uppermost edge or surface of the product at least as far as the maximum distance *D* as calculated below plus enough additional length to accommodate the attachment of the inclinometer as described below.

7.4.2 *Test Surface #1 Preparation:*

7.4.2.1 Determine the coverage area for a product that contacts or attaches to the bottom surface of an adult bath tub for its support and stability. Clean the coverage area with any commercial cleaner intended for bath tubs, following the cleaner's instructions. Then wipe the coverage area with alcohol and allow to dry.

7.4.2.2 Apply the safety tread strips evenly onto the coverage area at a distance of 0.375 ± 0.125 in. (9.5 ± 3 mm) apart from edge to edge.

7.4.2.3 Safety tread strips shall be replaced if they become damaged or dislodged from their specified position(s).

Note 3—The installation of the safety tread strips for Test Surface #1 will most likely need to be done only during the initial setup of this test surface, except for replacements that may be necessary from time to time.

7.4.3 *Test Protocol for Test Surface #1:*

7.4.3.1 Clean the coverage area with any commercial cleaner intended for adult bath tubs following the cleaner's instructions. Then wipe the coverage area with alcohol and allow to dry.

7.4.3.2 Use the spray bottle with the baby wash solution to thoroughly saturate the coverage area that is above the water level specified in 7.4.3.3.

F1967 – 19



**FIG. 4 Test Platform A-A Sectional View**

7.4.3.3  Fill the test platform with clear water that is at an initial temperature of 100 to 105°F (37.8 to 40.6°C) to a depth of 2 in. (51 mm) above the estimated highest point of the occupant seating surface when the product is installed.

7.4.3.4  Install the product according to the manufacturer's instructions onto the test surface. If the product has more than one manufacturer's recommended use position, select one position for the initial test.

NOTE 4—If necessary, adjust the water level to the 2-in. (51-mm) requirement by either adding or removing water from the test platform.

7.4.3.5  Securely attach the test bar to the inside edge of the occupant seating space in a vertical orientation at the position that is most likely to cause the bath seat to tip over, with the widest surface of the test bar facing outward from the product.

7.4.3.6  Calculate the distance $D$ for a force to be applied to the test bar using the following formula:

$$D = (20.4 \text{ in.} - H)/2 \left[(518 \text{ mm} - H)/2\right] \tag{1}$$

where:

$H$ = the height of the uppermost edge or surface above the lowest point of the occupant seating surface.

7.4.3.7  Securely install the inclinometer to the test bar above the location where the force in 7.4.3.6 is to be applied. Measure and record the pre-test angle of the test bar.

7.4.3.8  Apply a 17.0 lbf (76.5 N) force to the test bar at distance $D$ above the height $H$. Apply the force perpendicular to the test bar and outward from the center of the product over a period of 5 s (see Fig. 6). Maintain this force for an additional 10 s. If the product begins to release from the test surface, continue to maintain this force perpendicular to the test bar until the product either tips over or the 10 s time limit is attained.

NOTE 5—If necessary, to prevent the product from sliding horizontally on the test surface during this test, the bottom edge of the product may be blocked or wedged to prevent such sliding. However, such blocking shall in no way interfere with or influence the results of this test.



**F1967 − 19**

4.0 ± 0.5 in. total top width measurement taken at intersection of side and top along straight lines

Top width of 3.5 ± 0.5 in. specified for flat section only

4.0 ± .5 in. (102 ± 13 mm)

3.5 ± .5 in. (89 ± 13 mm)

14.0 ± .5 in. (356 ± 13 mm)

12.0 ± .5 in. (304.8 ± 13 mm)

82° ± 3°

89° ± 2°



**FIG. 5 Test Platform B-B Sectional View**

**TABLE 1 Representative Baby Wash**[A]

NOTE 1—Instructions:
Mix Polyquaternium-10 with 40 % of the water to hydrate.
Mix surfactants and the rest of the water until uniform, then add polymer solution.
Add preservative and fragrance mixture. Mix well.
Adjust final pH (6 to 7) with citric acid.
Viscosity range: 6000 to 10 000 cPs.

| Ingredients | % Weight | Function |
|---|---|---|
| Cocmidopropyl Betaine (30 % active) | 14.0 | Surfactant |
| PEG-80 Sorbitan Laurate (74 % active) | 5.0 | Anti-irritant |
| Sodium Laureth Sulfate (70 % active) | 4.3 | Surfactant |
| Glycerine | 0.5 | Humectant |
| Polyquaternium-10 | 0.2 | Conditioner |
| PEG-150 Distearate | 0.3 | Thickener |
| Tetrasodium EDTA (40 %) | 0.2 | Chelant added for clarity |
| Dye/Fragrance | As desired | Not added |
| DMDMH | 0.2 | Preservative |
| Water | 75.3 | |

[A] This baby wash (Lot #00536–133, made Aug. 16, 2005) was originally manufactured by Cognis Care Chemicals, 300 Brookside Ave., Ambler, PA 19002. The baby wash solution may be generated following the instructions and using the ingredients in their respective percentages shown in this table.

F1967 − 19



F = 17.0 lbf (76.5 N) APPLIED
PERPENDICULAR TO THE TEST
BAR OUTWARD FROM THE CENTER
OF THE PRODUCT

1 x 1/4 in. (25 x 6 mm)
RIGID ALUMINUM TEST BAR

SEATING SURFACE

D = (20.4 in. − H)/2; [(518 mm − H)/2]

H = HEIGHT OF UPPERMOST EDGE
OR SURFACE ABOVE THE LOWEST
POINT OF SEATING SURFACE

**FIG. 6 Diagram of Force Application**

7.4.3.9 Measure and record the maximum angle of the test bar during the application of the force. Calculate the change in angle from the pre-test angle measured above.

7.4.3.10 Repeat 7.4.3.1 through 7.4.3.10 three additional times at increments of 90° around the perimeter of the product enclosure area.

7.4.3.11 Repeat 7.4.3.1 through 7.4.3.10 with the product in each of the manufacturer's recommended use positions.

7.4.4 *Test Protocol for Test Surface #2*—Prepare the test surface, install the product and conduct the stability test using the same steps as specified in 7.4.3.1 through 7.4.3.11.

7.4.5 *Test Protocol for Test Surface #3*—Prepare the test surface, install the product and conduct the stability test using the same steps as specified in 7.4.3.1 through 7.4.3.11.

Note 6—Test Surfaces #2 and #3 may be used separately or simultaneously depending on the manufacturer's installation instructions.

7.5 *Static Load Test:*

7.5.1 Install the product in one of the manufacturer's recommended use positions on Test Surface #2 or Test Surface #3, or both (refer to Stability Test any one or combination of the three test surfaces specified in 7.4.1.2 Method for test surface specification).depending on the manufacturer's installation instructions.

7.5.2 Flood the test surface(s) with clear water that is at an initial temperature of 100 to 105°F (37.8 to 40.6°C) to a depth of 2 in. (51 mm) above the highest point of the occupant seating surface.

7.5.3 Place a weight of 30 lb (13.6 kg) on the center of the seat and distribute it upon a 6 by 6 in. (150 by 150 mm) ¾ in. (19 mm) thick block made of high density polyethylene (HDPE).

7.5.4 Remove the weight after 20 min.

7.5.5 Repeat 7.5.1 through 7.5.4 in all other manufacturer's recommended use positions.

7.6 *Suction Cup Tests:*

7.6.1 *Suction Cup Attachment to Bath Seat:*

7.6.1.1 Install the product in one of the manufacturer's recommended use positions according to the manufacturer's instructions onto Test Surface #2 or Test Surface #3, or both, depending on the manufacturer's installation instructions (refer to Stability Test Method for test surface specification) that has been prepared in accordance with the Stability Test Method surface preparation instructions in 7.4.3.1 through 7.4.3.3. Allow the product to soak for of 20 min.

7.6.1.2 Remove the product according to the manufacturer's instructions and immediately apply to each suction cup a 25 lbf (111 N) force in the direction most likely to cause failure. Apply the force within 5 s and maintain it for an additional 10 s.

7.6.1.3 Repeat 7.6.1.1 and 7.6.1.2 for all other manufacturer's recommended use positions.

7.6.2 *Suction Cup Attachment to Bathing Surface:*

7.6.2.1 Install the product in one of the manufacturer's recommended use positions according to the manufacturer's instructions onto Test Surface #1 (refer to Stability Test Method for test surface specification) that has been prepared in accordance with the Stability Test Method surface preparation instructions in 7.4.3.1 through 7.4.3.3. Allow the product to soak for 20 min.

7.6.2.2 Within 5 s, apply a 25 lbf (111 N) force vertically at the center of the product and maintain it for an additional 10 s.

7.6.2.3 Remove and install the product in the manufacturer's recommended use position a total of 2000 cycles using the manufacturer's recommended method(s). Cycling shall be conducted on a continuous basis.

7.6.2.4 Repeat 7.6.2.2.

ASTM F1967 − 19

7.6.2.5  Repeat 7.6.2.1 through 7.6.2.4 for all other manufacturer's recommended use positions.

7.6.2.6  Repeat 7.6.2.1 through 7.6.2.5 on Test Surface #2 or Test Surface #3, or both, depending on the manufacturer's installation instructions (refer to Stability Test Method for test surface specification) that has been prepared in accordance with the Stability Test Method surface preparation instructions.

7.7 *Leg Openings:*

7.7.1  With the product in each of the manufacturer's recommended use position(s), insert the tapered end of the Bath Seat Torso Probe (see Fig. 7) in all orientations into each opening. The probe shall be inserted from the direction of the occupant seating surface. Gradually apply a 15 lbf (67 N) force in the direction of the major axis of the probe within a period of 5 s. Maintain this force for an additional 10 s (see Fig. 8).

7.7.2  With the product in each of the manufacturer's recommended use position(s), insert the tapered end of the Bath Seat Shoulder Probe (see Fig. 9) in all orientations into each opening. The probe shall be inserted from the direction of the occupant seating surface. Gradually apply a 15 lbf (67 N) force in the direction of the major axis of the probe within a period of 5 s. Maintain this force for 10 s (see Fig. 10). Release and apply a 10 lbf (44 N) force to the top 1.0 in. (25 mm) perimeter of the probe in a direction vertically downward toward the seating surface over a period of 5 s. Maintain this force for an additional 10 s (see Fig. 11).

## 8. Marking and Labelling

8.1  Each product and its retail package shall be marked or labeled clearly and legibly to indicate the following:

8.1.1  The name, place of business (city, state, and mailing address, including zip code), and telephone number of the manufacturer, distributor, or seller.

8.1.2  A code mark or other means that identifies the date (month and year at a minimum) of manufacture.

8.2  The marking and labeling on the product shall be permanent.

8.3  Any upholstery labeling required by law shall not be used to meet the requirements of this section.

8.4 *Warning Design for Product:*

8.4.1  The warnings shall be easy to read and understand and be in the English language at a minimum.

8.4.2  Any marking or labeling provided in addition to those required by this section shall not contradict or confuse the meaning of the required information, or be otherwise misleading to the consumer.

8.4.3  The warnings shall be conspicuous and permanent.



**FIG. 7 Modified Bath Seat Torso Probe**

F1967 − 19



**FIG. 8 Bath Seat Torso Probe Force**

8.4.4  The warnings shall conform to ANSI Z535.4 – 2011, American National Standard for Product Safety Signs and Labels, sections 6.1 – 6.4, 7.2 – 7.6.3, and 8.1, with the following changes.

8.4.4.1  In sections 6.2.2, 7.3, 7.5, and 8.1.2, replace "should" with "shall."

8.4.4.2  In section 7.6.3, replace "should (when feasible)" with "shall."

8.4.4.3  Strike the word "safety" when used immediately before a color (for example, replace "safety white" with "white").

NOTE 6—For reference, ANSI Z535.1 provides a system for specifying safety colors.

8.4.5  The safety alert symbol "▲" and the signal word "**WARNING**" shall be at least 0.4 in. (10 mm) high and in bold capital letters. The remainder of the text shall be in characters whose upper case shall be at least 0.2 in. (5 mm) high, except where otherwise specified.

NOTE 7—For improved warning readability, typefaces with large height-to-width ratios, which are commonly identified as "condensed," "compressed," "narrow," or similar should be avoided.

8.4.6  *Message Panel Text Layout:*

8.4.6.1  The text shall be left aligned, ragged right for all but one-line text messages, which can be left aligned or centered.

NOTE 8—Left aligned means that the text is aligned along the left margin, and, in the case of multiple columns of text, along the left side of each individual column. See Fig. X1.1 in X1.22 of the appendix for examples of left aligned text.

8.4.6.2  The text in each column should be arranged in list or outline format, with precautionary (hazard avoidance) statements preceded by bullet points. Multiple precautionary statements shall be separated by bullet points if paragraph formatting is used.

8.5  Each product shall be marked or labeled with warnings as follows.

8.5.1  The following warning statement shall be addressed:

**NOT A SAFETY DEVICE**

Babies have DROWNED while using bath seats.

NOTE 9—"Addressed" means that verbiage other than what is shown can be used as long as the meaning is the same or information that is product-specific is presented.

8.5.2  Additional warning statements shall address the following:

• **Stay** in arm's reach of your baby.

• STOP using when baby begins pulling to a standing position.

NOTE 10—"Address" means that verbiage other than what is shown can be used as long as the meaning is the same or information that is product-specific is presented.

8.5.3  Products utilizing suction cups as an attachment mechanism to the support surface, and which are not intended by the manufacturer to be used on any type of slip-resistant surface, shall also include a warning to this effect. In addition, if there are other types of surfaces that the manufacturer does not intend the product to be used on, then additional warning(s) shall be included to this effect. Such warning(s) shall comply with the format and text requirements in 8.4 and shall be displayed as a separate warning OR shall be included in a combined warnings format without repeating the safety alert symbol and signal word.

8.5.4  An example warning in the combined format described in this section is shown in Fig. 12. The warning statements' wording content, as well as the use of underlining, capital lettering, italics or bold typeface, or a combination thereof, are at the discretion of the manufacturer.

8.6  *Warning Design for Package:*

**F1967 – 19**



**Top View**

3.0 in. (76 mm)

7.0 in. (178 mm)

1.0"
(25 mm)
Typical

Shoulder Breadth
6 – 8 mos.

1.0 in. (25 mm)

9.5 in. (241 mm)

**Front View**

5.04°
Ref.

Full taper 2 pl

**Side View**

5.5 in. (140 mm)

**Bottom View**

**NOTE: NOT TO SCALE**     Probe shall be made of uncoated, sanded hardwood.

FIG. 9 Bath Seat Shoulder Probe

13

**F1967 – 19**



**FIG. 10 Bath Seat Shoulder Probe Force**



**FIG. 11 Bath Seat Shoulder Probe Force**

8.6.1 Each product's retail package shall address the recommended age and developmental stage for the user:
Product is suitable for babies able to sit up unassisted (approximately 5 months of age).
STOP using when baby begins pulling to a standing position (approximately 10 months of age).

8.6.2   Each product's retail package shall be marked or labeled on the principal display panel with the warnings required in 8.5 and as specified in 8.4.1, 8.4.2, 8.4.4, 8.4.5, and 8.4.6. The warnings and statements are not required on the retail package if they

14

42

F1967 – 19

| ⚠ WARNING |
|---|
| **NOT A SAFETY DEVICE** |
| Babies have DROWNED while using bath seats. |
| • <u>**Stay**</u> in arm's reach of your baby. |
| • STOP using when baby begins pulling to a standing position. |
| |
| *Additional warnings regarding suction cups and/or surfaces on which product is not intended for use.* |

**FIG. 12 Example of Warnings on Product**

are on the product and visible in their entirety and are not concealed by the retail package. Cartons and other materials used exclusively for shipping the product are not considered retail packaging.

8.7 Warnings, statements, and graphic pictorials on the product and package shall not indicate or imply that the infant may be left in the product without an adult caregiver in attendance.

## 9. Instructional Literature

9.1 Instructions shall be provided with the product and shall be easy to read and understand, and shall be in the English language at a minimum. These instructions shall include the following:

9.1.1 Instructions for assembly, maintenance, cleaning, inspections, and limitations of the product as applicable, as well as the manufacturer's recommended use position(s).

9.1.2 Emphasis and reinforcement of the requirement that the adult caregiver should always be present within arm's reach of the infant in the product, regardless of the circumstances.

9.1.3 Advice to test the temperature of the water surrounding the bath seat prior to placing the infant into the product and that the typical water temperature for bathing a baby should be between 90 and 100°F (32.2 and 37.8°C).

9.1.4 Instruction to the caregiver to discontinue the use of the product if it becomes damaged, broken, or disassembled.

9.1.5 The age and developmental stage information as specified in 8.6.1.

9.2 The instructions shall include all warnings specified in 8.5.

9.3 The instructions shall address the following additional warnings:
Prevent drowning.
• Babies can drown in as little as **1 inch** of water. Use as little water as possible to bathe your baby.
• **Never** rely on a toddler or preschooler to help your baby or alert you to trouble. Babies have drowned even when other children are in or near the bathtub.

9.4 The warnings in the instructions shall meet the requirements specified in 8.4.4, 8.4.5, and 8.4.6 except that sections 6.4 and 7.2 – 7.6.3 of ANSI Z535.4 need not be applied. However, the signal word and safety alert symbol shall contrast with the background of the signal word panel, and the warnings shall contrast with the background of the instructional literature.

NOTE 11—For example, the signal word, safety alert symbol, and the warnings may be black letters on a white background, white letters on a black background, navy blue letters on an off-white background, or some other high-contrast combination.

9.5 An example warning that meets the requirements is shown in Fig. 13. The warning statements' wording content, as well as the use of underlining, capital lettering, italics, or bold typeface, or a combination thereof, are at the discretion of the manufacturer.

NOTE 12—For additional guidance on the design of warnings for instructional literature, please refer to ANSI Z535.6, American National Standard: Product Safety Information in Product Manuals, Instructions, and Other Collateral Materials.

9.6 Warnings, statements, and graphic pictorials in the instructions shall not indicate or imply that the infant may be left in the product without an adult caregiver in attendance.

9.7 Any instructions provided in addition to those required by this section shall not contradict or confuse the meaning of the required information, or be otherwise misleading to the consumer.

## 10. Keywords

10.1 bath ring; bath seat; bath tub; drowning; stability

F1967 − 19

> ## ⚠ WARNING
>
> **NOT A SAFETY DEVICE**
> Babies have DROWNED while using bath seats.
>
> - **Stay** in arm's reach of your baby.
> - STOP using when baby begins pulling to a standing position.
>
> Prevent drowning.
> - Babies can drown in as little as **1 inch** of water. Use as little water as possible to bathe your baby.
> - **Never** rely on a toddler or preschooler to help your baby or alert you to trouble. Babies have drowned even when other children are in or near the bathtub.
>
> *Additional warnings regarding suction cups and/or surfaces on which product is not intended for use.*

FIG. 13 Example of Warnings in Instructional Literature

## APPENDIX

(Nonmandatory Information)

### X1. RATIONALE

X1.1 *Section* 3—All of the definitions reflect those previously approved in the safety standards for other juvenile products.

X1.2 *Sections* 3.1.4 *and* 6.6—This definition and requirement address potential incidents that may occur with bath seat designs that require the use of an extra component(s) to attach the bath seat to an adult bath tub. Because such component(s) may not be attached to the bath seat, and the bath seat may appear to function as intended without using the component(s), consumers can choose choose to install the bath seat without them. In addition, such component(s) may not be removable from their originally installed locations and thus not accompany the bath seat to a different use location. These bath seat designs, when installed without the extra component(s), are very similar in performance to older designed bath seats that were associated with over 100 tip-over incidents, many of which resulted in the death of the infant. Requiring any attachment component(s) to be permanently attached to the bath seat before consumers buy it will help ensure their use is not optional and will help prevent other tip-over fatalities.

X1.3 *Section* 4—This section reflects similar wording previously approved in the safety standards for other juvenile products.

X1.4 *Sections* 5.1, 5.2, 5.3, *and* 5.5—These sections reflect wording previously approved in the safety standards for other juvenile products.

X1.5 *Section* 5.4—This section, as well as the definition of double action release mechanism, reflects more recent wording used in juvenile products standards for latching and locking mechanisms or other means to prevent product collapse, some of which is adapted from Standard Consumer Safety Specification for Children's Chairs and Stools F2613.

X1.6 *Section* 5.7—These are commonly accepted requirements for all graspable components on any children's product.

 **F1967 − 19**

X1.7  *Section* 6.1—This requirement was originally based on the need to determine the ability of the bath seat to remain stable and not tip over during use, which would allow the infant to become submerged or trapped. Refer to the CPSC Federal Register final rule of June 4, 2010, for the rationale for including the 12° tilt angle requirement.

X1.7.1  This section and the corresponding referenced test method were revised in 2007 to include:
*(1)* A specified test platform (bath tub) that represents a "worst case scenario" for products that attach to the side of the tub. Based on incidents involving this style bath seat, it is apparent that bath seats installed on certain bath tubs are more susceptible to tip over than on others. Testing conducted on various bath tubs has determined that porcelain coated steel tubs with thinner/straight side wall ledges are the most susceptible of standard sized bath tubs.
*(2)* A solution that is sprayed on all contact areas between the test platform (bath tub) and the bath seat. Laboratory testing has shown that certain bath seats, when attached to bath tubs under wet conditions, are more susceptible to tip over than when attached dry. Bathing a child occurs in wet and soapy conditions, thus the rationale for including the soap solution preparation as part of the stability test.

X1.7.2  This section was revised in 2011 to reflect the requirement and rationale from the CPSC Federal Register final rule of June 4, 2010.

X1.7.3  This section was revised in 2018 to clarify the requirements, as well as to include the specifics for the usage of the various test surfaces in the test method.

X1.8  *Section* 6.2—This requirement is based on the need for the bath seat to prevent the infant from sliding through the front of the product. It precludes bath seats with a passive crotch restraint from also having any additional restraint system due to the potential for allowing this additional restraint to give a false sense of security to the caregiver.

X1.9  *Section* 6.3—This section reflects wording previously approved in the safety standards for other juvenile products.

X1.10  *Section* 6.5—To prevent submarining of a child through the openings of a bath seat and to prevent the entrapment of a child in the opening with their shoulders below the top rail of the bath seat, two probes are used to determine compliance. These probes represent the 5th percentile 6- to 8-month-old hip breadth and hip-to-shoulder dimension. The torso probe is also identical to the probe used in the current high chair Consumer Safety Specification F404, for a product which has the same minimum developmental stage occupant.

X1.11  *Section* 7.1—This section reflects updated wording approved in consumer safety specifications for other juvenile products.

X1.12  *Section* 7.1.3—Assumes one use per day for 24 months of product usage. Incorporates a safety factor of 2.5 into the calculation to take into consideration multiple uses per day or extended life of the product (730 days × 2.5 = 1825). Rounded off to 2000 for convenience. In addition, this subsection was revised to be similar to the durability cycling requirement in Standard Consumer Safety Specification for Infant Bath Tubs F2670 for the timing of the durability cycling in order to accommodate latching and locking mechanisms on some products that may require longer than 5 seconds to activate and deactivate. Continuous cycling is being prescribed to accommodate these potential longer activation/deactivation cycles, but the intent of the standard is to cycle the latching and locking mechanism at a rate as close to 12 cycles per minute as can be reasonably achieved for the specific mechanism.

X1.13  *Section* 7.2—This section reflects standard testing methodology for any graspable components. The submersion for 20 min in warm water was determined to be the most representative condition for conducting this test.

X1.14  *Section* 7.3—This section reflects wording previously approved in safety standards for other juvenile products.

X1.15  *Section* 7.4—The initial reference for this test method was Consumer Safety Specification F977. However, a fundamental difference between the bath seat and the walker is that in the bath seat, the infant is in a sitting position without their legs being extended vertically to use for standing or pushing. Using anthropometric data for a 12 to 15 month old infant, the maximum crown to rump length is 20.4 in. (518 mm). The 95th percentile weight for this same age group is 27.8 lb (12.6 kg). Sixty percent of the

 **F1967 − 19**

weight of the infant was used for the force calculation. Fifty percent of the difference between the crown to rump length and the height of the bath seat was used as the location for this force to be applied.

X1.15.1 Refer to the CPSC Federal Register final rule of June 4, 2010, for the rationale for rearranging the protocol steps.

X1.15.2 This section was significantly revised in 2018 to provide a more logical description of the test equipment and protocol to be used for the stability test. Test Surface #3 was added to accommodate bath seat configuration that attach to the sides of adult bath tubs. Alternative baby wash solutions were also added due to the unavailability of the originally specified solution. The bath tub test platform was also updated to reflect more accurate dimensions. The test bar and its attachment specifics, as well as the figure showing the force application were also updated.

X1.16 *Section 7.5*—This section reflects revised wording to clarify the appropriate test surface and to include all manufacturer's recommended use positions.

X1.17 *Section 7.7*—Refer to the CPSC Federal Register final rule of June 4, 2010, for the rationale for revising the protocol for the torso probe test, as well as the dimensions of the torso probe itself.

X1.18 *Section 8 Marking and Labeling*—This section in the 2018 published version was modified based on the wording and formatting developed by the ASTM Ad Hoc Language Task Group for juvenile product standards, as well as the language currently in the Marking and Labeling section for ASTM Standard Consumer Safety Specification for Infant Bath Tubs F2670 – 18.

X1.18.1 Refer to the CPSC Federal Register final rule of June 4, 2010, for the rationale for increasing the size of the warnings and the additional requirement regarding placement.

X1.19 *Section 8.6.1*—Information reviewed on normal child development suggests that the age at which a child begins sitting up unassisted ranges from 5 to 9 months, with varying degrees of stability. The opinion provided by the CPSC indicates that an older child most at risk in the product when left unattended is a child able to pull itself up to a standing position, but who is still unable to stand alone. Given the intended use of the product and this at risk scenario, the developmental milestone where use should be discontinued is when a child can pull to a standing position. With the revision of 8.1 in 2007, 8.5 is revised to be consistent with the use of the identifiers, "baby" and "babies" and also to include the same verbiage indicating the approximate end point of product use.

X1.20 *Section 9*—This section in the 2018 published version was modified based on wording and formatting developed by the ASTM Ad Hoc Language Task Group for juvenile product standards.

X1.21 *Section 9.3*—96.4 % of all death, injury, and other incidents involving bath seats have occurred when reported water depths were greater than 1 or 2 in. It is generally recognized and has been continuously debated as to whether a specific maximum water level should be recommended to caregivers. Although there is a consensus that no "safe" level of water can be recommended, it is appropriate to strike a balance between the amount of water generally considered necessary to bathe a baby and the amount of water that may be inherently dangerous. This warning is intended to alert the caregiver to this important issue, but leave the decision up to them. In addition, 54 % of all death, injury, and other incidents involving bath seats have occurred when one or more siblings were present in the bath with the baby. This is generally recognized as potentially being one factor in the caregiver's decision to leave the baby (and sibling) alone for some time period. This warning is intended to alert the caregiver to this important issue, as well as to reinforce the warning to be present at all times with the baby during bathing.

X1.22 *Message Panel Text Layout*:

F1967 – 19



NOTE 1—The text shown for these warnings is filler text, known as lorem ipsum, commonly used to demonstrate graphic elements.

**FIG. X1.1 Examples of Left Aligned Text**

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, Tel: (978) 646-2600; http://www.copyright.com/



Office *of the*
Federal Register



August 26, 2019

David M. DiMatteo
Attorney
Office of the General Counsel
Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814

Dear Mr. DiMatteo,

I approve the standard(s) for incorporation by reference into Title 16 of the *Code of Federal Regulations*, as listed in the attachment.

This approval is contingent upon the final rule containing any language changes that have been agreed upon by our staffs. The approval to incorporate by reference the publication(s) is effective on the effective date of your final rule. This approval will expire 2 years from the date of this letter unless you request an extension.

If you wish to enforce some other edition of the publication(s) approved, you must:

1.  Publish notice of the change in the *Federal Register*, amend the *Code of Federal Regulations*; and

2.  Ensure that a copy of that edition is on file at the Office of the Federal Register; and

3.  Notify me in writing of the change.

If you have any questions concerning this incorporation by reference, please call Miriam Vincent, Staff Attorney, at 202-741-6024.

Sincerely,

Oliver A. Potts
Director of the Federal Register

Federal Register Attorney: MEV
Ref#: IBR-2019-00029

ATTACHMENT

<u>**ASTM International**</u>

*ASTM F1967-19*

*Standard Consumer Safety Specification for Infant Bath Seat*

Approved May 1, 2019

<u>*CFR Title, Part, Section*</u>
16, 1215.2

This document has been electronically
approved and signed.


Date:  August 28, 2019


TO          :    The Commission
                 Alberta E. Mills, Secretary

THROUGH:        Patricia M. Hanz, General Counsel
                 Mary T. Boyle, Executive Director

FROM        :    Patricia M. Pollitzer, Assistant General Counsel
                 David M. DiMatteo, Attorney

SUBJECT  :    ASTM's Revisions to Safety Standard for Infant Bath Seats

            BALLOT VOTE DATE: _Wednesday, September 4, 2019_____

    Staff is forwarding to the Commission for consideration a briefing memorandum recommending that the Commission issue a direct final rule updating the reference to the ASTM standard cited in the Commission's rule for infant bath seats, 16 CFR part 1215.  Under the Consumer Product Safety Improvement Act of 2008, revised voluntary standards automatically are considered consumer product safety standards, unless the Commission determines and notifies the voluntary standards organization that the revised voluntary standard "does not improve the safety of the consumer product."  Staff recommends that the Commission allow the revised ASTM F1967-19, *Standard Consumer Safety Specification for Infant Bath Seats,* to become the CPSC-mandated standard for infant bath seats and publish a direct final rule that revises the reference in CPSC's safety standard for infant bath seats to refer to the revised ASTM standard for those products.  A draft *Federal Register* notice for that purpose is attached.

    Please indicate your vote on the following options:


I.      Approve publication of the attached document in the *Federal Register*, as drafted.


    _____                    _____

       (Signature)                                        (Date)

II.     Approve publication of the attached document in the *Federal Register*, with the specified changes.

_____

_____

_____

_____


_____         _____
(Signature)                                              (Date)


III.    Do not approve publication of the attached document in the *Federal Register*.


_____         _____
(Signature)                                              (Date)


IV.     Take other action specified below.

_____

_____

_____

_____


_____         _____
(Signature)                                              (Date)


Attachment: Draft *Federal Register* notice, titled, "Revisions to Safety Standard for Infant Bath Seats"

Page 2 of 2

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

[Billing Code 6355-01-P]

CONSUMER PRODUCT SAFETY COMMISSION

**[Docket No. CPSC-2009-0064]**

**16 CFR Part 1215**

**Revisions to Safety Standard for Infant Bath Seats**

**AGENCY**: Consumer Product Safety Commission.

**ACTION**: Direct final rule.

**SUMMARY:** In December 2013, the U.S. Consumer Product Safety Commission

(CPSC) published an update to the consumer product safety standard for infant bath seats.

The standard incorporated by reference the applicable ASTM voluntary standard. ASTM

has since published two revised versions of the voluntary standard for infant bath seats.

We are publishing this direct final rule revising the CPSC's mandatory standard for infant

bath seats to incorporate by reference, the most recent version of the applicable ASTM

standard.

**DATES:** The rule is effective on December 22, 2019, unless we receive significant

adverse comment by [**insert date 30 days after publication in the FEDERAL**

**REGISTER**]. If we receive timely significant adverse comments, we will publish

notification in the *Federal Register,* withdrawing this direct final rule before its effective

date. The incorporation by reference of the publication listed in this rule is approved by

the Director of the Federal Register as of December 22, 2019.

**ADDRESSES:** You may submit comments, identified by Docket No. CPSC-2009-0064,

by any of the following methods:

*Electronic Submissions:* Submit electronic comments to the Federal eRulemaking Portal at: https://www.regulations.gov. Follow the instructions for submitting comments. The CPSC does not accept comments submitted by electronic mail (e-mail), except through www.regulations.gov. The CPSC encourages you to submit electronic comments by using the Federal eRulemaking Portal, as described above.

*Written Submissions:* Submit written submissions in the following way: Mail/Hand delivery/Courier (for paper, disk, or CD-ROM submissions), preferably in five copies, to: Division of the Secretariat, Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814; telephone (301) 504-7923.

*Instructions:* All submissions received must include the agency name and docket number for this proposed rulemaking. All comments received may be posted without change, including any personal identifiers, contact information, or other personal information provided, to: https://www.regulations.gov. Do not submit confidential business information, trade secret information, or other sensitive or protected information that you do not want to be available to the public. If furnished at all, such information should be submitted in writing.

*Docket:* For access to the docket to read background documents or comments received, go to: www.regulations.gov, and insert the docket number, CPSC-2009-0064, into the "Search" box, and follow the prompts.

**FOR FURTHER INFORMATION CONTACT**: Keysha Walker, Compliance Officer, Office of Compliance and Field Operations, Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814-4408; telephone: 301-504-6820; email: kwalker@cpsc.gov.

**SUPPLEMENTARY INFORMATION:**

**A. Background**

*1. Statutory Authority*

Section 104(b)(1)(B) of the Consumer Product Safety Improvement Act (CPSIA), also known as the Danny Keysar Child Product Safety Notification Act, requires the Commission to promulgate consumer product safety standards for durable infant or toddler products.  The law requires these standards to be "substantially the same as" applicable voluntary standards or more stringent than the voluntary standards if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product.

The CPSIA also sets forth a process for updating CPSC's durable infant or toddler standards when the voluntary standard, upon which the CPSC standard was based, is changed.  Section 104(b)(4)(B) of the CPSIA provides that if an organization revises a standard that has been adopted, in whole or in part, as a consumer product safety standard under this subsection, it shall notify the Commission.  In addition, the revised voluntary standard shall be considered to be a consumer product safety standard issued by the Commission under section 9 of the Consumer Product Safety Act (15 U.S.C. 2058), effective 180 days after the date on which the organization notifies the Commission (or such later date specified by the Commission in the Federal Register) unless, within 90 days after receiving that notice, the Commission notifies the organization that it has determined that the proposed revision does not improve the safety of the consumer product covered by the standard and that the Commission is retaining the existing consumer product safety standard.

2. *The Infant Bath Seats Standard*

On June 4, 2010, the Commission published a final rule issuing a standard for infant bath seats that incorporated by reference the standard in effect at that time, ASTM F1967-08a, *Standard Consumer Specification for Infant Bath Seats,* with certain modifications to make the standard more stringent. 75 FR 31691.  The standard was codified in the Commission's regulations at 16 CFR part 1215.  The ASTM standard has been revised twice since the rule issued, with the Commission incorporating by reference, ASTM F1967-11a (77 FR 45242, Jul. 31, 2012), and ASTM F1967-13 (78 FR 73692, Dec. 9, 2013), respectively.

Since December 2013, when the CPSC incorporated by reference ASTM F1967-13 as the mandatory standard for infant bath seats, ASTM published two additional revisions to the standard.  On June 25, 2019, ASTM notified the Commission that it has revised ASTM's standard for infant bath seats.  The current ASTM standard is ASTM F1967-19, *Standard Consumer Safety Specification for Infant Bath Seats*, approved May 1, 2019.  The CPSC reviewed the changes between the current CPSC standard, 16 CFR part 1215 and the two revisions to the standard (ASTM F1967-18 and ASTM F1967-19) since ASTM F1967-13 became mandatory.  ASTM did not notify CPSC of the publication of the 2018 version of the standard because ASTM was considering making additional changes in 2019.  Consequently, ASTM notified CPSC of the 2019 revision to the standard, which included the changes in the 2018 version of the standard.

## B. Revisions to the ASTM Standard

The ASTM standard for infant bath seats establishes performance requirements, test methods, and labeling requirements to address hazards to children associated

with infant bath seats, including stability, restraints, suction cups, latching and locking mechanisms, and resistance to collapse.  Products commonly referred to as bath rings also are included in the scope of this specification.  Traditional infant bath tubs that are used to bathe an infant are not within the scope of this standard.

Under section 104(b)(4)(B) of the CPSIA, unless the Commission determines that ASTM's revision to a voluntary standard that is a CPSC mandatory standard "does not improve the safety of the consumer product covered by the standard," the revised voluntary standard becomes the new mandatory standard.  As discussed below, the Commission determines that the changes made in ASTM F1967–19 will either improve the safety of infant bath seats or are neutral with respect to safety.  Therefore, the Commission will allow the revised voluntary standard to become effective as a mandatory consumer product safety standard under the statute, effective December 22, 2019.

There are several differences between the current CPSC standard 16 CFR part 1215 (ASTM F1967-13) and the two subsequent revisions to the standard (ASTM F1967-18 and ASTM F1967-19).  We summarize the differences and the CPSC's assessment of the revisions below.

1.          Differences between 16 CFR part 1215 and ASTM F1967-18

The major revisions made in ASTM F1967 – 18 are summarized below.  ASTM F1967–18 includes several changes that improve safety by clarifying testing.  ASTM also made several editorial changes, such as spacing, formatting, re-ordering, and renumbering, which do not change the safety of the infant bath seats.

*a. Scope*

The 2018 version of the ASTM standard adds language (Section 1.5), which ASTM intends to add to all of its standards, stating that ASTM developed the standard in accordance with principles recognized by the World Trade Organization. We conclude that adding this text does not change the safety of infant bath seats.

*b. Terminology*

The 2018 revision to the standard adds four new definitions to address changes the ASTM subcommittee made to achieve consistency across juvenile product safety standards, including defining the terms "conspicuous," "double action release system," "installation components," and "protective component." Of these new terms, the definition of "double action release system" is significant because it clarifies the actions and the sequence necessary for a release mechanism to be considered a double action release mechanism. Accordingly, we determine that this new definition improves the safety of infant bath seats. The other new definitions are neutral to the safety of infant bath seats.

*c. General Requirements*

Section 5 *General Requirements* contains a number of minor editorial adjustments. The Commission considers these changes to be neutral to the safety of infant bath seats. ASTM also added section 5.10, to state: "Infant bath seats must comply with applicable requirements of the Consumer Product Safety Improvement Act." The purpose of this statement is to alert potential manufacturers to CPSIA requirements. We consider this statement to be neutral to the safety of infant bath seats because the product must comply with CPSIA, regardless of this requirement in

the standard.

### d. Performance Requirements

Section 6.1 *Stability* moves wording from an explanatory note into the enforceable performance requirement. Specifically, Section 6.1.2.3 states: "If the product would continue to tip over under the application of force, but it is prevented from doing so by the test platform interior side walls, it shall be considered a tip over." With this change to the stability performance requirement, certain types of contact to the tub fixture test platform are clearly identified as failures. This change will reduce ambiguity in testing to the standard and will lead to more consistent testing. We consider the reduced ambiguity for testing to be an improvement to safety because the revised language will clarify what constitutes a failure when conducting the testing.

The other changes to the performance requirements in section 6 are editorial in nature: the changes separate the stability requirements and present a succinct modified decimal numbering system, as opposed to paragraph form. We consider these editorial changes to be neutral to the safety of infant bath seats.

### e. Test Methods

#### i. Section 7.1 Latching and Locking Mechanism Tests

Two different latching and locking test procedures (Section 7.1.1.1 and 7.1.2.1), in the 2018 version of the standard reference a new test surface. The new "Test Surface #3" is defined as: "(a)ny area on the side(s) of the test platform (for example, inside surface, outside surface, and top ledge), where safety tread strips are not applied." Therefore, new products that are restrained by the sides of the tub can now be installed and tested according to the manufacturer's instructions by using Test

Surface #3.  The changes regarding the definition of a new test surface reduce ambiguity in the standard and will lead to more consistent testing.  We expect that an increase in testing consistency will improve the safety of bath seats.

*ii. Section 7.4 Stability Test*

The 2018 ASTM standard made four changes to Section 7.4 *Stability Test*:

• The new tub fixture test platform figures correct dimensioning errors, add a cross-section drawing, define more clearly the location of the cross-sections, and add new dimensions to specify accurately the physical tub detailed in ASTM F1967–18 Footnote #5.  Adding the two new cross-section drawings in this section required the rest of the figures in the standard to be renumbered accordingly.  These revised fixtures correct errors and increase accuracy and clarity, which we expect will improve the safety of infant bath seats.

• The 2018 version of the ASTM standard adds a requirement for a new test surface and modifies the two existing test surfaces.  The 2013 version required testing on only two surfaces, and those two surfaces had to be ". . . within the 24 in. (60.0 cm) length of uniform tub side ledge thickness . . . ."  The restrictive test surface definitions and the lack of a test surface on the side and end walls of the tub fixture test platform created a conflict between the test procedures and the manufacturer's installation instructions.  New products on the market engage with the side and end walls as part of the new products' retention system.  To reduce potential sources of test-to-test and laboratory-to-laboratory variation, the ASTM subcommittee decided to add Test Surface #3, which addresses tub fixture test platform's sides and end walls as a new test surface in Section

7.4.1.2.3.  The new language broadens the test procedures and allows for new designs of bath seats to be installed according to the manufacturer's instructions. These changes reduce ambiguity in the standard and lead to more consistent testing.  We expect the reduced ambiguity and increased consistency will improve the safety of infant bath seats.

- Section 7.4.3.8 states that the 17.0 lbf applied force shall be perpendicular to the test bar.  The 2013 revision stated that the force shall be horizontal.  During the stability test, many products deflect elastically, while remaining in the initial manufacturer's recommended-use position.  As a product deflects elastically, the test bar rotates in the direction of the applied force.  If the test bar rotates, but the applied force remains horizontal, then the angle between the test bar and the applied force changes, reducing the torque applied to the sample.  In contrast, the 2018 version states that the applied force must be perpendicular to the test bar, causing the applied torque to remain nominally consistent as the product deflects elastically.  We conclude that a test that applies a consistent torque is a more stringent test, and therefore, this change improves the safety of infant bath seats.

- ASTM F1967-13 provides a formula for the baby wash solution that is used in testing, and states the contact information for a specific manufacturer of the solution.  However, the company listed is no longer in business. ASTM F1967-18 lists two name-brand baby wash products readily available for purchase.  We consider this change neutral to the safety of infant bath seats.

*iii. Section 7.5 Static Load Test*

The 2018 ASTM standard also changed the static load test in section 7.5, to reflect the new Test Surface #3.  This change allows new types of products that are intended to be restrained by the sides of the tub, to be installed according to the manufacturer's instructions.  Adding a new test surface reduces ambiguity in the standard and leads to more consistent testing.  We consider the reduced ambiguity and increased consistency to improve the safety of infant bath seats.

The second change to Section 7.5.5 requires that a product be tested ". . . in all other manufacturer's recommended use positions."  The revised language improves safety by requiring products be tested in all manufacturer's use positions, not just in one position.  Typically, laboratories conduct testing in one position, usually what the laboratory considers to be the most onerous position.  This can lead to different results from different laboratories.  Adding the statement that testing should be ". . . in all other manufacturer's recommended use positions" will improve test-to-test and laboratory-to-laboratory repeatability.  We consider the reduced ambiguity and increased consistency to improve safety.

*iv. Section 7.6 Suction Cup Tests*

The suction cup test methods in section 7.6 also include the new Test Surface #3 and require testing of the product ". . . in all other manufacturer's recommended use positions."  As noted, testing "in all other manufacturer's recommended use positons" removes the possibility of different laboratories getting different testing results because of ambiguity.  Reduced ambiguity leads to improving test-to-test and laboratory-to-laboratory repeatability, resulting in more consistent, testing which improves testing

accuracy.  We consider the reduced ambiguity and increased consistency to improve safety.

### f. Marking and Labeling

Revisions to section 8 in the 2018 standard, regarding *Marking and Labeling,* include changes to the formatting and presentation of the warnings.  These revisions result from major changes ASTM initiated for juvenile products.  After publishing the 2013 version of the standard, ASTM convened a task group, ASTM Ad Hoc Wording Task Group (Ad Hoc TG), consisting of members of the various durable nursery products voluntary standards committees, including CPSC staff.  The purpose of the Ad Hoc TG is to harmonize the wording, as well as the warning format, across durable infant and toddler product voluntary standards.  Ad Hoc TG recommendations were published as a reference document, titled, "Ad Hoc Wording – May 4, 2016," as part of the F15 Committee Documents.

In addition to the formatting changes, the warning statement required by the 2018 ASTM standard includes a personalized warning using the words: "Stay in arms' reach of your baby," as opposed to: "ALWAYS keep baby within adult's reach."  Research suggests that personalizing warnings and instructions increase compliance.

The revisions in ASTM F1967 – 18 incorporate the Ad Hoc Wording recommendations.  Accordingly, we consider adopting the Ad Hoc Wording reference document recommendations and the more personal messaging as improvements to safety because they provide noticeable, personalized, and consistent warning labels on infant bath seats.

*g. Instructional Literature*

The requirements for *Instructional Literature* in section 9 of ASTM F1967–18 are expanded to include infant bath seat labeling requirements similar to the marking and labeling section of the standard.  Staff considers these changes to improve the safety of bath seats because they provide noticeable, personalized, and consistent instructional literature.

2.    <u>Differences between 16 CFR part 1215 and ASTM F1967-19</u>

ASTM F1967-19 revises two sections of the standard.  The first, a change to section 7.5.1, allows the static load tests to be conducted on any of the three test surfaces, rather than specify a particular test surface.  The second update removes Footnote #6 from the ASTM standard.  The standard already covers the same topic in Section 7.4.1.2, and the footnote was incomplete and confusing.  Both changes are neutral to the safety of bath seats.

**C. Incorporation by Reference**

The Office of the Federal Register (OFR) has regulations concerning incorporation by reference. 1 CFR part 51. Under these regulations, agencies must discuss, in the preamble to the final rule, ways that the materials the agency incorporates by reference are reasonably available to interested persons and how interested parties can obtain the materials. In addition, the preamble to the final rule must summarize the material. 1 CFR 51.5(b).

In accordance with the OFR's requirements, section B of this preamble summarizes the major provisions of the ASTM F1967-19 standard that the Commission incorporates by reference into 16 CFR part 1215. The standard is reasonably available to

interested parties, and interested parties may purchase a copy of the standard from ASTM International, 100 Barr Harbor Drive, P.O. Box C700, West Conshohocken, PA 19428-2959 USA; phone: 610-832-9585; www.astm.org. A copy of the standard can also be inspected at CPSC's Division of the Secretariat, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301-504-7923.

## D. The Congressional Review Act

The Congressional Review Act (CRA; 5 U.S.C. 801-808) states that, before a rule may take effect, the agency issuing the rule must submit the rule, and certain related information, to each House of Congress and the Comptroller General. 5 U.S.C. 801(a)(1). The submission must indicate whether the rule is a "major rule." The CRA states that the Office of Information and Regulatory Affairs (OIRA) determines whether a rule qualifies as a "major rule." Pursuant to the CRA, OIRA designated this rule as not a "major rule," as defined in 5 U.S.C. 804(2). In addition, to comply with the CRA, the Office of the General Counsel will submit the required information to each House of Congress and the Comptroller General.

## E. Certification

Section 14(a) of the CPSA requires that products subject to a consumer product safety rule under the CPSA, or to a similar rule, ban, standard, or regulation under any other act enforced by the Commission, be certified as complying with all applicable CPSC requirements. 15 U.S.C. 2063(a). Such certification must be based on a test of each product, or on a reasonable testing program, or, for children's products, on tests on a sufficient number of samples by a third party conformity assessment body accredited by

the Commission to test according to the applicable requirements. As noted, standards issued under section 104(b)(1)(B) of the CPSIA are "consumer product safety standards." Thus, they are subject to the testing and certification requirements of section 14 of the CPSA.

Because infant bath seats are children's products, samples of these products must be tested by a third party conformity assessment body whose accreditation has been accepted by the Commission. These products also must comply with all other applicable CPSC requirements, such as the lead content requirements in section 101 of the CPSIA, the tracking label requirement in section 14(a)(5) of the CPSA, and the consumer registration form requirements in section 104(d) of the CPSIA.

### F. Notice of Requirements

In accordance with section 14(a)(3)(B)(iv) of the CPSIA, the Commission has previously published a notice of requirements (NOR) for accreditation of third party conformity assessment bodies for testing infant bath seats (75 FR 31688, September 4, 2010). The NOR provided the criteria and process for our acceptance of accreditation of third party conformity assessment bodies for testing infant bath seats to 16 CFR part 1215. The NORs for all mandatory standards for durable infant or toddler products are listed in the Commission's rule, "Requirements Pertaining to Third Party Conformity Assessment Bodies," codified at 16 CFR part 1112.

CPSC staff from the Directorate for Laboratory Sciences, Division of Mechanical Engineering, analyzed testing revisions to the infant bath seat standard and found that the revised tests use existing equipment and similar testing protocols. Testing laboratories that have demonstrated competence for testing in accordance with ASTM F1967-13 will

have the competence to test in accordance with the revised standard ASTM F1967-19.

Therefore, the Commission considers the existing CPSC-accepted laboratories for testing

to ASTM F1967-13 to be capable of testing to ASTM F1967-19 as well.  Therefore, the

Commission considers the existing accreditations that the Commission has accepted for

testing to this standard also to cover testing to the revised standard.  Accordingly, the

existing NOR for this standard will remain in place, and CPSC-accepted third party

conformity assessment bodies are expected to update the scope of the testing laboratories'

accreditation to reflect the revised standard in the normal course of renewing their

accreditation.

## G.  Direct Final Rule Process

The Commission is issuing this rule as a direct final rule.  Although the

Administrative Procedure Act (APA) generally requires notice and comment rulemaking,

section 553 of the APA provides an exception when the agency, for good cause, finds

that notice and public procedure are "impracticable, unnecessary, or contrary to the

public interest."  5 U.S.C. 553(b)(B).  The Commission concludes that when the

Commission updates a reference to an ASTM standard that the Commission has

incorporated by reference under section 104(b) of the CPSIA, notice and comment is not

necessary.

Under the process set out in section 104(b)(4)(B) of the CPSIA, when ASTM

revises a standard that the Commission has previously incorporated by reference as a

Commission standard for a durable infant or toddler product under section 104(b)(1)(b)

of the CPSIA, that revision will become the new CPSC standard, unless the Commission

determines that ASTM's revision does not improve the safety of the product.  Thus,

unless the Commission makes such a determination, the ASTM revision becomes CPSC's standard by operation of law.  The Commission is allowing ASTM F1967-19 to become CPSC's new standard.  The purpose of this direct final rule is merely to update the reference in the Code of Federal Regulations so that it reflects accurately the version of the standard that takes effect by statute.  Public comment will not impact the substantive changes to the standard or the effect of the revised standard as a consumer product safety standard under section 104(b) of the CPSIA.  Under these circumstances, notice and comment are not necessary.  In Recommendation 95-4, the Administrative Conference of the United States (ACUS) endorsed direct final rulemaking as an appropriate procedure to expedite promulgating rules that are noncontroversial and that are not expected to generate significant adverse comment.  *See* 60 FR 43108 (August 18, 1995).  ACUS recommended that agencies use the direct final rule process when they act under the "unnecessary" prong of the good cause exemption in 5 U.S.C. 553(b)(B).  Consistent with the ACUS recommendation, the Commission is publishing this rule as a direct final rule because we do not expect any significant adverse comments.

 Unless we receive a significant adverse comment within 30 days, the rule will become effective on December 22, 2019.  In accordance with ACUS's recommendation, the Commission considers a significant adverse comment to be one where the commenter explains why the rule would be inappropriate, including an assertion challenging the rule's underlying premise or approach, or a claim that the rule would be ineffective or unacceptable without change.

Should the Commission receive a significant adverse comment, the Commission would withdraw this direct final rule.  Depending on the comments and other

circumstances, the Commission may then incorporate the adverse comment into a subsequent direct final rule or publish a notice of proposed rulemaking, providing an opportunity for public comment.

## H.  Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) generally requires that agencies review proposed and final rules for their potential economic impact on small entities, including small businesses, and prepare regulatory flexibility analyses.  5 U.S.C. 603 and 604.  The RFA applies to any rule that is subject to notice and comment procedures under section 553 of the APA.  *Id*.  As explained, the Commission has determined that notice and comment are not necessary for this direct final rule.  Thus, the RFA does not apply. We also note the limited nature of this document, which updates the incorporation by reference to reflect the mandatory CPSC standard that takes effect under section 104 of the CPSIA.

## I.  Paperwork Reduction Act

The standard for infant bath seats contains information collection requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520).  The revisions made no changes to that section of the standard.  Thus, the revisions will not have any effect on the information collection requirements related to the standard.

## J.  Environmental Considerations

The Commission's regulations provide a categorical exclusion for the Commission's rules from any requirement to prepare an environmental assessment or an environmental impact statement because they "have little or no potential for affecting the human environment."  16 CFR 1021.5(c)(2).  This rule falls within the categorical

exclusion, so no environmental assessment or environmental impact statement is required.

## K.  Preemption

Section 26(a) of the CPSA, 15 U.S.C. 2075(a), provides that where a consumer product safety standard is in effect and applies to a product, no state or political subdivision of a state may either establish or continue in effect a requirement dealing with the same risk of injury unless the state requirement is identical to the federal standard.  Section 26(c) of the CPSA also provides that states or political subdivisions of states may apply to the CPSC for an exemption from this preemption under certain circumstances.  Section 104(b) of the CPSIA refers to the rules to be issued under that section as "consumer product safety rules," thus, implying that the preemptive effect of section 26(a) of the CPSA would apply.  Therefore, a rule issued under section 104 of the CPSIA will invoke the preemptive effect of section 26(a) of the CPSA when it becomes effective.

## L.  Effective Date

Under the procedure set forth in section 104(b)(4)(B) of the CPSIA, when a voluntary standard organization revises a standard upon which a consumer product safety standard was based, the revision becomes the CPSC standard within 180 days of notification to the Commission, unless the Commission determines that the revision does not improve the safety of the product, or the Commission sets a later date in the *Federal Register*.  The Commission has not set a different effective date.  Thus, in accordance with this provision, this rule takes effect 180 days after we received notification from ASTM of revision to this standard.  As discussed in the preceding section, this is a direct

final rule.  Unless we receive a significant adverse comment within 30 days, the rule will become effective on December 22, 2019.

**List of Subjects in 16 CFR Part 1215**

Consumer protection, Imports, Incorporation by reference, Infants and children, Law enforcement, Safety, Toys.

For the reasons stated above, the Commission amends Title 16 CFR chapter II as follows:

**PART 1215 – SAFETY STANDARD FOR INFANT BATH SEATS**

1.  The authority citation for part 1215 continues to read as follows:

**Authority:** Sec. 104, Pub. L. 110-314, 122 Stat. 3016 (August 14, 2008); Sec 3, Pub. L. 112-28, 125 Stat. 273 (August 12, 2011).

2. Revise § 1215.2 to read as follows:

**§ 1215.2  Requirements for infant bath seats.**

Each infant bath seat shall comply with all applicable provisions of ASTM F1967-19, Standard Consumer Safety Specification for Infant Bath Seats, approved May 1, 2019.  The Director of the Federal Register approves the incorporation by reference listed in this section in accordance with 5 U.S.C. 552(a) and 1 CFR part 51.  You may obtain a copy of this ASTM standard from ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959 USA; phone: 610-832-9585; www.astm.org.  You may inspect a copy at the Division of the Secretariat, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301-504-7923, or at the National Archives and Records Administration (NARA).  For information on the availability of this material at NARA,

email fedreg.legal@nara.gov, or go to: www.archives.gov/federal-register/cfr/ibr-locations.html.


Dated: _____


_____

Alberta E. Mills, Secretary
U.S. Consumer Product Safety Commission



**UNITED STATES**
**CONSUMER PRODUCT SAFETY COMMISSION**
**4330 EAST WEST HIGHWAY, BETHESDA, MD 20814**

**Memorandum**

Date:   August 28, 2019

TO:              The Commission
                 Alberta E. Mills, Secretary

THROUGH:         Patricia M. Hanz, General Counsel
                 Mary T. Boyle, Executive Director
                 DeWane Ray, Deputy Executive Director for Safety Operations

FROM:            Duane E. Boniface, Acting Assistant Executive
                 Director  Office of Hazard Identification and
                 Reduction

                 Celestine T. Kish, Project Manager
                 Division of Human Factors, Directorate for Engineering Sciences

SUBJECT:         Notice of Revision to the Infant Bath Seats Standard 16 CFR Part 1215

## I.    INTRODUCTION

The Danny Keysar Child Product Safety Notification Act, *i.e.*, section 104 of the Consumer Product Safety Improvement Act of 2008 (CPSIA), instructs the voluntary standards organization, ASTM International (ASTM), to notify the U.S. Consumer Product Safety Commission (CPSC) of revisions to voluntary standards that are a basis for a consumer product safety standard promulgated by the Commission:

> *(B) COMMISSION ACTION ON REVISED VOLUNTARY STANDARD - If an organization revises a standard that has been adopted, in whole or in part, as a consumer product safety standard under this subsection, it shall notify the Commission.  The revised voluntary standard shall be considered to be a consumer product safety standard issued by the Commission under section 9 of the Consumer Product Safety Act (15 U.S.C. 2058), effective 180 days after the date on which the organization notifies the Commission (or such later date specified by the Commission in the Federal Register) unless, within 90 days after receiving that notice, the Commission notifies the organization that it has*

*determined that the proposed revision does not improve the safety of the consumer product covered by the standard and that the Commission is retaining the existing consumer product safety standard.*

In May 2019, ASTM International (ASTM) approved a revision to the voluntary standard for infant bath seats, *Standard Consumer Safety Specification for Infant Bath Seats* (ASTM F1967). Pursuant to section 104(b)(4)(B) of the CPSIA, ASTM notified the CPSC of the revision on June 25, 2019. CPSC staff has reviewed the revised voluntary standard, and we conclude that ASTM F1967 – 19 improves the safety of infant bath seats. Accordingly, staff recommends that the Commission allow ASTM F1967 – 19 to become a consumer product safety standard, effective 180 days from ASTM's June 25, 2019 notice, as provided in the CPSIA. Additionally, staff recommends updating the incorporation by reference for CPSC's corresponding mandatory rule on infant bath seats, codified at 16 CFR part 1215, by direct final rule.

This memorandum outlines the differences between the Commission's mandatory standard for infant bath seats, 16 CFR part 1215, and ASTM F1967 – 18 and ASTM F1967 – 19, ASTM's two revised voluntary standards since ASTM F1967 – 13, became the current mandatory standard. The memorandum explains staff's recommendation to allow the latest revision (ASTM F1967 – 19) to be considered the new safety standard issued by the Commission for infant bath seats.

## II.    BACKGROUND

On June 4, 2010, the Commission published a final rule for infant bath seats that incorporated by reference ASTM F1967 – 08a, *Standard Consumer Specification for Infant Bath Seats*, with certain modifications to make the standard more stringent. (75 FR 31691). On May 16, 2012, ASTM notified the CPSC that ASTM had approved and published a revised version of the infant bath seat standard, ASTM F1967 – 11a. The Commission voted unanimously to publish a *Federal Register* notice revising the Commission's infant bath seats standard to incorporate by reference the revised infant bath seat standard, ASTM F1967 – 11a, as the Commission's standard for infant bath seats. 77 FR 45242 (July 31, 2012).

On September 25, 2013, ASTM notified CPSC of ASTM's approval and publication of ASTM F1967 – 13, *Standard Consumer Specification for Infant Bath Seats*. The Commission voted unanimously to publish a *Federal Register* notice revising the Commission's infant bath seats standard to incorporate by reference the revised infant bath seat standard, ASTM F1967 – 13, as the Commission's standard for infant bath seats with an effective date of March 24, 2014. 78 FR 73692 (December 09, 2013). ASTM F1967 – 13 is the current mandatory standard.

As set forth below, CPSC staff reviewed the revised voluntary standard and concludes that the latest revised standard improves the safety of infant bath seats. Accordingly, staff recommends that the Commission allow the revised standard to take effect on December 22, 2019 (180 days after the June 25, 2019, notice from ASTM), and publish a direct final rule to update the incorporation by reference in 16 CFR part 1215 to reference ASTM F1967 – 19 as the mandatory standard.

## III.    DISCUSSION

### A.    *Review of Differences Between 16 CFR Part 1215 and ASTM F1967 – 18*

Since March 2014, when the CPSC incorporated by reference ASTM F1967 – 13 as the mandatory standard for infant bath seats, ASTM has revised the standard twice, in 2018 and 2019. These revisions not only update the standard to reflect clarifications to testing for consistency, the revisions also harmonize the format of warnings consistent with other juvenile product standards.

The major revisions made in ASTM F1967 – 18 are summarized below.

ASTM F1967 – 18 includes several changes that improve safety by clarifying testing. There are also several editorial changes, such as spacing, formatting, re-ordering, and renumbering, which do not change the safety of the infant bath seats. ASTM did not, however, notify CPSC of the 2018 changes because additional changes were under consideration soon thereafter, in 2019. Consequently, ASTM notify CPSC of the 2019 version, which includes the 2018 and 2019 changes, soon after publication.

1. *Scope*

The 2018 version of the ASTM standard adds language (Section 1.5), which ASTM intends to add to all of its standards, stating that ASTM developed the standard in accordance with principles recognized by the World Trade Organization. Staff concludes that adding this text does not change the safety of infant bath seats.

2. *Terminology*

The revised standard adds four new definitions to address changes the ASTM subcommittee made to achieve consistency across juvenile product safety standards, including defining the terms "conspicuous," "double action release system," "installation components," and "protective  component." Of these new terms, the definition of "double action release system" is significant because it clarifies the actions and the sequence necessary for a release mechanism to be considered a double action release mechanism. For that reason, staff

considers this new definition an improvement to the safety of the standard. The other new definitions are neutral to the safety of infant bath seats.

3. *General Requirements*

Section 5 *General Requirements* contains a number of minor editorial adjustments that are neutral to the safety of infant bath seats. Of note, however, is section 5.10, which states: *Infant bath seats must comply with applicable requirements of the Consumer Product Safety Improvement Act*. The purpose of this statement is to alert potential manufacturers to CPSIA requirements. Staff considers this statement to be neutral to the safety of infant bath seats because the product must comply with CPSIA, regardless of this requirement in the standard.

4. *Performance Requirements*

Section 6.1 *Stability* has a substantive change that involves moving wording from an explanatory note into the enforceable performance requirement. Specifically, Section 6.1.2.3 states: "*If the product would continue to tip over under the application of force, but it is prevented from doing so by the test platform interior side walls, it shall be considered a tip over.*" By defining the fixture contact in a performance requirement, as opposed to a non-mandatory note, the ASTM members more clearly defined the test requirements, which will reduce ambiguity in the standard and will lead to more consistent testing. Staff considers the reduced ambiguity for testing to be an improvement to safety because the testing will clarify what constitutes a failure when conducting the testing.

The other changes to the performance requirements in section 6 are editorial in nature: the changes separate the stability requirements and present a succinct modified decimal numbering system, as opposed to paragraph form. Staff considers these editorial changes in the performance requirement section to be neutral to the safety of infant bath seats.

5. *Test Methods (See Appendix A)*

a. *7.1 Latching and Locking Mechanism Tests*

Two different latching and locking test procedures (Section 7.1.1.1 and 7.1.2.1), in the 2018 version of the standard, reference a new test surface. The new "Test Surface #3" is defined as: "*(a)ny area on the side(s) of the test platform (for example, inside surface, outside surface, and top ledge), where safety tread strips are not applied.*" For testing purposes, new products that are restrained by the sides of the tub can now be installed and tested according to the manufacturer's instructions. The changes regarding the definition of a new test surface reduce ambiguity in the standard and will lead to more consistent testing. Staff considers the new test surface definition's increase in consistency in testing to improve safety.

    b.  7.4 *Stability Test*

Four changes to Section 7.4 *Stability Test* have been made to the voluntary standard:

- updates to the tub fixture test platform figures;
- new Test Surface #3;
- change to the applied force's orientation; and
- baby wash test solution availability.

   (1)  The new tub fixture test platform figures correct dimensioning errors, add a cross section drawing, define more clearly the location of the cross-sections, and add new dimensions to specify accurately the physical tub detailed in ASTM F1967 – 18 Footnote #5.  Adding the two new cross section drawings in this section required the rest of the figures in the standard to be renumbered accordingly.  These revised fixtures correct errors and increase accuracy and clarity, which staff considers an improvement to safety.

   (2)  The 2018 version of the ASTM standard adds a requirement for a new test surface and modifies the two existing test surfaces.  The 2013 version required testing on only two surfaces, and those two surfaces had to be ". . . *within the 24 in. (60.0 cm) length of uniform tub side ledge thickness. . .*"  The restrictive test surface definitions and the lack of a test surface on the side and end walls of the tub fixture test platform created a conflict between the test procedures and the manufacturer's installation instructions.  New products on the market engage with the side and end walls as part of the new products' retention system.  To reduce potential sources of test-to-test and laboratory-to-laboratory variation, the ASTM subcommittee decided to add Test Surface #3, which addresses tub fixture test platform's sides and end walls as a new test surface in Section 7.4.1.2.3.  The new language broadens the test procedures and allows for new designs of bath seats to be installed as per the manufacturer's instructions.  These changes reduce ambiguity in the standard and lead to more consistent testing.  Staff  considers the reduced ambiguity and increased consistency to improve safety.

   (3)  Section 7.4.3.8 states that the 17.0 lbf applied force shall be perpendicular to the test bar.  The 2013 revision stated that the force shall be horizontal.  During the stability test, many products deflect elastically, while remaining in the initial manufacturer's recommended use position.  As a product deflects elastically, the test bar rotates in the direction of the applied force.  If the test bar rotates, but the applied force remains horizontal, then the angle between the test bar and the applied force changes, reducing the torque applied to the sample.  In contrast, the 2018 version states that the applied force must be perpendicular to the test bar, causing the applied torque to remain nominally consistent as the product deflects elastically.  Staff concludes that applying a consistent torque is a more stringent test, and therefore, improves safety by testing products in a more severe manner.

(4) ASTM F1967 – 13 provides a formula for the baby wash testing solution and contact  information for a specific manufacturer of the solution; however, the company listed is no longer in business.  ASTM F1967 – 18 now lists two name brand baby wash products readily  available for purchase.  Staff considers this change neutral to the safety of infant bath seats.

    c.  7.5  *Static Load Test*

The static load test in section 7.5, similar to the stability test in section 7.4, is changed to reflect the new Test Surface #3. This change allows new types of products that are intended to be restrained by the sides of the tub, to be installed according to the manufacturer's instructions. Adding a new test surface reduces ambiguity in the standard and leads to more consistent testing.  Staff considers the reduced ambiguity and increased consistency to improve safety.

The second substantive change listed in Section 7.5.5 requires that a product be tested ". . . *in all other manufacturer's recommended use positions.*"  Technical staff concludes that the revised language improves safety by requiring products be tested in all manufacturer's use positions, not just in one position.  Typically, testing is conducted in one position, as determined by the testing laboratory to be the most onerous position.  This can lead to different results from different laboratories.  By adding the statement that testing should be ". . . *in all other manufacturer's recommended use positions.*"  The change also improves test-to-test and laboratory-to-laboratory repeatability.

    d.  7.6 *Suction Cup Tests*

The suction cup test methods in section 7.6 also includes the new Test Surface #3 and require testing of the product be tested ". . . in all other manufacturer's recommended use positions." As noted, testing ". . . in all other manufacturer's recommended use *positons*" removes the chance of different laboratories getting different testing results because of ambiguity.  Therefore, the safety of infant bath seats is improved by reducing ambiguity, improving test-to-test and laboratory-to-laboratory repeatability, leading to more consistent testing.

    6.  *Marking and Labeling*

Revisions to section 8 of the 2018 standard, regarding *Marking and Labeling,* include changes to the formatting and presentation of the warnings.  These revisions result from major changes ASTM initiated for juvenile products.  After publishing the 2013 version of the standard, ASTM convened a task group, ASTM Ad Hoc Wording Task Group (Ad Hoc TG), consisting of members of the various durable nursery products voluntary standards committees, including CPSC staff.  The purpose of the Ad Hoc TG is to harmonize the wording, as well as the warning format, across durable infant and toddler product voluntary standards.  The

Human Factors Division hazard communication subject matter expert, who also is the CPSC staff representative on the ANSI Z535 committee, represents CPSC staff in this task group. Ad Hoc TG recommendations were published as a reference document, titled, "Ad Hoc Wording – May 4, 2016," as part of the F15 Committee Documents. The approved Ad Hoc Wording reference document recommends language very similar to the ANSI Z535.4, with modifications to strengthen the Ad Hoc TG's recommendations.

In addition to the formatting changes, the statement includes a personalized warning with the use of the words: "Stay in arms' reach of your baby," as opposed to "ALWAYS keep baby within adult's reach." Research suggests that personalizing warnings and instructions increase compliance.

The revisions in ASTM F1967 – 18 incorporate the Ad Hoc Wording recommendations. Accordingly, staff considers adoption of the Ad Hoc Wording reference document recommendations and the more personal messaging as improvements to safety because they provide noticeable, personalized, and consistent warning labels on infant bath seats.

   7.  *Instructional Literature*

The requirements for *Instructional Literature* in section 9 of ASTM F1967 – 18 are expanded to include infant bath seat labeling requirements similar to the marking and labeling section of the standard. Staff considers these changes to improve the safety of bath seats because they provide noticeable, personalized, and consistent instructional literature.

   **B.    *Review of Differences Between 16 CFR Part 1215 and ASTM F1967 – 19***

The 2019 revision to the standard, ASTM F1967 *Standard Consumer Safety Specification for Infant Bath Seats*, updates two sections. The first update is to section 7.5.1, which allows the static load tests to be conducted on any of the three test surfaces rather than specify a particular test surface. The second update removes Footnote #6 from the standard. The standard already covers the same topic in Section 7.4.1.2, and the footnote was incomplete and confusing. Both changes are neutral to the safety of bath seats.

   **C.    *Staff's Assessment of the Revised Voluntary Standard***

Under section 104(b)(4)(B) of the CPSIA, unless the Commission determines that ASTM's revision to a voluntary standard that is a CPSC mandatory standard "does not improve the safety of the consumer product covered by the standard," the revised voluntary standard becomes the new mandatory standard. Staff's assessment, as discussed above, is that the changes made in ASTM F1967 – 19 will improve the safety of infant bath seats. Therefore, staff recommends that the Commission allow the revised voluntary standard to become effective as a mandatory consumer product safety standard under the statute, effective December 22, 2019.

### D.    Effect of the Changes on CPSC Acceptance of Third Party Testing Laboratories

The notice of requirements (NORs) set forth in the final rule for infant bath seats provided the criteria and process for the Commission's acceptance of accreditation of third party conformity assessment bodies for testing infant bath seats to 16 CFR part 1215 (incorporating ASTM F1967 – 13).  The NORs for all mandatory standards for durable infant or toddler products are listed in the Commission's rule, "Requirements Pertaining to Third Party Conformity Assessment Bodies," codified at 16 CFR part 1112.  CPSC staff from the Directorate for Laboratory Sciences, Division of Mechanical Engineering, analyzed testing revisions to the infant bath seat standard and found that the revised tests use existing equipment and similar testing protocols.  Testing laboratories that have demonstrated competence for testing in accordance with ASTM F1967 – 13 will have the competence to test in accordance with the revised standard.  Therefore, staff recommends that the Commission consider the existing CPSC-accepted laboratories for testing to this standard to cover testing to ASTM F1967 – 19 as well.  Accordingly, the existing NOR for this standard will remain in place, and CPSC-accepted  third party conformity assessment bodies would be expected to update the scope of the testing  laboratories' accreditation to reflect the revised standard in the normal course of renewing their  accreditation.

If the Commission approves the draft direct final rule, CPSC staff will notify all CPSC-accepted laboratories by direct email and will provide links to the *Federal Register* notice to explain the changes to the standard and the effective date.

### E.    Effective Date

Pursuant to section 104(b)(4)(B) of the CPSIA, because ASTM's revised standard improves the safety of infant bath seats, staff recommends that the Commission allow ASTM F1967 – 19 to be considered a consumer product safety standard issued by the Commission.  Staff supports an effective date that is 180 days from ASTM's notice of June 25, 2019, which would be December 22, 2019.

Furthermore, staff recommends that the Commission revise the incorporation by reference in 16 CFR part 1215 to reflect adoption of ASTM F1967 – 19 as the mandatory standard for infant bath seats.  Staff does not recommend a longer effective date for this update.  JPMA typically allows 6 months for products in their certification program to meet the requirements of a new voluntary standard after publication.  Therefore, juvenile product manufacturers are accustomed to adjusting to new voluntary standards within this time frame.  ASTM F1967 – 19 was

approved on May 1, 2019; so by December 22, 2019, manufacturers should already be producing products that meet this standard.

## IV.    RECOMMENDATION

Staff recommends that the Commission allow ASTM F1967 – 19 to become the CPSC-mandated standard and approve publication of a direct final rule in the *Federal Register* to revise the reference to ASTM F1967 – 19, with an effective date of December 22, 2019. Specifically, staff recommends that the Commission not determine that the revision  does not improve the safety of infant bath seats.

Appendix A



**UNITED STATES
CONSUMER PRODUCT SAFETY COMMISSION
4330 EAST WEST HIGHWAY, BETHESDA, MD 20814**

**Memorandum**

Date:   July 31, 2018

TO:             Celestine T. Kish, Project Manager
                Division of Human Factors, Engineering Sciences

THROUGH:         Andrew G. Stadnik, Associate Executive Director
                Directorate for Laboratory Sciences

FROM:            Michael A. Nelson, Division Director
                Division of Laboratory Science Mechanical, Laboratory Sciences

                Ian B. Hall, Mechanical Engineer
                Division of Laboratory Science Mechanical, Laboratory Sciences

SUBJECT:         Laboratory Science Mechanical Staff Assessment of Revisions to the
                Infant Bath Seats Standard 16 CFR Part 1215

## I.    INTRODUCTION

In May 2019, ASTM International (ASTM) approved a revision to the voluntary standard for infant bath seats, *Standard Consumer Safety Specification for Infant Bath Seats* (ASTM F1967). Pursuant to section 104(b)(4)(B) of the Consumer Product Safety Improvement Act (CPSIA), ASTM notified the CPSC of the revision on June 25, 2019.

This memorandum outlines the differences between the Commission's mandatory standard for infant bath seats, 16 CFR part 1215, and ASTM F1967 – 18 and ASTM F1967 – 19, ASTM's two revisions to the voluntary standard since the previous update to the mandatory standard. The memorandum explains staff's recommendation to allow the latest revision of the standard to be considered the new safety standard for infant bath seats.

## II.    BACKGROUND

The Infant Bath Seat regulation, at 16 CFR part 1215, published on June 4, 2010.  The Commission published a final rule for infant bath seats that incorporated by reference ASTM F1967 – 08a, *Standard Consumer Specification for Infant Bath Seats*, with certain modifications, to make the standard more stringent. (75 FR 31691).  Since then, the regulation was  updated twice by incorporating by reference ASTM F1967 – 11a (77 FR 45242 on July 31,  2012) and ASTM F1967 – 13, (78 FR 73692 on December 09, 2013).

As detailed below, CPSC staff reviewed the two most recent revisions of the voluntary standard and concludes that the latest revised standard, ASTM F1967 – 19, improves the safety of infant bath seats.  Accordingly, staff recommends that the Commission allow the revised standard to take effect within 180 days of the notice given by ASTM on June 25, 2019, and update the incorporation by reference in 16 CFR part 1215 to reference ASTM F1967 – 19 as the mandatory standard.

## III.    DISCUSSION

### A.    *Review of Differences Between 16 CFR Part 1215 and ASTM F1967 – 18*

Since CPSC incorporated by reference ASTM F1967 – 13 as the mandatory standard for infant bath seats, ASTM published 2018 and 2019 revisions to ASTM F1967 in December 2018 and May 2019, respectively.  These revisions update and clarify multiple sections of the voluntary standard.  Specifically, the substantive changes relate to the sections on Stability, Latching and Locking, Static   Load, and Suction Cups.

ASTM F1967 – 18 also includes non-substantive changes that do not affect safety, such as editorial clarifications and editorial reorganizations.

#### 1.    Changes to Standard

##### a)    Stability Test Method

The 2018 version of ASTM F1967 alters the stability performance requirement (Section 6.1) and test method (Section 7.4) with multiple changes to the standard.  The substantive changes include modifications to a performance requirement, adding a new test surface, and a change to the orientation of the applied force.

First, the ASTM membership chose to move wording from an explanatory note into an enforceable performance requirement.[1]  In ASTM F1967 – 18, Section 6.1.2.3 states, "If the product would continue to tip over under the application of force, but it is prevented from doing

---

[1] According to the ASTM Form and Style guide, notes are explanatory and not enforceable.
https://www.astm.org/FormStyle_for_ASTM_STDS.html

so by the test platform interior side walls, it shall be considered a tip over." By defining the fixture contact in a performance requirement, as opposed to a non-mandatory note, the ASTM members more clearly defined the test requirements, which will reduce ambiguity in the standard and will lead to more consistent testing. This change makes the performance criteria more severe and will improve safety.

Second, the 2018 version of the ASTM standard adds a new test surface and modifies the two existing test surfaces. The 2013 version tested on only two surfaces, and those two surfaces were overly constrained to be ". . . *within the 24 in. (60.0 cm) length of uniform tub side ledge thickness* . . ." The overly constrained test surface definitions and the lack of a test surface on the side and end walls of the tub fixture test platform created a conflict between the test procedures and the manufacturer's installation instructions. The updated language in the 2018 version eliminates this problem.

> *ASTM F1967 – 13 Section 7.4.3.1. Test Surface #1—Any area on the test platform within the 24 in. (60.0 cm) length of uniform tub side ledge thickness as described in 7.4.3 where commercially available adhesive backed safety tread strips (for bath tub use) have been applied as described in 7.4.3.3-7.4.3.6.*

> *ASTM F1967 – 13 Section 7.4.3.2. Test Surface #2—Any area within the 24 in. (60.0 cm) length of uniform tub side ledge thickness as described in 7.4.3 on the original test platform surface (smooth porcelain enamel). One test platform can be used for both test surfaces if there is sufficient space that allows for proper coverage areas as described in 7.4.3.3.*

> *ASTM F1967 – 18 Section 7.4.1.2 (1) Test Surface #1—Any area on the bottom surface of the test platform where safety tread strips are applied as described below.*

> *ASTM F1967 – 18 Section 7.4.1.2 (2) Test Surface #2—Any area on the bottom surface of the test platform where safety tread strips are not applied.*

> *ASTM F1967 – 18 Section 7.4.1.2.3. Test Surface #3—Any area on the side(s) of the test platform (for example, inside surface, outside surface, and top ledge), where safety tread strips are not applied.*

These changes eliminate the original inconsistency and allow products that attach to the tub's side walls to be installed as per the manufacturer's instructions and be tested according to the standard's procedure. Staff concludes that eliminating the conflict improves safety by reducing ambiguity in testing.

Finally, the 2018 version changes the orientation of the stability test's applied force relative to the test bar. Specifically, Section 7.4.3.8 of ASTM F1967 – 18 states that the 17.0 lbf applied

force shall now be perpendicular to the test bar.  The 2013 revision stated that the force  shall be horizontal.  During the stability test, many products deflect elastically, while remaining  in the initial manufacturer's recommended use position.  As a product elastically deflects, the  test bar rotates in the direction of the applied force.  If the test bar rotates but the applied force  remains horizontal, then the angle between the test bar and the applied force changes, reducing  the torque applied to the sample.  In contrast, the 2018 version states that the applied force must  be perpendicular to the test bar, causing the applied torque to remain nominally consistent as the product elastically deflects.

> *ASTM F1967 – 18 Section 7.4.3.8. Apply a 17.0 lbf (76.5 N) force to the test bar at distance D above the height H. Apply the force perpendicular to the test bar and outward from the center of the product over a period of 5 s (see Fig. 6). Maintain this force for an additional 10 s. If the product begins to release from the test surface, continue to maintain this force perpendicular to the test bar until the product either tips over or the 10 s time limit is attained.*

Staff concludes that applying a consistent torque results in a more stringent test; therefore, this improves safety by testing products in a more severe manner.

## b)    Latching and Locking

The 2018 version of ASTM F1967 updates two parts of the latching and locking test procedure. Specifically, the 2018 version modifies the definition of a "double action release mechanism" and  refers to the new test surface, "Test Surface #3," referenced in Section 7.4.1.2 *Stability Test*.

In Section 3.1.3 of ASTM F1967 – 18, the standard harmonizes the definition of a "double action  release mechanism" with the definition used in other juvenile products standards.  The new  definition clarifies the actions and the sequence necessary for a release mechanism to be considered a "double action release mechanism."  This is critical, because a double action release  mechanism, by its very presence, meets the criteria of ASTM F1967 – 18 Section 5.4.3. In the  2013 version of the standard, the definition wasn't clear and was open to interpretation.

Depending on the test lab's interpretation, the product could pass or fail the performance requirement.  With the updated definition in the 2018 version of the standard, the definition is clear, and the latching and locking test results are no longer defined by interpretation.

> *ASTM F1967 – 13 Section 7.1.2.2 Products With Double Action Release Mechanism— Each double action locking/latching mechanism shall require two distinct and separate actions for release of the mechanism.*
>
> .

> *ASTM F1967 – 18 Section 3.1.3 double action release system, n—a mechanism requiring either two consecutive actions, the first of which must be maintained while the second is carried out, or two separate and independent simultaneous actions to fully release.*

This change reduces ambiguity in the standard and eliminates the possibility that a test lab's interpretation of double action could change the test result.  Staff concludes that reducing ambiguity improves safety.

The second substantial change in the latching and locking test procedures are in Sections 7.1.1.1 and 7.1.2.1, where the 2018 version references the updated Test Surface #2 and the new Test Surface #3.

> *ASTM F1967 – 18 7.1.1.1 Install the product with the latching and locking mechanism(s) engaged in one of the manufacturer's recommended use positions on Test Surface #2 or Test Surface #3, or both, depending on the manufacturer's installation instructions (refer to Stability Test Method for test surface specification). Secure the product to the test surface(s) so that any collapsing motion is not impeded.*

> *ASTM F1967 – 18 7.1.2.1 Install the product in one of the manufacturer's recommended use positions on Test Surface #2 or Test Surface #3, or both (refer to Stability Test Method for test surface specification). Secure the product so that any collapsing motion is not impeded.*

These changes eliminate the 2013 version's conflict between the test procedures and the manufacturer's instructions, as detailed in the Stability section above.  Staff concludes that eliminating the conflict improves safety by reducing ambiguity.

### c)  Static Load Test Method

The 2018 revision of ASTM F1967 updates the static load test with two substantive changes. In particular, the 2018 version of the standard adds a new test surface and requires that the product be tested in all manufacturer recommended use positions.

The first change, in Section 7.5.1, references the updated Test Surface #2 and the new Test Surface #3. As stated in the Stability section above, the 2013 version's language created a conflict between the manufacturer's instructions and the test procedure.

86

> *ASTM F1967 – 18 Section 7.5.1 Install the product in one of the manufacturer's recommended use positions on Test Surface #2 or Test Surface #3, or both (refer to Stability Test Method for test surface specification).*

This change eliminates the 2013 version's conflict between the test procedures and the manufacturer's instructions, as detailed in the Stability section above. Staff concludes that eliminating the conflict improves safety by reducing ambiguity.

The second substantive change, listed in Section 7.5.5., requires that a product be tested ". . . *in all other manufacturer's recommended use positions.*" Technical staff concludes that the revised language improves safety by requiring products be tested in all manufacturer's use positions. The change also improves test-to-test and laboratory-to-laboratory repeatability, because products must now be tested in all manufacturer use positions.

### d)    Suction Cup Test Method

The 2018 revision of ASTM F1967 updates the suction cup tests with two substantive changes. The substantive changes mirror those listed in the Static Load Test Method, because the 2018 Suction Cup Test Method also references the updated Test Surface #2 and the new Test Surface #3. In addition, the new 2018 version requires testing to be conducted in all manufacturer use positions.

The first change, in Section 7.6.1.1, references the updated Test Surface #2 and the new Test Surface #3. As stated in the Stability section above, the 2013 version's language created a conflict between the manufacturer's instructions and the test procedure.

> *ASTM F1967 – 18 Section 7.6.1.1 Install the product in one of the manufacturer's recommended use positions according to the manufacturer's instructions onto Test Surface #2 or Test Surface #3, or both, depending on the manufacturer's installation instructions (refer to Stability Test Method for test surface specification) that has been prepared in accordance with the Stability Test Method surface preparation instructions in 7.4.3.1 through 7.4.3.3. Allow the product to soak for of 20 min.*

This change eliminates the 2013 version's conflict between the test procedures and the manufacturer's instructions, as detailed in the Stability section above. Staff concludes that eliminating the conflict improves safety by reducing ambiguity.

The second substantive change to the Suction Cup Attachment to Bath Seat test method, listed in Section 7.6.1.3, requires that a product be tested ". . . *in all other manufacturer's recommended  use positions.*" Technical staff concludes that the revised language will improve the safety of products by requiring products to be tested in all manufacturer's use positions. The change also  improves test-to-test and laboratory-to-laboratory repeatability, because products must now be   tested in all manufacturer use positions.

87

2.        **Editorial Changes**

The 2018 version includes a significant number of editorial changes, which, according to technical staff, did not affect consumer safety.  The non-substantive changes were editorial clarifications and editorial reorganizations of the original 2013 language and are beyond the scope of this memo.

B.        *Review of Differences Between ASTM F1967 – 18 and ASTM F1967 – 19*

The 2019 revision to the standard, ASTM F1967 *Standard Consumer Safety Specification for Infant Bath Seats*, updates two sections.  Both changes are non-substantive.

The first change allows the static load tests to be conducted on any of the three test surfaces, instead of specifying a particular test surface.  Staff believes this change is neutral relative to consumer safety.

> *ASTM F1967 – 18 Section 7.5.1 Install the product in one of the manufacturer's recommended use positions on any one or combination of the three test surfaces specified in 7.4.1.2 depending on the manufacturer's installation instructions.*

The second change removes Footnote #6 from the standard.  The standard had already covered the topic in Section 7.4.1.2, and the footnote created confusion among test laboratories.  Staff believes this change is neutral relative to consumer safety.

> *ASTM F1967 – 18 NOTE 6—Test Surfaces #2 and #3 may be used separately or simultaneously depending on the manufacturer's installation instructions.*

C.        *Staff's Assessment of the Revised Standard*

Under section 104(b)(4)(B) of the CPSIA, unless the Commission determines that ASTM's revision to a voluntary standard that is referenced in a mandatory standard "does not improve the safety of the consumer product covered by the standard," the revised voluntary standard becomes the new mandatory standard.  Staff's assessment is that the changes made in ASTM F1967 – 19 will improve the safety of infant bath seats covered by the standard.  Therefore, staff recommends that the Commission not make a determination that the revision does not improve the safety of bath seats.  Staff also recommends that the Commission issue the draft

*Federal Register* notice to specify ASTM F1967 – 19 as the new safety standard referenced in 16 CFR part 1215.  If the Commission allows this revision, the revised standard will become effective on December 22, 2019.



# U.S. CONSUMER PRODUCT SAFETY COMMISSION
### 4330 EAST WEST HIGHWAY
### BETHESDA, MARYLAND 20814-4408

Record of Commission Action
Commissioners Voting by Ballot*

Commissioners Voting:         Acting Chairman Ann Marie Buerkle
                              Commissioner Robert S. Adler
                              Commissioner Elliot F. Kaye
                              Commissioner Dana Baiocco
                              Commissioner Peter A. Feldman

ITEM:

ASTM's Revisions to Safety Standard for Infant Bath Seats
(Briefing package dated August 28, 2019, OS No. 5291)

DECISION:

The Commission voted unanimously (5-0) to approve publication of a *Federal Register* notice as
drafted, to issue a direct final rule updating the reference to the ASTM standard cited in the
Commission's rule for infant bath seats, 16 CFR part 1215.

                              For the Commission:

                              Alberta E. Mills
                              Secretary

*Ballot vote due September 4, 2019

⚘ New Civil Liberties Alliance

October 21, 2019

VIA REGULATIONS.GOV

Robert S. Adler
Acting Chairman
Alberta E. Mills
Secretary of the Commission
Keysha Walker
Compliance Officer
Office of Compliance and Field Operations
Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814-4408
Docket No. CPSC-2009-0064

Re:     *Revisions to Safety Standard for Infant Bath Seats*, Docket Number CPSC-2009-0064

Acting Chairman Adler:

The New Civil Liberties Alliance (NCLA) submits the following commentary in response to the direct final rule proposed by the Consumer Product Safety Commission (CPSC), *Revisions to Safety Standard for Infant Bath Seats*, 84 Fed. Reg. 49435 (Sept. 20, 2019) (*Proposed Rule*).

NCLA sincerely appreciates this opportunity to comment and express its concerns about the Proposed Rule. Due process, at a minimum, assumes that the public is adequately informed of its legal obligations before it can be held accountable for them. It offends basic notions of fairness for the public to be forced to pay for access to the law. But the Proposed Rule continues an odious trend of incorporating private standards into the law only by reference, thereby hiding the binding law behind a paywall. The Proposed Rule is therefore unconstitutional and must not be enacted as

written. This comment is intended to serve as a significant adverse commentary, which should require CPSC to withdraw the Proposed Rule.

## I. STATEMENT OF INTEREST

NCLA is a nonprofit civil-rights organization and public-interest law firm devoted to defending constitutional freedoms. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as jury trial, due process of law (which includes fair notice of legal obligations), the right to be tried in front of an impartial and independent judge, and the right to live under laws made by the nation's elected lawmakers through constitutionally prescribed channels. Yet these selfsame rights are also very contemporary—and in dire need of renewed vindication—precisely because Congress, federal administrative agencies, and sometimes even the courts have trampled them for so long.

NCLA views the administrative state as an especially serious threat to civil liberties. No other current aspect of American law denies more rights to more Americans. Although Americans still enjoy the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed to prevent.[1] This unconstitutional administrative state within the Constitution's United States is the focus of NCLA's attention.

Even where NCLA has not yet brought a suit to challenge an agency's unconstitutional exercise of administrative power, it encourages agencies themselves to curb the unlawful exercise of such power by establishing meaningful limitations on administrative rulemaking, adjudication, and enforcement. The courts are not the only government bodies with the duty to attend to the law. Even more immediately, agencies and agency heads have a duty to follow the law, not least by avoiding unlawful modes of governance. NCLA therefore advises that all agencies and agency heads must examine whether their modes of rulemaking, adjudication, and enforcement comply with the Administrative Procedure Act (APA) and with the Constitution.

## II. CPSC'S USE OF INCORPORATION BY REFERENCE

---

[1] *See generally* Philip Hamburger, *Is Administrative Law Unlawful?* (2014).

The Consumer Product Safety Act (15 U.S.C. § 2051 *et seq.*) requires manufacturers of products that are subject to the Consumer Product Safety Commission's authority to certify that the product complies with all applicable CPSC requirements. 15 U.S.C. § 2063(a). For children's products, the manufacturer must base this certification on tests of a sufficient number of samples by a third-party conformity assessment body accredited by CPSC to test according to the applicable requirements. *Id.* at § 2063(a)(2).

CPSC is required to set product safety standards for children's products. 15 U.S.C. § 2056a(b)(1). However, CPSC is authorized to promulgate standards that "are substantially the same as [] voluntary standards" set within the industry by private third parties. *Id.* at § 2056a(b)(1)(B)(i).

The Freedom of Information Act requires "each agency" to "make available to the public" and "separately state and currently publish in the Federal Register for the guidance of the public" "substantive rules of general applicability adopted as authorized by law." 5 U.S.C. § 552(a)(1)(D).

Nevertheless, "When agencies or legislatures incorporate private standards into law, they often do so by reference—that is, instead of spelling out the requirements of a standard within legislative or regulatory text, they reference the standard being incorporated and direct interested parties to consult that standard in order to understand their obligations." *Am. Soc'y for Testing & Materials, et al. v. Public.Resource.Org, Inc.*, 896 F.3d 437, 442 (D.C. Cir. 2018). To do so, the agency follows a process set out in 1 C.F.R. § 51.5(b), which allows the Director of the Federal Register to deem the rule published by reference "provided that the 'matter is reasonably available' to the class of persons affected[.]" *Id.* (quoting 1 C.F.R. § 51.5(b)(5)).

Reasonable availability does not always equate, in the Director's eyes, to *freely* available. *Id.* As of 2015, the CFR "contain[ed] nearly 9,500 'incorporations by reference' of standards." Nina A. Mendelson, *Taking Public Access to the Law Seriously: The Problem of Private Control over the Availability of Federal Standards*, 45 Envtl. L. Rep. News & Analysis 10776, 10766 (2015). For each, "An individual who seeks access to this binding law generally cannot freely read it online or in a governmental depository library, as she can the U.S. Code or the Code of Federal Regulations. Instead, she generally must pay a significant fee to the drafting organization, or else she must travel to Washington, D.C., to the Office of the Federal Register's reading room." Nina A. Mendelson, *Private*

*Control over Access to the Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 737 (2014).

CPSC has now proposed to incorporate one more private standard by reference. *See Proposed Rule*, 84 Fed. Reg. at 49435. Indeed, this proposed rule exists solely to update the reference to the ASTM International voluntary standard governing infant bath seats, and, rather than set out the standard in full, proposes to incorporate it by reference. *Id.* at 49436. And instead of informing the public of the precise requirements set by law, CPSC insists the law "is reasonably available to interested parties" for "purchase" "from ASTM International" or for "inspect[ion]" in person at CPSC'S office in Bethesda, MD. *Id.* at 49437-38. A copy of ASTM F1967-19 costs $56.00 to purchase. ASTM International, ASTM F1967-19, Standard Consumer Safety Specification for Infant Bath Seats, https://www.astm.org/Standards/F1967.htm.

## III. Incorporation by Reference Violates Due Process

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Due process under the Fifth and Fourteenth Amendments requires no less. *Id.*

The public must also have notice of the *laws* themselves. "[C]itizens must have free access to the laws which govern them." *Bldg. Officials & Code Adm. v. Code Tech., Inc.*, 628 F.2d 730, 734 (1st Cir. 1980); *see also Armstrong v. Maple Leaf Apartments, Ltd.*, 436 F. Supp. 1125, 1145 (N.D. Okla. 1977), *aff'd in part*, 622 F.2d 466 (10th Cir. 1979) ("The Court further concludes that the due process of law rights of the defendant as guaranteed by the Fifth Amendment of the United States Constitution were violated in the application to this case for the reason that Congress did not provide any reasonable means by which the defendants or their attorneys could have acquired notice or knowledge of the existence or content of the Act.) As James Madison wrote in Federalist No. 62, "It will be of little avail to the people that the laws are made by men of their own choice, if the laws be so voluminous that they cannot be read, or so incoherent that they cannot be understood; if they be repealed or revised before they are promulged, or undergo such incessant changes that no man who knows what the law is to-day can guess what it will be to-morrow. Law is defined to be a rule

of action; but how can that be a rule, which is little known and less fixed?" *The Federalist* 421 (Jacob E. Cooke, Ed.1961).

Making the law inaccessible is a trick of tyrants. *See* Suetonius, *The Lives of the Twelve Caesars, Caligula* 470 (1907) ("When taxes of this kind had been proclaimed, but not published in writing, inasmuch as many offences were committed through ignorance of the letter of the law, he at last, on the urgent demand of the people, had the law posted up, but in a very narrow place and in excessively small letters, to prevent the making of a copy.").

Indeed, courts have long recognized that limiting access to legal requirements offends basic precepts of due process. In *Banks v. Manchester*, 128 U.S. 244, 253-54 (1888) the Supreme Court easily concluded that judicial opinions could not be copyrighted, in part because of the "public policy" requirement that "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or a statute." More recently, also in copyright disputes, courts have recognized that "[d]ue process requires people to have notice of what the law requires of them so that they may obey it and avoid its sanctions. So long as the law is generally available for the public to examine, then everyone may be considered to have constructive notice of it; any failure to gain actual notice results from simple lack of diligence. But if access to the law is limited, then the people will or may be unable to learn of its requirements and may be thereby deprived of the notice to which due process entitles them." *BOCA*, 628 F.2d at 734; *see also Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 799–800 (5th Cir. 2002) (en banc) (following *Banks* and *BOCA*). Indeed, the D.C. Circuit Court of Appeals acknowledged the "serious constitutional concerns" raised by the unavailability of ASTM standards, while also deciding an issue of copyright law. *ASTM*, 869 F.3d at 441.[2]

The Federal Register and the Code of Federal Regulations were created to ensure that regulatory requirements would also be publicly and freely available. The New Deal's massive amount

---

[2] The related question concerning whether legal commentary is subject to copyright protection is currently pending before the United States Supreme Court. *See Code Revision Comm'n for Gen. Assembly of Georgia v. Public.Resource.Org, Inc.*, 906 F.3d 1229, 1232 (11th Cir. 2018) ("no valid copyright interest can be asserted in any part of the [Official Code of Georgia Annotated]"), *cert. granted sub nom. Georgia v. Public.Resource.Org, Inc.*, 139 S. Ct. 2746 (2019).

of new administrative regulations were mostly available only in "separate paper pamphlets;" creating "chaos" because the regulated public lacked easy access to legal obligations. Erwin Griswold, *Government in Ignorance of the Law—A Plea for Better Publication of Executive Legislation*, 48 Harv. L. Rev. 198, 199, 204-05 (1934). The situation was so bad that even the *government* lacked notice of regulatory requirements, and "was seriously embarrassed" when it brought major prosecutions to enforce regulations that had been repealed or altered. *The Federal Register and the Code of Federal Regulations-A Reappraisal*, 80 Harv. L. Rev. 439, 440-41 (1966). In one such instance, the Supreme Court observed, "Whatever the cause of the failure to give appropriate public notice of the change in the section, with the result that the persons affected, the prosecuting authorities, and the courts, were alike ignorant of the alteration, the fact is that the attack in this respect was upon a provision which did not exist." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 412 (1935). Publication in a single, freely available source was meant to solve this problem. *The Federal Register and the Code of Federal Regulations-A Reappraisal*, 80 Harv. L. Rev. at 440-41.

Incorporation by reference, in general, and CPSC's current attempt to incorporate by reference, in particular, violate the basic premise that the law should be freely accessible to everyone. "[R]egulatory beneficiaries of all sorts, as well as regulated entities, have a strong and direct interest in access to the content of regulatory standards—including [incorporated-by-reference] material—because it directly affects their interests and can potentially affect their conduct. Accordingly, if notice is to be effective, ready public access must be provided to anyone potentially affected by the law, not just to those who must comply." Mendelson, *Private Control over Access to Public Law*, 112 Mich. L. Rev. at 771. But CPSC proposes to issue legal requirements that will be binding on the industry, and affect consumers who use regulated products, that are *not* publicly available. Instead CPSC proposes that anyone seeking access to the contents of the law must either pay a private entity for the privilege, or make the trip to Bethesda, MD, for the right to simply see (but not copy) the law in the agency's reading room. *Proposed Rule*, 84 Fed. Reg. at 49437-38. This absurd policy is offensive to the most basic requirement that the law be knowable and is no better than placing the law "in a very narrow place and in excessively small letters, to prevent the making of a copy." *See* Suetonius, *The Lives of the Twelve Caesars, Caligula* 470.

CPSC's practice of incorporation by reference is also bad policy. CPSC should want its rules to be publicly available and known by all. Certainly regulated entities need to be aware of their legal

obligations, and it does not serve CPSC's interests to limit that access through a third party. Compliance, and ensuring consumer safety, are hardly furthered by *limiting* availability of safety standards. But consumers also need to know what CPSC has required of manufacturers. Consumers have an interest in knowing the safety standards governing their products, as it does them little good to know the product is compliant with a standard without knowing what that entails. For that matter, a consumer has no ability to confirm that a product is genuinely compliant without access to the underlying standard. It is unreasonable, moreover, to expect consumers to pay $56.00 for access to the ASTM standard for infant bath seats when the products themselves often cost far less. Finally, as was shown in the 1930s, even regulators might lose sight of the legal requirements if they are not freely accessible to all.

Of course, CPSC could avoid these problems by simply publishing the legal standard instead of incorporating it by reference. CPSC has no obligation to adopt the ASTM standards. And to the extent it wishes to adopt the ASTM standards, it always has the option of reproducing those standards in full in the Code of Federal Regulations. In order to protect fundamental constitutional rights, CPSC should amend its proposed rule and do so here.

Ultimately, CPSC should not continue to repeat the mistakes that led Congress to create the Federal Register and the Code of Federal Regulations. If the regulated public cannot discern its legal obligations, then the public has no hope of conforming its behavior to these requirements. Should CPSC nevertheless insist on incorporating the ASTM standard by reference despite these "serious constitutional concerns" *ASTM*, 869 F.3d at 441, NCLA will not hesitate to bring appropriate legal action to challenge the rule in court.

*     *     *

Thank you again for this opportunity to provide NCLA's views on this important issue. Should you have any questions, please contact Caleb Kruckenberg, Litigation Counsel, at caleb.kruckenberg@ncla.legal.

Sincerely,

**Caleb Kruckenberg**
Litigation Counsel
**Mark Chenoweth**
General Counsel
New Civil Liberties Alliance



## U.S. CONSUMER PRODUCT SAFETY COMMISSION
### 4330 EAST WEST HIGHWAY
### BETHESDA, MD 20814

OFFICE OF THE GENERAL COUNSEL

J. Gibson Mullan
General Counsel
Tel: 301-504-7066
E-Mail: jmullan@cpsc.gov

February 6, 2020

VIA EMAIL AND FIRST CLASS MAIL

Caleb Kruckenberg
Mark Chenoweth
New Civil Liberties Alliance
1225 19th Street, NW, Suite 450
Washington, DC 20036

*Re: Revisions to Safety Standards for Infant Bath Seats; CPSC Docket No. CPSC-2009-0064*

Dear Mr. Kruckenberg and Mr. Chenoweth:

We received your letter dated October 21, 2019, which you submitted to regulations.gov. You state that you intend the letter to be a significant adverse comment on the direct final rule (DFR) *"Revisions to Safety Standards for Infant Bath Seats"* (Docket Number CPSC-2009-0064). We are writing to advise you that despite the stated intent of your letter, we did not treat it as a significant adverse comment. Nor did we receive any other significant adverse comment on the DFR. Therefore, the direct final rule took effect on December 22, 2019.

Your letter seeks a change to a longstanding Commission practice relating to mandatory standards for durable nursery products. CPSC's standards for this class of products are based on voluntary standards. When the underlying voluntary standard is revised, the Commission can update its mandatory standard to reflect the change. If it chooses to accept the change, the Commission's practice has been to incorporate the revised voluntary standard by reference.

Your letter protests this practice of "incorporation by reference" as a violation of due process. You maintain that "CPSC could avoid these problems by simply publishing the legal standard instead of incorporating it by reference. CPSC has no obligation to adopt the ASTM standards. And to the extent it wishes to adopt the ASTM standards, it always has the option of reproducing these standards in full in the Code of Federal Regulations."

In reality, the Commission's options are far more limited. The options are limited both by our own organic statute and by the Office of the Federal Register.

Date Filed: 05/18/2020    Page: 94    Document: 15    Case: 20-1373

Case: 20-1373     Document: 15     Page: 95     Date Filed: 05/18/2020

To begin with, section 104 of the Consumer Product Safety Improvement Act (CPSIA) spells out a process for revision of durable nursery standards. Unlike CPSC standards for most other types of products, these standards are based on voluntary consensus standards. Specifically, CPSIA section 104(b) states that a standard for a durable nursery product must be "substantially the same as" an existing voluntary standard for the product in question, or more stringent than the voluntary standard "if the Commission determines that more stringent standards would further reduce the risk of injury associated with [the product]." 15 U.S.C. § 2056a(b)(1)(B).

In 2011, Congress amended section 104 to set out a process for updating these standards if the underlying voluntary standard is revised. When the Commission is notified of a revision, it has 90 days to consider the change. If the Commission determines that the revision to the voluntary standard will not improve the safety of the consumer product covered by the standard, the existing standard remains in effect. 15 U.S.C. § 2056a(b)(4)(B). If the Commission does not reject the change, however, the revised voluntary standard automatically becomes the mandatory CPSC standard. The revised mandatory standard then takes effect 180 days after notification to the Commission (or at a later date if the Commission specifies one).

Although this process does not obligate the Commission to accept all revised standards, it does limit the Commission's authority to veto a change. The Commission staff will often have participated in developing the revised voluntary standard, but section 104 does not give the Commission authority to rewrite the standard after notification--it can reject the revision only if it determines that the change does not improve safety.

This brings us to the second limitation relevant to your comment. The text of nearly all voluntary standards is protected by copyright. Therefore, the Commission cannot reproduce the standard in full as your letter suggests. Congress long ago recognized that it may not always be lawful to publish the full text of a rule in the Federal Register. For that reason, it provided in the Administrative Procedure Act that "matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register." 5 U.S.C. § 552(a).

In recent years, the Office of the Federal Register has been petitioned to limit the use of incorporation by reference and to require free access to the text of agency rules. The proponents of free availability have raised many of the same arguments as appear in your letter. In response, the OFR has tightened up its requirements for incorporation by reference, but it has steadfastly refused to take the further step of requiring free access. Instead, it has maintained that "recent developments in the Federal law, including the Veeck decision [*Veeck v. Southern Building Code Congress International, Inc.*, 293 F.3d 791 (5th Cir. 2002)] and amendments to FOIA, and the NTTAA [National Technology Transfer and Advancement Act of 1995] have not eliminated the availability of copyright protection for privately developed codes and standards that are referenced in or incorporated into federal regulations. Therefore, we cannot issue regulations that could be interpreted as removing copyright protection for [standards that are incorporated by reference]." Office of the Federal Register, Incorporation By Reference, 79 *Fed. Reg.* 66,267, 66,273 (Nov. 7, 2014).

Case: 20-1373     Document: 15     Page: 96     Date Filed: 05/18/2020

By the same token, this Commission also cannot ignore the copyright law or publish copyrighted material without permission of the copyright holder. Instead, the Commission follows the process specified by the Office of Federal Register for incorporation by reference. A key requirement is to ensure that the actual text of the standard is reasonably available to affected persons. The steps that we take to ensure reasonable availability are specified in the Federal Register notice announcing the update of our mandatory standard.

With regard to the particular standard on which you commented, ASTM notified the Commission of a revision to the voluntary standard for infant bath seats on June 25, 2019. To keep the revised ASTM standard from becoming the mandatory standard, the Commission would have to have determined that ASTM's revisions would "not improve the safety of the consumer product" within 90 days of that notification. That did not happen. Nor did the Commission specify a later effective date than the default provided by statute. Therefore, the revision to the mandatory standard took effect 180 days after ASTM's notification to the Commission by operation of law.

Given this statutory operation, the purpose of our Federal Register notice was to update the reference in the Code of Federal Regulations (CFR), so that interested persons would be aware of the version that is in effect, and to highlight the reasonable availability of the standard. If the agency did not update its incorporation by reference, the CFR would refer to a superseded standard instead of the version that has become effective. We appreciate your interest in providing notice to the public. However, given the process specified in section 104 of the CPSIA, not taking steps to reflect the correct version of the standard would actually reduce transparency.

In sum, we do not regard your letter as a significant adverse comment because, contrary to your position, the Commission does not have the option of publishing the revised mandatory standard instead of incorporating it by reference. CPSIA Section 104 generally requires us to base standards for durable nursery products on pertinent voluntary standards. The voluntary standard on which we based our mandatory standard in this case is one in which the responsible organization (ASTM) claims copyright. For that reason alone, it could not be published in the Federal Register. The Office of the Federal Register allows us to avoid a copyright violation by incorporating the ASTM standard by reference, provided that the standard itself is reasonably accessible. That procedure was followed here and approved by the Office of the Federal Register as stated in the rule.

As required by the OFR's regulations, the latest standard is reasonably available to interested parties, who may purchase a copy of the standard from ASTM. Interested parties can also inspect a copy of the standard free of charge at CPSC's offices in Bethesda.

Sincerely,

John Gibson Mullan

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Lisa Milice,                              :
                                          :    No. 20-1373
                                          :
       *Petitioner*,                      :
                                          :
              v.                          :
                                          :
Consumer Product Safety Commission,:
                                          :
                                          :
       *Respondent.*                      :

## **AFFIDAVIT OF PETITIONER LISA MILICE**

1. I am the Petitioner in this matter.

2. On March 6, 2020, I gave birth to my son, Callahan Milice Craft.

3. I am a consumer of durable infant and toddler products.

4. On January 10, 2020, I called the Consumer Product Safety Commission to
   inquire about viewing copies of safety standards that the Commission has
   incorporated by reference into its rules governing durable infant and toddler
   products.

5. I took contemporaneous notes of my phone call, and I relayed those notes to
   my attorney, Jared McClain, as soon as the call ended.

6. During my phone call on January 10, 2020, I spoke with a representative from
   the Consumer Product Safety Commission who advised me that "there is

absolutely no way" that I can view ASTM International standards for free, at the agency reading room or otherwise.

7. The representative told me that to get a copy of the standards I wished to view, I would have to contact ASTM International and pay for the standards.

8. My contemporaneous notes of my phone conversation confirm the substance of the phone conversation.


I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: May 11, 2020

_____

Lisa Milice

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| Lisa Milice, | : | |
| | : | No. 20-1373 |
| | : | |
| *Petitioner*, | : | |
| | : | |
| v. | : | |
| | : | |
| Consumer Product Safety Commission, | : | |
| | : | |
| | : | |
| *Respondent*. | : | |

## AFFIDAVIT OF COUNSEL JARED McCLAIN, ESQ.

1. I am an attorney licensed in the State of Maryland, in good standing with the Court of Appeals of Maryland. I am admitted to practice in the United States Court of Appeals for the Third Circuit.

2. I represent Petitioner Lisa Milice in *Milice v. CPSC*, No. 20-1373.

3. According to the rule at issue in this case, *Revisions to Safety Standard for Infant Bath Seats*, 84 Fed. Reg. 49435, 49438-39 (Sept. 20, 2019), "A copy of the [relevant] standard can also be inspected at CPSC's Division of the Secretariat, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301-504-7923."

4. On the afternoon of January 9, 2020, I called the Consumer Product Safety Commission Division of the Secretariat at the number provided in the proposed rule.

5. The purpose of my call was to clarify how to find CPSC's reading room and what steps I would have to take to view a copy of the standard.

6. Consistent with directions from CPSC published in public notices of proposed rulemaking, I planned to travel to Bethesda, Maryland, to view a copy of CPSC's Safety Standard for Infant Bath Seats as well as two other safety standards that CPSC has incorporated by reference into its rules.

7. I took contemporaneous notes of my call, which I forwarded to my co-counsel Caleb Kruckenberg following my phone call.

8. The representative of CPSC with whom I spoke told me that CPSC does not possess a copy of the full standards. She confirmed that there was no way for me to view the standard without paying the organization who produced the standard to see a copy.

9. My contemporaneous notes from that call memorialized that the representative of CPSC responded as follows to my inquiry: "Listen, I've been here for five years and we get calls about this every single day, and the answer is that if you want to see, you have to pay for it. Because we don't come up with them; the labs who come up with them have to make money somehow. So, there's only

limited information that we can provide for free.  They are private organizations and we have nothing to do with the prices they set."


I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: May 11, 2020

_____

Jared McClain

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this Appendix with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on May 18, 2020. Until further notice from this Court, NCLA has deferred filing paper copies based on the Court's March 17 Notice addressing the COVID-19 pandemic. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Respectfully,

/s/ Jared McClain
Jared McClain
New Civil Liberties Alliance
1225 19th Street NW, Suite 450
Washington, D.C. 20009
(202) 869-5210
Jared.McClain@NCLA.legal